**E.I. DUPONT DE NEMOURS AND COMPANY, Plaintiff,**

v.

**MONSANTO COMPANY, Defendant.**

**BASF CORPORATION, Plaintiff,**

v.

**E.I. DUPONT DE NEMOURS AND COMPANY, Defendant.**

Civ. A. Nos. 92–625(LON), 93–263(LON).

United States District Court,
D. Delaware.

Aug. 18, 1995.

Jack B. Blumenfeld, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware.

Richard Allen Paul, James A. Forstner, and Erin Kelly, of E.I. DuPont De Nemours & Company Incorporated, Wilmington, Delaware; Of Counsel: Stephen R. Smith, Christopher K. Hu, Michael P. Dougherty, Arnold I. Rady, John W. Osborne, Barry Schindler, John T. Gallagher, and Jean E. Shimotake, of Morgan & Finnegan, New York City; for E.I. DuPont De Nemours and Company Incorporated.

Josy W. Ingersoll, and Martin S. Lessner, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware; Of Counsel: Richard L. Mayer, Robert T. Tobin, Richard L. DeLucia, Richard S. Gresalfi, Michael D. Loughnane, Paul Richter, Donna Praiss, Lynne Darcy, of Kenyon & Kenyon, New York City; for BASF Corporation.

William J. Marsden, Jr., Joanne Ceballos, of Potter Anderson & Corroon, Wilmington, Delaware.

Steven J. Balick, of Ashby & Geddes, Wilmington, Delaware; Of Counsel: John F. Lynch, Susan K. Knoll, John C. Cain, and Michael E. Lee, of Arnold White & Durkee; Mark F. Wachter, John P. Foryt, of Monsanto Company; for Monsanto Company.

LONGOBARDI, Chief Judge.

## I. *NATURE AND STAGE OF THE PROCEEDINGS*

This is a consolidated action for patent infringement which for all practical purposes amounted to three separate trials divided into two phases. In the first phase of this case, BASF Corporation ("BASF") alleges that E.I. DuPont De Nemours and Company ("DuPont") infringes Claim 5 of United States Patent No. 4,374,641 ("the Burlone patent"), which is owned by BASF. DuPont denies infringement and contends that the Burlone patent is invalid.

In the second phase of this case, DuPont alleges that BASF and Monsanto Company ("Monsanto") infringe the process claimed in United States Patent No. 5,108,684 ("the Anton patent"), which is owned by Dupont. DuPont also contends that both BASF and Monsanto induce their common customer and indemnitee, CaMac Corporation ("CaMac"), to infringe the Anton patent, and that BASF's and Monsanto's alleged infringement is willful. Both BASF and Monsanto deny DuPont's charges of infringement, inducement, and willfulness and contend that the Anton patent is invalid.

A thirteen-day bench trial was held in this Court from July 11, 1994 through July 28, 1994. The first three days of trial were devoted to the Burlone phase of the case; the remaining ten days were devoted to the Anton phase. Throughout the course of the trial, the Court heard testimony from some twenty-nine live witnesses. Many additional witnesses testified by deposition. The trial transcript exceeds thirty-six hundred pages, and the exhibits admitted into evidence number in the hundreds. Post-trial briefing was completed on November 4, 1994.

This Opinion represents the Court's findings of fact and conclusions of law with respect to all issues. The Court's discussion is divided into two parts. First, the Court will address the issues related to the Burlone patent. The second part of the discussion will focus upon the Anton patent.

This Court has jurisdiction over the subject matter of the claims and counterclaims in this action pursuant to 28 U.S.C. § 1331, § 1338(a), § 2201, and § 2202. Venue is proper under 28 U.S.C. § 1391 and § 1400(b).

## II. *THE BURLONE PHASE*

### A. *Technological Background*

The technology at issue in this case relates generally to nylon fibers and, more specifically, to fibers known as "solution dyed nylon" fibers. Solution dyed nylon ("SDN") is also referred to as "producer colored" or "melt colored" nylon. One of the uses of these SDN fibers is to make commercial carpets.

## 1. *Nylon Carpet Fibers*

Nylon itself is a white, thermoplastic material that is included in a large class of chemicals called polymers. [Docket Item ("D.I.") 273 at 4]. It is made by connecting or "polymerizing" smaller chemical units known as monomers. (D.I. 293, Burlone, Tr. at 43).

Nylon carpet fibers are generally made from one of two types of nylon polymer: "nylon–6" or "nylon–6,6." BASF makes nylon–6 polymer and nylon–6 carpet fibers. (*E.g.,* D.I. 297, Hoyt, Tr. at 1649). Nylon–6 is a polymer made by polymerizing a single monomer called epsilon caprolactam. (D.I. 293, Tr. at 43; D.I. 287, at iv). DuPont makes nylon–6,6 polymer and nylon–6,6 carpet fibers. Nylon–6,6 is a polymer made by polymerizing two different monomers, namely, hexamethylene diamine and adipic acid. (D.I. 287, at iv). Both BASF and DuPont began making nylon and nylon fibers in the 1930s.

To make carpet fibers from nylon, chips of the nylon polymer are introduced at one end of a heated cylindrical device known as an extruder. (D.I. 293, Tr. at 45–47). As the chips melt, a screw-like device forces the resultant molten polymer to the opposite end of the extruder and through a plate that contains many small holes. The plate is referred to as a "spinnerette" and the process is referred to as "spinning." As the molten polymer is forced from the spinnerette, it is cooled, causing it to solidify into fibers.

## 2. *Solution Dyed Nylon Fibers*

Solution dyed nylon fibers are nylon fibers that are colored prior to the spinning process. The color pigments are added to the molten nylon in the extruder before the fibers are formed. (D.I. 295, Sandukas, Tr. at 628; D.I. 297, Hoyt, Tr. at 1648–49). SDN fibers were introduced into the carpet industry in 1970. Prior to 1970, carpet fibers were generally colored after they were spun by immersing them in baths containing various types of dyes. These nylon fibers that are marketed to be dyed are generally referred to as "white nylon."

The manner in which SDN fibers are commercially made was explained at trial through the use of a diagram that was marked and introduced into evidence as BTX–218–5. The diagram demonstrates generally that the blend used to make SDN fibers results from the addition into the extruder of one or more types of nylon and one or more types of pigment. According to the diagram, before the pigment is introduced into the extruder, it is first pre-blended with one or more types of nylon; the reason that the pigment is pre-blended is because adding pure pigment into the extruder is less effective. (D.I. 293, Tr. at 52). The initial pre-blend of pigment and nylon is referred to as a "color concentrate." The relative amount of pigment to other polymers in this color concentrate is about 25–35%. (D.I. 293, Tr. at 70). The color concentrate is then introduced into the extruder with the uncolored nylon. The relative amount of pigment to polymers in the final blend in the extruder, just prior to spinning, is typically around 1%. (D.I. 293, Tr. at 54–55). The pigment/polymer blend used to make SDN fibers provides those fibers with certain advantages over fibers that are dyed after the spinning process. For example, SDN fibers have a higher resistance to fading from sunlight and harsh cleaning agents such as bleach. (*See, e.g.,* D.I. 295, Sandukas, Tr. at 672).

## 3. *Catdye Nylon*

Catdye nylon, also called sulfonated nylon, is a nylon typically made by incorporating chemicals called aromatic sulfonates into the nylon polymer. (D.I. 293, Burlone, Tr. at 65). The presence of these sulfonates in the nylon polymer has the effect of rendering the nylon resistant to staining by acid dyes. (D.I. 293, Tr. at 66; D.I. 295, Tr. at 663, 667). Acid dyes are defined as:

> Negatively charged colorants that attach to dye sites (amine ends) in nylon polymer chains, and are repelled by negatively charged sulfonate groups in catdye nylon. Their attachment to nylon is called "dyeing" when desired and "staining" when not desired.

(D.I. 287, at iii). Thus, while acid dyes are purposefully employed as colorants for white

nylon carpet fibers, these same dyes, which are contained in items such as red fruit drinks, can also stain carpet fibers. The addition of sulfonate groups into the nylon polymer can therefore be used to impart acid-dye stain-resistance to nylon carpet fibers. By contrast, unsulfonated nylon accepts acid dyes very readily. (D.I. 293, Tr. at 66).

B. *The Burlone Patent*

Dominick Burlone was hired as a Research Chemist in 1976 by BASF (which was then called Dow Badische Corporation). (D.I. 293, Tr. at 42). At that time, BASF was in the carpet fiber business, and BASF manufactured its carpet fibers from nylon–6. (D.I. 293, Tr. at 43). One of Dr. Burlone's first research projects was to develop a commercial process to make solution dyed nylon–6 fibers. At that same time, according to Dr. Burlone, he was also asked to develop a commercial process to make a certain type of catdye nylon. Dr. Burlone's work in these two areas resulted in his discovery of the patented invention in 1978. On August 1, 1979, an application for a patent on Dr. Burlone's discovery was filed in the United States Patent & Trademark Office. This application was refiled on June 5, 1980, and ultimately issued in 1983 as the Burlone patent.

The Burlone patent (U.S. Patent No. 4,374,641) is entitled "Polymeric Color Concentrates for Thermoplastic Polymeric Materials." (JTX 1). Claim 1 of the patent provides:

1. A color concentrate for coloring thermoplastic polymeric materials, the concentrate comprising a blend of the following two essential components, from which blend any solvent present during processing is subsequently removed:

(A) A water- or polar organic solvent dispersible polycondensation or addition polymer polymerized from condensable or unsaturated monomers containing functional groups capable of solubilizing or dispersing the polymer in water or in polar organic solvents, and which is capable of being:

(1) utilized in the preparation of 1–95% solution or dispersion;

(2) recovered from 1–95% solution or dispersion thereof at a temperature which will not cause substantial volatilization or degradation thereof;

(3) fused at a temperature between about 130 degrees and 350 degrees C.;

(4) melted with the thermoplastic polymeric material to be colored without substantial degradation or reaction and without any visible separation therefrom on a microscopic scale; and

(5) utilized to wet the surface of pigments by adhesion thereto; and

(B) a heat-stable, chemically-inert coloring agent selected from the group consisting of: water-soluble dyes; polar organic solvent-soluble dyes; polymer-soluble dyes; and pigments, the coloring agent causing no visible chemical reaction with the thermoplastic material to be colored or the water- or polar organic solvent-dispersible polycondensation or addition polymer.

(JTX 1, col. 9, 11. 8–34; col. 10, 11. 1–5).

Claim 2 of the patent is dependent from Claim 1 and provides:

2. The color concentrate of claim 1, wherein component A is selected from the group consisting of: water- or polar organic solvent-dispersible polyamides; water- or polar organic solvent-dispersible polyesters; water- or polar organic solvent-dispersible vinyl polymers or copolymers; and water- or polar organic solvent-dispersible alkylene oxide polymers or copolymers.

(JTX 1, col. 10, 11. 6–12).

Claim 5 of the Burlone patent is dependent from Claim 2 and provides:

5. The color concentrate of claim 2, wherein the functional groups capable of solubilizing or dispersing component A in water or in polar organic solvents are selected from the group consisting of sulfo-

nate groups, phosphate groups, and polyglycol groups.

(JTX 1, col. 10, 11. 23–27).

In this case, BASF charges DuPont with infringement of Claim 5 of the Burlone patent. Claim 5, which is dependent from Claims 1 and 2, necessarily incorporates by reference all of the elements of Claims 1 and 2. *See AMP, Inc. v. Fujitsu Microelectronics, Inc.*, 853 F.Supp. 808, 828 (M.D.Pa.1994) (a dependent claim "incorporates by reference all of the elements of the claim on which it depends.").

Simply stated, Claim 5 discloses a color concentrate consisting of two components. The first component, defined by part (A) of Claim 1 and by Claims 2 and 5, is typically a sulfonated or catdye nylon.[1] The second component, defined by part (B) of Claim 1, is a coloring agent.

## C. *Arguments of the Parties*

### 1. *Infringement*

BASF alleges that the blend of pigment and catdye nylon–6,6 that DuPont uses to manufacture certain solution dyed nylon carpet fibers under the brand names ANTRON LUMENA, DSDN and 1850 Berber (collectively "LUMENA") directly infringes Claim 5 of the Burlone patent.[2] (*See, e.g.*, D.I. 293, Harris, Tr. at 281, 283).

Needless to say, DuPont denies that its products infringe the Burlone patent. Although DuPont does not dispute that: 1) Claim 5 of the Burlone patent discloses a color concentrate typically composed of catdye nylon–6 and colored pigment, and 2) the blend used to make LUMENA fibers contains catdye nylon–6,6 and colored pigment,

DuPont argues that the catdye nylon described in part (A) of Claim 1 of the Burlone patent is a "carrier" polymer for the pigment described in part (B), and this blend of components (A) and (B) constitutes Burlone's claimed "color concentrate." According to DuPont, it is this "color concentrate" which is then introduced into a "host" polymer for the purpose of coloring the host polymer. DuPont asserts that the claims of the Burlone patent are expressly directed to such "color concentrates for coloring thermoplastic polymeric materials" comprised of a blend of carrier polymer and coloring agent, and the claims do not cover the "host" polymer, *i.e.*, "the thermoplastic polymeric material to be colored". Thus, according to DuPont, its accused carpet fiber products and the blends from which they are spun are not color concentrates within the meaning of Burlone Claim 5 because its products are not used to color anything else; the LUMENA blend and fibers are, essentially, already-colored hosts. DuPont asserts further that, unlike the Burlone color concentrate, DuPont does not use a sulfonated carrier polymer (component (A)) which is then used to color a separate, unsulfonated host polymer; instead, DuPont uses a sulfonated nylon host polymer, which is not used to color anything.[3] In short, according to DuPont, the composition claimed in the Burlone patent is a color concentrate for coloring thermoplastic materials; LUMENA does not infringe the Burlone patent because neither the blend used to make LUMENA, nor the LUMENA fibers themselves are color concentrates for coloring thermoplastic materials. Moreover, according to DuPont, even if the sulfonated carrier polymer defined by component (A) of

---

[1]. Claims 2 and 5 recite further limitations on the polymer described in Claim 1(A). (D.I. 293, Harris, Tr. at 278).

[2]. The Court points out that the accused product in this case is the blend that is used by DuPont to manufacture its LUMENA fibers; BASF does *not* accuse DuPont's color concentrates of infringement. In fact, according to the testimony of Mr. Sandukas and Mr. Corey, DuPont does not even manufacture its own color concentrates; rather, DuPont purchases its color concentrates from a vendor. (D.I. 295, Sandukas, Tr. at 652–53, 684; D.I. 295, Corey, Tr. at 843). These color concen-

trates that DuPont uses do not include any sulfonated material. (D.I. 295, Tr. at 685).

[3]. DuPont's expert, Dr. Cohen, testified at trial that by accusing the LUMENA blend of infringement, BASF is saying that DuPont's LUMENA polymer, the sulfonated host polymer, is really the carrier polymer, component (A) of the Burlone claim. (D.I. 294, Cohen, Tr. at 500). DuPont argues, however, that its LUMENA polymer is not a carrier polymer by the definition of Dr. Burlone's claims; it is the host polymer, the thermoplastic material to be colored. (D.I. 294, Tr. at 500; D.I. 295, Tr. at 654).

the Burlone color concentrate could be compared to the sulfonated nylon host polymer that is used to make LUMENA, then DuPont's LUMENA would not infringe Claim 5 because it does not satisfy all of the elements of the claim.

In response, BASF argues that neither the term "host" nor the term "carrier" is recited in Claim 5 of the Burlone patent. BASF objects to the implication of these terms because it contends that the polymer described in part (A) of Claim 1 need not be a "carrier", and there need not be a specific thermoplastic polymeric material to be colored, i.e., a "host" polymer. (D.I. 293, Tr. at 199; D.I. 294, Tr. at 357–58, 396–97). Rather, BASF argues, the color concentrate claimed by the Burlone patent can be spun directly into fiber. Accordingly, BASF argues that whether a given composition is a color concentrate as defined by Dr. Burlone can only be determined by comparing the chemical components of that composition with the two essential components of the blend that are described in Claim 5 of the Burlone patent, and, BASF asserts, the blend used by DuPont to make LUMENA is the "color concentrate" defined by Claim 5 of the Burlone patent. Thus, BASF contends that the recitation in the preamble of the patent, "a color concentrate *for coloring thermoplastic materials*", is not an end-use limitation, and DuPont's attempt to impose an end-use limitation on Claim 5 is improper. (*E.g.*, D.I. 293, Tr. at 259). Furthermore, according to BASF, DuPont's LUMENA contains each element of Claim 5 of the Burlone patent. Specifically, BASF contends that the sulfonated nylon flake that DuPont uses to make the LUMENA fiber meets the requirements of component (A) of the Burlone blend, and DuPont's colored pigments meet the requirements of component (B). (D.I. 293, Tr. at 315–16; D.I. 294, Tr. at 396, 399).

## 2. *Invalidity*

DuPont contends that the Burlone patent is invalid. In support of this contention, DuPont argues that: 1) the claimed subject matter is identically disclosed in the prior art, such as U.S. Patent No. 3,849,377 (DTX 359); 2) the Burlone invention is obvious, and

3) the Burlone patent fails to comply with the best mode requirement of 35 U.S.C. § 112.

## D. *Analysis*

In resolving the disputes arising under the Burlone patent, the Court will first address the issues relating to BASF's allegations of patent infringement. The Court will then address the issue of invalidity raised by DuPont.

### 1. *Infringement*

Title 35 U.S.C. § 271(a) provides in part:

[W]hoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271 (1984 & Supp.1994). According to the Federal Circuit, the "issue of infringement raises at least two questions: (1) what is patented, and (2) has what is patented been made, used or sold by another." *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir.1983); *see also Rawlplug Co., Inc., v. Illinois Tool Works, Inc.*, 11 F.3d 1036, 1041 (Fed.Cir.1993); *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1578 (Fed.Cir.1988); *American Standard, Inc. v. Pfizer, Inc.*, 722 F.Supp. 86, 92 (D.Del.1989). Thus, the resolution of the issue of infringement is a two-step process. First, a court must determine the scope of the claims of the patent. *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 779 F.Supp. 1429, 1442 (D.Del.1991), *aff'd*, 980 F.2d 742 (Fed. Cir.1992). Then, once the scope of the claims is ascertained, the court must determine whether the defendant's allegedly infringing activity falls within the scope of the claims. *Id.* Claim construction is a question of law. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 866 (Fed.Cir.1985); *Fromson*, 720 F.2d at 1569; *Mobil*, 779 F.Supp. at 1442. The determination of whether a patented invention has been made, used or sold by another is a question of fact. *Fromson*, 720 F.2d at 1569. A plaintiff must establish infringement by a preponderance of the evidence. *Phillips Petroleum Co. v. United States Steel Corp.*, 673 F.Supp. 1278, 1344

(D.Del.1987), *aff'd,* 865 F.2d 1247 (Fed.Cir. 1989).

### a. *Claim Construction*

 To determine the "true meaning" of a disputed claim, a Court must examine: 1) the claim at issue; 2) the specification; and 3) the prosecution history. *ZMI Corp.,* 844 F.2d at 1579; *Loctite,* 781 F.2d at 867; *American Standard,* 722 F.Supp. at 92. The threshold requirement in claim construction is an examination of the language of the claim itself. *McGill, Inc. v. John Zink Co.,* 736 F.2d 666, 672 (Fed.Cir.), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984). In this regard, the "terms of a claim will be given their ordinary meaning, unless it appears that the inventor used them differently." *ZMI Corp.,* 844 F.2d at 1579. A court must construe the claim as it would be construed by one who is skilled in the art. *Loctite,* 781 F.2d at 867. To this end, the court could consider the testimony of experts; "[s]uch testimony is evidence of construction of the claims as they would be construed by those skilled in the art." *McGill,* 736 F.2d at 675; *American Standard,* 722 F.Supp. at 92.

Thus, in this case, to determine the scope of Claim 5 of the Burlone patent, the Court must resort to the language of the claim itself, the specification, and the prosecution history. In construing the claims, the Court will consider the trial testimony of the various experts.

### 1) *Claim Construction—The Claim Language*

 A patent claim typically has three parts: 1) the preamble; 2) the transition; and 3) the body. 2 Donald S. Chisum, *Patents* § 806[1][b] (1994). The preamble is "an introductory phrase that may summarize the invention, its relation to the prior art, or its intended use or properties." *Id.* It may also constitute a limitation on a claim. *Id.* The transition is a phrase containing a term such as "comprising" that serves to connect the preamble to the body of the claim. *Id.* The third part of a patent claim, the body, is composed of the recitation of the elements and limitations that "define the product or process to be encompassed within the patent monopoly." *Id.*

In this case, the Burlone patent is entitled "Polymeric Color Concentrates for Thermoplastic Polymeric Materials." (JTX 1). Claim 5 of the Burlone patent recites: "The color concentrate of claim 2 ..." Claim 2 in turn recites: "The color concentrate of claim 1 ..." Claim 1, the only independent claim of the Burlone patent, begins with the following preamble: "A color concentrate for coloring thermoplastic polymeric materials ..." One of the fundamental disputes between the parties in this case revolves around the meaning of the term "color concentrate" and the effect that should be given to the language of the preamble: "color concentrate for coloring thermoplastic polymeric materials."

DuPont contends that: 1) the ordinary meaning of "color concentrate" is a blend of a carrier polymer and a concentrated amount of pigment that is used to color something else, a host polymer, and 2) the language of the Burlone patent supports this ordinary construction of the term. Based upon the language of the claims and, particularly, the language of the preamble of Claim 1 as incorporated into Claim 5, DuPont contends that the Burlone patent relates to "a specific kind of material, a polymer-based 'color concentrate' for coloring other polymeric materials." (D.I. 278 at 2). In other words, DuPont contends that the preamble—"a color concentrate for coloring thermoplastic polymeric materials"—is a limitation on the claims of the patent, and that LUMENA does not infringe the Burlone patent because LUMENA does not meet this limitation. According to DuPont, LUMENA is not a "color concentrate" as the term is understood both in the art and in the Burlone patent, and it is not used to color thermoplastic materials. Rather, LUMENA is an already-colored host polymer that is not used to color any other material.

BASF contends, on the other hand, that the preamble of the claims does not impose any such end-use limitation on the color concentrate described in Claim 5. Rather, according to BASF, "if a composition contains the components described by the claims of

the Burlone patent, that product is a 'color concentrate,' and is covered by the patent, no matter what name or label may be applied to it by someone else, or how it may be used." (D.I. 273 at 23). In other words, the Burlone "color concentrate" must be interpreted as Dr. Burlone defined it in his patent, and if a composition contains the two components recited by the claims of the Burlone patent, catdye nylon and colored pigment, then that product is a Burlone "color concentrate," regardless of whether it is ultimately used to "color thermoplastic polymeric materials."

■■■■ Thus, the first issue to be resolved in construing Claim 5 of the Burlone patent is whether the preamble recitation, "a color concentrate for coloring thermoplastic polymeric materials", is a limitation on the claim. It is well-settled that the "preamble of a claim does not limit the scope of the claim when it merely states a purpose or intended use of the invention." *In re Paulsen*, 30 F.3d 1475, 1479 (Fed.Cir.1994). Nevertheless, "terms appearing in a preamble may be deemed limitations of a claim when they 'give meaning to the claim and properly define the invention.'" *Id.* (quoting *Gerber Garment Technology, Inc. v. Lectra Systems Inc.*, 916 F.2d 683, 688 (Fed.Cir.1990)). There is, however, no "litmus test" to determine when the introductory words of a claim, the preamble, constitute an additional limitation of the claim, or when the words represent mere introductory language. *Id.; Corning Glass Works v. Sumitomo Electric, Inc.*, 868 F.2d 1251, 1257 (Fed.Cir.1989). Rather, the issue of whether a preamble constitutes a claim limitation must be determined on the facts of each case in light of the claimed invention as a whole. *In re Stencel*, 828 F.2d 751, 754 (Fed.Cir.1987). The effect that should be accorded to the words contained in a preamble "can be resolved only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *Corning Glass Works*, 868 F.2d at 1257. The terms of a claim must be given their ordinary meaning, unless it appears that the inventor used them differently. *ZMI Corp.*, 844 F.2d at 1579. In this regard, the Federal Circuit has recently stated that:

[T]he focus in construing disputed terms in claim language is not the subjective intent of the parties to the patent contract when they used a particular term. Rather the focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean.

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 986 (Fed.Cir.1995).

DuPont's expert, Dr. Cohen, testified as to his pre-lawsuit understanding of what a color concentrate is:

[A] color concentrate is a concentrated mixture, blend, of a pigment or colorant, it could be a dye, in a carrier vehicle. A small amount of that is usually added to a material to be colored. And when you do that, you impart a predetermined color to that material to make a final product.

(D.I. 294, Cohen, Tr. at 472). With regard to the amount of colorant by weight that is typically contained in commercial color concentrates, Dr. Cohen testified that such commercial color concentrates typically contain "ten, fifteen percent or greater", but in any event, "as much [colorant] as possible." (D.I. 294, Tr. at 472, 494–95). Dr. Cohen also testified that his understanding of color concentrates was consistent with the definition provided by Robert A. Charvat in an article entitled "Introduction to Color Concentrates For Plastics" that appeared in the July/August 1968 issue of *Color Engineering*. In that article, Mr. Charvat defined a color concentrate as:

[A] resin in which a high concentration of a single pigment or combination of pigments has been dispersed. When a specified quantity of the concentrate is mixed with a specified quantity of natural (uncolored) resin, a predetermined color should be produced. Pigment colors may be as low as 10 percent or as high as 70 percent with the remaining portion being a polymer designed to work with a specific polymer family.

(DTX 250; D.I. 204, Tr. at 473–74). A "resin" is a polymer. (D.I. 293, Tr. at 207). According to Dr. Cohen, color concentrates are typically mixed with a fiber-forming host polymer, and then the mixture is spun into

fiber. (D.I. 294, Tr. at 473). Based upon his review of the Burlone patent and the prosecution history, Dr. Cohen opined that Dr. Burlone used the term "color concentrate" in his patent as the term had been understood by those skilled in the art. (*See, e.g.,* D.I. 294, Tr. at 480).

Like DuPont's Dr. Cohen, BASF's witnesses, Dr. Burlone and Dr. Harris, each testified as to his understanding of the term "color concentrate" in 1979, prior to the Burlone invention. According to them, the two basic components of a color concentrate as understood in the art were: 1) a colorant, *i.e.,* a pigment or dye, and 2) a vehicle polymer to disperse and carry that colorant. (D.I. 293, Tr. at 50; D.I. 294, Tr. at 395). With regard to the level of pigment that was typical of color concentrates in the art, Dr. Burlone testified that the lower limit on pigment levels in traditional color concentrates was typically about 25% or 35%.[4] (D.I. 293, Tr. at 53). It is BASF's position that, in contrast to these lower levels of pigment that were typical of traditional color concentrates (*i.e.,* 25% to 35%), Claim 5 of the Burlone patent discloses a composition containing pigment levels from 1% to 70%. According to BASF, traditional color concentrates that are intended for use in adding color to other materials are not typically sold at the level of 1% pigment; rather, such 1% blends are typical in the art of blends that are spun directly into fiber. (D.I. 293, Tr. at 54, 255; D.I. 287, at 4). Thus, BASF argues, because the Burlone patent specifically claims pigment levels at 1%, it follows that Dr. Burlone

did not use the term "color concentrate" in his patent as the term had been understood by those skilled in the art. (*E.g.,* D.I. 293, Tr. at 284; D.I. 294, Tr. at 392). Instead, Dr. Burlone defined his color concentrate in a different way than had been understood in the art, and DuPont's LUMENA infringes the color concentrate as defined in the patent.[5] According to BASF, because Dr. Burlone specifically described his "color concentrate" as having pigment levels from 1% to 70%, his claimed color concentrate, unlike traditional color concentrates that may have been limited in use to coloring other materials, is capable of being spun directly into fiber at its lower pigment levels. (D.I. 293, Tr. at 186, 286). In support of this contention that the Burlone color concentrate is not limited to "coloring thermoplastic polymeric materials" and, in fact, can be spun into fiber at claimed 1% pigment levels, BASF points to the trial testimony of Dr. Burlone and Dr. Harris. (*See, e.g.,* D.I. 293, Tr. at 73–74, 284; D.I. 294, Tr. at 384, 392). BASF also points to several places in the text of the patent wherein pigment levels from 1 to 70 percent are described.[6] (D.I. 273, at 11; JTX 1, col. 3, 11. 28, 34,; col. 10, 1. 16).

After careful consideration of the language of the claims and the testimony of the experts at trial, the Court finds that the phrase in the preamble of Claim 1 of the Burlone patent as incorporated through Claim 5, "a color concentrate for coloring thermoplastic polymeric materials", is not merely introductory in nature but rather, "breathes life and meaning into the claims and, hence, is a

---

4. Dr. Harris testified that he did not know whether anyone had ever specified what the pigment level in a color concentrate is. (D.I. 294, Tr. at 394).

5. Dr. Harris testified at trial that the level of pigment recited by Claims 1, 2, and 5 of the Burlone patent is satisfied by the pigment content in the LUMENA, DSDN, and Berber blends. (D.I. 293, Harris, Tr. at 284).

6. The "1 to 70 percent pigment" language is found in at least four places in the Burlone patent. First, the specification provides: "very beneficial results are obtained when the coloring agent is a pigment, which is present in the color concentrate in an amount sufficient to provide from about 1 to 70 percent by weight thereof ..." (JTX 1, Tab 1, col. 3, 11. 26–30). The specification also states that "[e]qually beneficial

results are achieved, moreover, if the coloring agent is a dye, which is present in the color concentrate in an amount sufficient to provide about 1 to 70 percent by weight thereof ..." (*Id.,* 11. 31–34). Third, Claim 3 of the patent recites: "The color concentrate of Claim 2, wherein the coloring agent is a pigment, which is present in the color concentrate in an amount sufficient to provide from about 1 to about 70 percent by weight thereof ..." (*Id.,* col. 10, 11. 13–16). Claim 4 also includes the "1 to about 70 percent" pigment language. (*Id.,* col. 10, 1. 21). In addition to the patent text itself, the patent examiner stated in his reasons for allowance of the Burlone patent that "Component B (1–70 wt%) consists of a non-reactive dye ..." (JTX–2–C, ¶ 3).

necessary limitation to them." *See Loctite,* 781 F.2d at 866. The testimony of DuPont's Dr. Cohen demonstrates that the way he understood the term "color concentrate" prior to this lawsuit was as a mixture of a high concentrate of pigment and another substance that is used to color something else. The express language of the Burlone claims reveals that Dr. Burlone did not ascribe a different meaning to the term "color concentrate" than that which had been understood by those in the art, such as Dr. Cohen. In particular, the preamble is entirely consistent with Dr. Cohen's testimony regarding the ordinary construction of the term "color concentrate" because the preamble discloses a color concentrate "for coloring thermoplastic polymeric materials." That the preamble breathes life into the claims of the patent is evident in subpart (A)(4) and part (B) of Claim 1. Subpart (A)(4) imposes the limitation that the claimed concentrate must be capable of being "melted with *the thermoplastic material to be colored* without substantial degradation or reaction ..." Clearly, the preamble language is absolutely necessary to give meaning to subpart (A)(4) of Claim 1 because, if the preamble language were not present, then the "thermoplastic material to be colored" in subpart (A)(4) would be meaningless. In other words, if the preamble did not disclose a color concentrate *for coloring thermoplastic polymeric materials* and, if such an end-use were not, in fact, built into the claim, then the property described in subpart (A)(4), capable of being "melted with *the thermoplastic material to be colored*", would make no sense; if there were no material to be colored, then there would be no way to test the property that is recited in subpart (A)(4). Said yet another way, subpart (A)(4) of Claim 1 cannot be read independently of the preamble; the preamble is essential to give definition to subpart (A)(4) of Claim 1. In short, every element of a claim is "material and essential" and, in Claim 1, the preamble is necessary to give meaning and effect to subpart (A)(4).[7] *See Environmental Instruments, Inc. v. Sutron Corp.,* 877 F.2d 1561, 1564 (Fed.Cir. 1989) (words of a claim "have meaning and must be given effect."); *Lemelson v. United States,* 752 F.2d 1538, 1551 (Fed.Cir.1985) ("each element of a claim is material and essential").

Similarly, the preamble is necessary to give meaning to part (B) of Claim 1. Part (B) defines the second essential component of the Burlone color concentrate: "a heat-stable, chemically-inert coloring agent ..., the coloring agent causing no visible chemical reaction with *the thermoplastic material to be colored* ..." Again, as in subpart (A)(4), the language of the preamble is necessary to breathe life into this claim because, without the preamble, the language of part (B) is meaningless. Like subpart (A)(4), part (B) cannot be read independently of the preamble. Furthermore, the language of part (B) makes clear that component (A) of the claimed color concentrate is separate from, and does not include, the material to be colored. Part (B) provides in part: "the coloring agent causing no visible chemical reaction with the thermoplastic material to be colored *or* the ... [polymer defined in part (A)]." (emphasis added). The "or" in Part (B) separates the thermoplastic material to be colored from the polymeric component (A), evidencing that the two materials are distinct from each other; to satisfy part (B), the coloring agent must not cause a visible chemical reaction with either one. (*See* D.I. 294, Tr. at 499). Even BASF's Dr. Harris conceded that such a distinction exists in part (B). (D.I. 294, Tr. at 402). Moreover, unlike elements (A)(1) through (A)(5) of Claim 1, the limitation described in part (B) does not

7. In this regard, Dr. Burlone's testimony that the limitation described in subpart (A)(4) is not always important and need not be met in every application of his invention is not credible. (D.I. 293, Tr. at 209–10). Dr. Burlone testified that if his claimed color concentrate is not going to be used to color anything else, then the limitation described in subpart (A)(4) of Claim 1, "capable of being melted with the thermoplastic polymeric material to be colored without substantial degradation or reaction ...", is a non-issue. Similarly, BASF's Dr. Harris testified that elements (A)(1) through (A)(4) of Claim 1 are properties of the invention that need not be utilized in every application. (D.I. 294, Tr. at 294). Both witnesses opined that the claimed invention need only have the *capability* of interacting with the thermoplastic material to be colored in the ways specified in subpart (A)(4) and part (B). The Court rejects this testimony.

follow the "capable of" language of part (A), and so, BASF's argument that the claimed invention need only have the *capability* of meeting the described limitations is unavailing as to part (B). (*See supra* note 7). In this regard, the Court rejects Dr. Harris's testimony that the limitation described in part (B) recites merely a capability of the claimed invention. (*See* D.I. 294, Tr. at 392).

At trial, Dr. Cohen testified that subpart (A)(4) and part (B) of Claim 1 of the Burlone patent would make no sense without the preamble. (D.I. 294, Tr. at 482–83). The Court agrees. Consequently, the Court finds that, based upon, *inter alia*, the testimony of Dr. Cohen, which the Court finds to be credible on this point, and the language of subpart (A)(4) and part (B) of Claim 1 of the Burlone patent, the preamble of Claim 1 as incorporated into Claim 5 gives meaning to the elements of the claim and is a necessary limitation to the claim. *See Schering Corp. v. Precision–Cosmet Co., Inc.*, 614 F.Supp. 1368, 1375 (D.Del.1985) (introductory phrase was a claim limitation because the phrase was essential to point out the subject matter defined by the claims).

In reaching this conclusion, the Court rejects BASF's argument that the phrase "for coloring thermoplastic polymeric materials" merely describes one possible usage of the claimed color concentrate.[8] Although a phrase in a preamble that merely states an intended use of the claimed invention is not a claim limitation, the language of the claims in the Burlone patent, particularly the language of subpart (A)(4) and part (B), unequivocally makes clear that the phrase "for coloring thermoplastic polymeric materials" is more than a mere intended use. The phrase is

necessary to define the claimed invention because it is only by reference to the preamble that the elements of the claim have meaning. Thus, notwithstanding the "1 to 70 percent pigment" language, subpart (A)(4) and part (B) of Claim 1 expressly define the claimed invention in terms of its properties in reference to the "thermoplastic material to be colored" of the preamble. Accordingly, based upon the claim language taken as a whole, the Court is unpersuaded by BASF's argument that the "1 to 70 percent pigment" language compels a finding that the disputed preamble phrase is merely an intended use and not a claim limitation.

The Court's conclusion in this regard is supported by the testimony of Dr. Cohen. Dr. Cohen testified that, although color concentrates in the art typically contained at least 10–15% pigment, it was his opinion that, based upon the claims and prosecution history of the Burlone patent, Dr. Burlone was claiming a color concentrate for coloring thermoplastic polymeric materials containing, at the extreme, pigment levels of 1%.[9] (D.I. 294, Tr. at 583–86). In other words, the fact that the Burlone patent recites pigment levels below 10% does not necessarily mean that Dr. Burlone used the term color concentrate in a different way than had been understood in the art, nor does it mean that the claimed color concentrate would be incapable of coloring thermoplastic polymeric materials at its lower pigment levels.[10] In short, the determination of the effect of the preamble can be resolved only on review of the entirety of the patent, and it is upon this basis that the Court rests its decision with regard to the effect of the Burlone preamble.

8. According to BASF, the Burlone color concentrate is not limited by the preamble because the concentrate need not be used to color another material; rather, it can be spun directly into fiber at its lower pigment levels. On this point, BASF relies principally upon the testimony of Dr. Harris and Dr. Burlone wherein they assert that, as evidenced by the specification and by the language of Claim 3, *see supra* note 6, the color concentrate claimed in the Burlone patent covers blends with pigment levels of about 1% to 70%.

To be sure, Claim 3 is not asserted against DuPont in this case; nevertheless, Dr. Harris testified at trial that the pigment levels recited in Claim 3 are useful to understand the pigment

levels of the color concentrate recited by Claim 1. (D.I. 293, Tr. at 319). Accordingly, he testified that the pigment levels of the color concentrate described in Claim 1 are also about 1% to 70%.

9. On this point, the Court finds the testimony of Dr. Cohen to be credible, and the Court rejects the testimony of Dr. Burlone and Dr. Harris.

10. In fact, Dr. Burlone conceded that his claimed color concentrate would be capable of coloring an uncolored polymer at its 1% pigment level. (D.I. 293, Tr. at 258; *see also* Harris, Tr. at 329).

The cases cited by BASF do not change this analysis. For example, BASF relies on *FunnelcaP, Inc. v. Orion Industries,* 421 F.Supp. 700 (D.Del.1976). There, the preamble of the patent at issue ("the Nowak patent") claimed:

1. A funnel, for use on a container, said container having a circular upper surface, a container flange upwardly directed from the periphery of the upper surface, and a container lip extending radially from the upper edge of the container flange, comprising:

[elements a through f].

*Id.* at 703. In support of its argument that the Nowak patent was not anticipated by the prior art, FunnelcaP argued that its patent claim was limited in its preamble to "funnels", and the term "funnel" necessarily connotes a conically-shaped device. *Id.* at 707. According to FunnelcaP, the prior art device did not constitute such a structure, and therefore, the Nowak patent was not anticipated. The Court rejected the patentee's argument, reasoning that a patentee is his own lexicographer, and Mr. Nowak defined his funnel in his patent as a "device comprising" elements (a) through (f). Because the prior art device read on all of those claim elements, the prior art device was a funnel within the meaning of the preamble of the Nowak patent. *Id.*

Based upon *FunnelcaP,* BASF argues that whether a given composition is a "color concentrate" as defined by Dr. Burlone can only be determined by comparing the chemical components of that composition with the two essential components of the blend described in Claim 5 of the Burlone patent. If the components of the blend in question conform to the components recited by that claim, then the blend is the "color concentrate" within the meaning of the Burlone patent.

The Court observes that *FunnelcaP* does not hold that a term in a preamble of a claim can never be a claim limitation. Rather, the *FunnelcaP* Court rejected the patentee's attempt to construe the preamble term "funnel" as a claim limitation because this construction was inconsistent with the patent specification, which revealed that the device was not limited to a conically shaped instrument. Similarly, in this case, the Court's construction of the preamble term "color concentrate" is completely consistent with Dr. Burlone's use of the term in his specification. (*See infra* section (D)(1)(a)(2)).

BASF also cites *Kropa v. Robie,* 187 F.2d 150, 152 (C.C.P.A.1951), for the proposition that a preamble is denied the effect of a limitation when it merely states a purpose or intended use of the invention. However, as discussed above, the preamble in this case does not merely state a purpose or intended use of the invention; rather, the preamble is necessary to define the invention. Moreover, according to the *Kropa* Court, a preamble is denied the effect of a limitation where the "portion of the claim following the preamble [is] a self-contained description of the structure not depending for completeness upon the introductory clause". *Id.* at 152. In contrast, the invention claimed by the Burlone patent most certainly depends upon the preamble for completeness and is "necessary to give life, meaning and vitality to the claims." *Id.*

None of the other cases relied upon by BASF compels a conclusion contrary to the Court's conclusion that the language of the Burlone patent claims supports a construction of the preamble as a limitation on the claims.[11] Nevertheless, the ordinary mean-

---

11. BASF also relies upon *Marston v. J.C. Penney Company,* 353 F.2d 976 (4th Cir.1965), *cert. denied,* 385 U.S. 974, 87 S.Ct. 515, 17 L.Ed.2d 437 (1966), where the Court held that the preamble of the claim did not limit the claims because, *inter alia,* the preamble was "not essential to a reading and understanding of the claim." *Id.* at 986. Thus, *Marston* is distinguishable from the Burlone preamble which is essential to a reading and understanding of subpart (A)(4) and part (B) of Claim 1. BASF cites *In re Sinex,* 309 F.2d 488 (C.C.P.A.1962), where the Court held that the phrase "for reconcentrating liquid dehydrating agents" was merely a statement of intended use and not a claim limitation. *Id.* at 492. However, every patent must be considered on an individual basis, and *In re Sinex* does not change this Court's finding that the Burlone preamble is a claim limitation. BASF's citations to *Data Line Corp. v. Micro Tech., Inc.,* 813 F.2d 1196 (Fed. Cir.1987); *DeGeorge v. Bernier,* 768 F.2d 1318 (Fed.Cir.1985); *In re Lundberg,* 280 F.2d 865 (C.C.P.A.1962); and *Dotolo v. Quigg,* 12 U.S.P.Q.2d 1032, 1989 WL 78137 (D.D.C.1989), are similarly unavailing.

ing of claim language does not end the inquiry. The Court must still resort "to the specification and prosecution history to determine if the inventor used the disputed terms differently than their ordinary accustomed meaning." *ZMI Corp.*, 844 F.2d at 1580.

### 2) *Claim Construction—The Specification*

■ It is well established that "[p]atent law allows an inventor to be his own lexicographer." *ZMI Corp.*, 844 F.2d at 1580. Thus, " 'the specification aids in ascertaining the scope and meaning of the language employed in the claims inasmuch as words must be used in the same way in both the claims and the specification.' " *Id.* (quoting *Autogiro Co. of America v. U.S.*, 384 F.2d 391, 397 (Ct.Cl.1967)); *see also McGill*, 736 F.2d at 674. Accordingly, the Court must ascertain how Dr. Burlone used the term "color concentrate" in the specification of his patent.

■ In the specification, Dr. Burlone repeatedly used the term "color concentrate" in reference to the coloring of thermoplastics. For example, in the Abstract of his patent, he described his invention as:

> **A color concentrate for coloring thermoplastic polymeric materials,** which is prepared from a blend of a . . . polymer and a . . . coloring agent. . . .

(JTX 1 at 1) (emphasis added). In delineating the field of his invention, Dr. Burlone stated that his invention

> relates generally to the coloring of thermoplastics. In particular, **it relates to the coloring of thermoplastics by the incorporation of color concentrates therein.**

(JTX 1, col. 1, 11. 11–14) (emphasis added). In discussing the prior art, he stated:

> However, coloring of fibrous materials through the use of color concentrates is a less common practice. . . . [T]he majority of color concentrates available today contain vehicles which are not totally compatible with, for instance, nylon, since **nylon is one of the fibers which is less commonly colored by the addition of color concentrates.**
>
> **Described here is the preparation of pigment or dye concentrates in vehicles**

**which are compatible with common fiberforming thermoplastic materials, in particular nylon.**

(JTX 1, col. 1, 11. 21–23, 30–38) (emphasis added). In the summary of the invention, Dr. Burlone stated:

> Concentrates according to the present invention are utilized with especially advantageous results **in coloring thermoplastic materials** which are employed in the production of synthetic textile fibers.

(JTX 1, col. 3, 11. 36–39) (emphasis added). Similarly, in the 18 examples provided in his patent, Dr. Burlone uniformly described the use of his color concentrate in coloring another polymer, and consistently distinguished his color concentrate from the material to be colored. For instance, Example 1 provides in part:

> **One part of the solid color concentrate was blended with 29 parts of uncolored nylon–6 polymer. . . .** This mixture was extruded into yarn. . . . Deeply colored blue fiber containing 1% pigment was obtained.

(JTX 1, col. 4, 11. 6–16) (emphasis added). Example 6 provides in part:

> **One part of the solid color concentrate was blended with 39 parts of uncolored nylon–6 polymer. . . .** The mixture was extruded into fiber as in Example 1 to obtain deeply colored golden fiber containing 1% colorant.

(JTX 1, col. 5, 11. 6–10) (emphasis added). Example 7 states that "One part of the solid color concentrate was blended with 24 parts of uncolored nylon–6 polymer . . ." (*Id.*, 11. 25–27). Example 10 provides: "One part of the color concentrate of Example 2 was blended with 29 parts of uncolored poly(ethylene terephthalate) . . ." (*Id.*, 11. 54–56). All of the remaining examples in the patent employ similar language and, significantly, none of the examples refers to the final colored product containing 1% pigment as a color concentrate. (*See* D.I. 293, Tr. at 224; D.I. 294, Tr. at 414–15; JTX 11). Instead, each of the examples refers to the final colored product as "colored fiber".[12]

---

**12.** According to the evidence presented at trial,

Example 17 of the Burlone patent, in which the

The repeated reference in the specification of the Burlone patent to the claimed "color concentrate" as a substance used to color another material indicates that Dr. Burlone did not employ the term "color concentrate" in a manner different from that which Dr. Cohen testified was understood in the art. (*See* D.I. 294, Tr. at 480). Rather, the specification patently demonstrates that the claimed color concentrate, a blend of pigment and carrier polymer, is directed to the use of color concentrates as that term had been used before in the art, *i.e.*, to color **another** material.[13] What is absent from the specification is any meaningful indication that the host polymer, that is, the material to be colored, was within the scope of Dr. Burlone's claimed invention.

Nevertheless, BASF maintains that the specification of the Burlone patent supports its construction of Claim 5 as covering a blend having pigment levels of 1% to 70%, which, at the 1% level, can be spun directly into fiber. (*See, e.g.*, D.I. 293, Tr. at 186). According to BASF, such 1% blends are literally embraced by Claim 5, which recites no numerical limit for the level of pigment in the blend.[14] (*See, e.g.*, D.I. 293, Tr. at 86–88, 319). In support of this contention, BASF argues that the examples in the patent expressly describe blends having 1% pigment levels. For instance, BASF cites to Example 1, where "One part of the solid color concentrate was blended with 29 parts of uncolored nylon–6 polymer . . . The mixture was ex-

truded . . . Deeply colored blue fiber containing 1% pigment was obtained." (JTX 2, col. 4, 11. 6–16). BASF argues that Example 1 describes a 1% blend that is "made by diluting the initial blend with nylon–6 in an extruder." (D.I. 273, at 11; D.I. 293, Tr. at 70).

The Court disagrees with BASF's construction of the patent examples. BASF argues that the examples in the specification disclose a Burlone color concentrate containing 1% pigment that is "made by diluting the initial blend" with the nylon–6 in the extruder. (*See* D.I. 293, Tr. at 79–81). Thus, it is BASF's position that the claimed color concentrate covers the initial blend of pigment and catdye polymer, *and* it covers the final blend after one part of the initial blend is "diluted" with 29 parts of the uncolored nylon.[15] (*See, e.g.*, D.I. 293, Tr. at 57, 73–75, 79–81; D.I. 294, Tr. at 412–13). This argument, that Burlone Claim 5 covers the final colored blend that is spun directly into fiber, is essentially an attempt to argue that the claimed color concentrate covers the "thermoplastic polymeric material to be colored" of subpart (A)(4) and part (B) of Claim 1. Such an argument is completely inconsistent with the patent specification, which repeatedly distinguishes between the "color concentrate" and the uncolored nylon, or polymer to be colored.[16] BASF cannot now rewrite the Burlone patent. The specification makes clear that the claimed "color concentrate" is a substance that is separate from the thermoplastic polymeric material to be colored.[17]

carrier polymer is plain Nylon–6, is not within the scope of Claim 1. (D.I. 294, Harris, Tr. at 373–74).

**13.** *See* D.I. 294, Cohen, Tr. at 477 ("every single example [of the Burlone patent] is directed toward the production of a color concentrate and its use.").

**14.** In contrast, DuPont contends that the claims of the Burlone patent have an "expressly-stated one-percent lower limit." (D.I. 294, Tr. at 495).

**15.** At trial, BASF characterized the claimed color concentrate as having two stages. At the "first blend" stage, the color concentrate is composed of catdye polymer and 25–35% pigment; at the "second blend" stage, the initial color concentrate is "diluted" with uncolored nylon to the level of 1% pigment. (*E.g.*, D.I. 293, Tr. at 74, 78–81; D.I. 294, Tr. at 335–36).

**16.** *See, e.g.*, JTX 1, Example 1 ("One part of the solid color concentrate was blended with 29 parts of uncolored nylon–6 polymer . . ."). Moreover, at trial, Dr. Cohen testified that "[t]hese colored products, or these final colored materials, are excluded [from the scope of the claims of the Burlone patent]." (D.I. 294, Cohen, Tr. at 488). In support of his assertion that the final colored products are not included within the scope of the Burlone color concentrate, Dr. Cohen discussed an entry in the 1968 *Kirk–Othmer Encyclopedia of Chemical Technology* wherein "very clear distinctions" are made among carrier polymers, host polymers to be colored, and final colored products. (D.I. 294, Tr. at 491–493; DTX 251 at 589–90).

**17.** *See also* part (B) of Claim 1 ("the coloring agent causing no visible chemical reaction with the thermoplastic material to be colored *or* the . . . [carrier polymer defined in part (A)].") (em-

The Court, therefore, rejects BASF's argument, as well as the supporting testimony of Dr. Burlone and Dr. Harris, as inconsistent with the patent specification.

Furthermore, the language in the specification and in Claim 3, wherein Dr. Burlone describes pigment levels from about 1 to 70 percent, does not change this Court's conclusion with regard to the effect of the preamble in this case. Notwithstanding the "1 to 70 percent pigment" language, *all* of the examples contained in the patent teach the addition of "one part of the solid color concentrate" to anywhere from 21 to 39 parts of an uncolored material. As discussed *supra*, subpart (A)(4) and part (B) of Claim 1 expressly define the claimed invention in terms of its properties in reference to the "thermoplastic material to be colored" of the preamble. Thus, based upon the entirety of the patent and its specification, and notwithstanding the "1 to 70 percent pigment" language, which the Court finds to be inconsistent with the patent claims and specification, the Court is unpersuaded by BASF's argument that the disputed preamble phrase states merely an intended use and not a claim limitation. Instead, the Court concludes that the specification of the Burlone patent supports a construction of the preamble as a limitation on the patent claims. *See In re Walles*, 366 F.2d 786, 790 (C.C.P.A. 1966) (introductory phrase "a composition for setting hair" was a claim limitation where the patent specification, including the discussion of the prior art and the examples, indicated that the invention was directed solely to compositions for setting hair).

### 3) *Claim Construction—The Prosecution History*

To interpret disputed claim language, the Court must also resort to extrinsic evidence, such as the prosecution history. *ZMI Corp.*, 844 F.2d at 1580. The " 'prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance.' " *Id.* (quoting *Stan-*

*dard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed.Cir.1985)). Like the specification, the prosecution history of the Burlone patent reveals that Dr. Burlone repeatedly distinguished his color concentrate from the host polymer to be colored. For example, in the August 1981 request for reconsideration, Dr. Burlone's representative distinguished the Burke reference as follows:

> As is clear from a study of the instant claims and the supporting specification, **the polymeric component A of the present invention is merely a carrier for the introduction of coloring component B into a host polymer.** Accordingly, **when introduced into the host polymer to be colored, polymeric component A of the instant color concentrate dissolves or disperses in the host polymer** leaving the coloring component B in a state identical to that in which it would be found if it were dispersed directly into the host polymer.

(JTX 2, at 51) (emphasis added). Further, in distinguishing his invention over the Kazenas reference, Dr. Burlone's representative argued that:

> Kazeras [sic] describes the synthesis of a melamine-sulfonamide-formaldehyde resin and the coloring thereof. The final product, which is a colored resin containing 1–2% coloring agent, cannot be employed as **a coloring agent such as that of the instant claims, wherein up to 70% of coloring agent is present for the purpose of combination with a virgin thermoplastic to produce a colored final product.** In fact, if the pigments of Kazeras are to be used to color plastics, a method must be found for dispersing them in the host polymer.

(JTX 2, at 52) (emphasis added). During BASF's summary in the same August 1981 Amendment, it explained:

> It is consequently impossible to arrive at applicant's invention as claimed by combining the non-reactive dyes of the primary reference with anything taught therein or in the secondary reference, **in order to prepare a color concentrate for coloring**

phasis added). At trial, Dr. Harris conceded that in part (B) of Claim 1, the (A) polymer and the thermoplastic material to be colored are two

different materials. (D.I. 294, Harris, Tr. at 402).

thermoplastic polymeric materials.... **What is lacking everywhere is any suggestion of a color concentrate,** especially one which is prepared in accord with the recitations in applicant's claims.

(JTX 2, at 54) (emphasis added). In its June 28, 1982 Brief on Appeal, BASF distinguished the McIntosh reference, arguing that:

**A color concentrate for coloring thermoplastic polymeric materials is neither taught nor suggested.**

(JTX 2, at 81) (emphasis added). In distinguishing the Industrial Colours reference, Dr. Burlone's representative argued:

Industrial Colours describes the preparation of a liquid coating composition (ink, varnish, etc.) and **not a color concentrate to be used for coloring thermoplastic materials, as recited in the instant claims.**

. . . . .

That the colored resins of Industrial Colours are not meant to be color concentrates for thermoplastic polymeric materials is clear from an observance of the colorant level of the resin, which at 5% is too low to be useful in the coloration of a **host polymer.** Moreover, the **resins specified by Industrial Colours could not be melted with a thermoplastic material to be colored without substantial degradation or reaction and without any visible separation therefrom on a microscopic scale.**

(JTX 2, at 53–54, 86) (emphasis added).

The prosecution history of the Burlone patent, like the specification, demonstrates that the claimed invention is limited to a color concentrate for coloring thermoplastic polymeric materials. Although BASF repeatedly objects to DuPont's use of the carrier/host distinction because the terms "carrier" and "host" do not appear in Claim 5, the prosecution history of the patent reveals that Dr. Burlone's representative repeatedly described the Burlone invention to the PTO as a carrier polymer for introducing pigment into a host polymer. Dr. Burlone's representative expressly used the terms "carrier" and "host". Thus, BASF's objections to the use of the terms are foreclosed by its own use of the terms before the PTO.

■■■ The Court finds that the prosecution history of the Burlone patent supports a conclusion that the preamble of the claim, "color concentrate for coloring thermoplastic polymeric materials", is a claim limitation because BASF repeatedly characterized it as such before the PTO to distinguish its invention over the prior art. The prosecution history indicates that: 1) BASF specifically referred to its sulfonated component (A) as a carrier polymer for introducing the pigment component (B) into a host polymer, and 2) BASF repeatedly distinguished its claimed "color concentrate" from the host polymer to be colored. In addition, BASF expressly relied upon the limitation described in subpart (A)(4) of Claim 1 of the Burlone patent to overcome the prior art Industrial Colours reference. *See* JTX 2 at 53–54 ("the resins specified by Industrial Colours could not be melted with a thermoplastic material to be colored without substantial degradation or reaction and without any visible separation therefrom on a microscopic scale."); *see also* D.I. 293, Tr. at 207–14. Thus, BASF is estopped from now asserting that Burlone Claim 5 is not limited to a "color concentrate for coloring thermoplastic polymeric materials" and that subpart (A)(4) is not always important and need not be met in every application of the invention. As stated above, BASF's argument that the preamble is not a claim limitation because the Burlone color concentrate need not be used to color another material and, in fact, it can be spun directly into fiber, appears to be an attempt to argue that Burlone Claim 5 covers the "thermoplastic material to be colored" of subpart (A)(4) and part (B) of Claim 1. In light of the prosecution history, this argument is untenable.[18]

---

18. In this regard, the Court finds unpersuasive the testimony of BASF's Dr. Harris, wherein he testified that the above-quoted excerpts from the Burlone prosecution history are taken out of context. (*See, e.g.,* D.I. 294, Tr. at 404–06). Similarly, the Court rejects BASF's characterization of the excerpts as "selective quotes." (D.I. 273, at 23).

#### 4) *Claim Construction—Conclusion*

Based upon its review of the entirety of the patent, including the language of the claims and the specification, the entire prosecution history, and the evidence presented at trial, the Court concludes that the preamble recites a limitation on Claim 5 of the Burlone patent, which is directed to color concentrates for coloring thermoplastic polymeric materials.

#### b. *Application of Claim 5 to LUMENA*
#### 1) *The Preamble*

 Having construed Claim 5 of the Burlone patent as directed to "color concentrates for coloring thermoplastic materials", the Court turns now to the issue of whether the claim reads on DuPont's accused products.

At trial, Mr. Sandukas, a DuPont employee since 1966, testified that neither the blend that is used to make LUMENA fiber, nor the fibers themselves are either intended to be used, or are used, as color concentrates. (D.I. 295, Tr. at 654–55). The testimony of DuPont's expert, Dr. Cohen, was consistent with the testimony of Mr. Sandukas. (D.I. 294, Tr. at 474–75). Even BASF's expert, Dr. Harris, conceded that in LUMENA, there is no "thermoplastic material to be colored" as recited in subpart (A)(4) and part (B) of Claim 1 of the Burlone patent.[19] (D.I. 294, Tr. at 400).

According to Mr. Sandukas, there are essentially two reasons why LUMENA is not made or sold to be a color concentrate. First, he stated that it would be economically prohibitive. Mr. Sandukas testified that DuPont's color concentrates contain about 20% colorant, and they cost about **[REDACTED]** colorant material. (D.I. 295, Tr. at 655). In contrast, a bobbin of LUMENA fiber typically contains about ½% of colorant. Therefore, to get the same one pound of colorant material, using a LUMENA fiber, it would take

200 pounds of the fiber, or about 370 miles, and this same pound of colorant material would cost about $500.00. (D.I. 295, Tr. at 655–57). Mr. Sandukas' second reason that LUMENA is not made or sold as a color concentrate is that it would not work very well. If LUMENA were used as a color concentrate, only lighter colors could be made. Furthermore, so much LUMENA would have to be used that the physical properties of the material to be colored would be altered by the addition of the LUMENA. (D.I. 295, Tr. at 656; *see also* D.I. 294, Tr. at 475).

Dr. Cohen distinguished LUMENA from the Burlone color concentrate based upon the levels of pigment contained in the two materials. With regard to the pigment levels of LUMENA, Dr. Cohen testified that the Du-Pont fibers "contain exceedingly low amounts of colorant, generally less than 1 percent, about half a percent ..., and the polymeric composition of the LUMENA materials wouldn't be well-suited ... to be a carrier material." (D.I. 294, Tr. at 475). Other testimony indicated that the pigment levels of LUMENA range from about .1 to 1.1%.[20] (D.I. 294, Tr. at 339; D.I. 295, Tr. at 649). In contrast, according to Dr. Cohen, although Claim 1 of the Burlone patent recites no numerical limit as to the pigment level in the claimed concentrate, Claims 3 and 4 recite a pigment level of "1 to about 70 weight percent." Dr. Cohen opined that, although the 1% lower limit is inconsistent with the normal usage of the term in the art and with the prosecution history, Claim 1 must have some lower limit on pigment concentration, and the expressly-described lower limit on the amount of colorant, component (B), that can be contained in the Burlone composition is 1%. (D.I. 294, Tr. at 494–95). According to Dr. Cohen, this lower limit is supported by the claims, the specification and the prosecution history. (D.I. 294, Tr. at 495–96). Only three of the 100 LUMENA products exceed

---

**19.** Interestingly, Dr. Burlone testified that although he did not consider the LUMENA fibers to be a color concentrate, he did consider the composition of pigment and polymer that is ultimately spun into the LUMENA fibers to be a color concentrate within the meaning of his invention. (D.I. 293, Tr. at 185–87, 200).

**20.** According to Mr. Sandukas, there are in excess of 100 colors in DuPont's LUMENA and DSDN lines and, of those 100 colors, only three exceed 1% colorant. (D.I. 295, Tr. at 650–51). The average pigment level is about .5%. (D.I. 295, Tr. at 649).

1% pigment, and those three contain only about 1.1% pigment. (D.I. 295, Tr. at 651). Thus, DuPont argues, even the three LUMENA products with the highest amount of colorant, *i.e.*, the three that exceed 1% pigment, have too little colorant to function as "color concentrates for coloring thermoplastic polymeric materials", whereas the Burlone invention covers colorant levels up to 70%.

BASF disagrees with DuPont's reading of an expressly described lower limit of 1% pigment into the Burlone patent claims. Dr. Burlone testified that his patent recites lower limits of "*about 1%*", and in fact, his claimed invention covers materials with pigment concentrations below 1%. (D.I. 293, Tr. at 86). Accordingly, BASF contends that the LUMENA blends, containing pigment levels up to 1.1%, are within Dr. Burlone's invention.

Based upon the evidence presented at trial, including the testimony of Mr. Sandukas, Dr. Cohen, Dr. Burlone, and Dr. Harris, the Court finds that DuPont's accused products are not color concentrates for coloring thermoplastic polymeric materials within the meaning of Claim 5 of the Burlone patent. In this regard, the Court is not persuaded by BASF's argument that the Burlone color concentrate recites no lower limit on pigment concentration and, therefore, DuPont's blends are within the scope of Claim 5. The language of the claims, the specification, and the prosecution history of the Burlone patent all reflect that the claimed invention is directed toward the coloring of other materials. Thus, notwithstanding the 1% pigment language, which is, in any event, inconsistent

with the prosecution history of the patent, the Court cannot conclude that the LUMENA blend is a "color concentrate for coloring thermoplastic" materials within the meaning of Claim 5 of the Burlone patent.[21]

The Court's conclusion in this regard is dispositive of the infringement issue; the Court has found that the Burlone preamble recites a limitation on Claim 5 of the patent, and LUMENA does not satisfy this limitation. However, for purposes of analysis, the Court will assume hypothetically that Claim 5 of the Burlone patent is not limited by its preamble to a color concentrate for coloring thermoplastic polymeric materials. Under this assumption, to establish literal infringement, BASF must demonstrate that LUMENA contains "every limitation set forth in [Claim 5] ... exactly ..." *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 (Fed.Cir.1989).

BASF contends that LUMENA does indeed contain every limitation set forth in Claim 5. In contrast, DuPont contends that BASF has failed to establish that LUMENA satisfies paragraph (A), subpart (A)(4), or subpart (A)(5) of Claim 1 as incorporated into Claim 5 of the Burlone patent. The Court will address each of these elements in turn.

### 2) Claim 1, Paragraph (A)

Claim 1(A) of the Burlone patent recites:

A water- or polar organic solvent dispersible polycondensation or addition polymer polymerized from condensable or unsaturated monomers containing functional groups capable of solubilizing or dispersing the polymer in water or in polar organic solvents, and which is capable of being ...

---

**21.** The 1% pigment language of the Burlone patent is inconsistent with the patent's prosecution history, during which BASF distinguished its claimed color concentrate from colored materials in the art having low pigment levels. In distinguishing the Kazenas reference, BASF stated:

> Kazeras [sic] describes the synthesis of a melamine-sulfonamide-formaldehyde resin and the coloring thereof. **The final product, which is a colored resin containing 1–2% coloring agent, cannot be employed as a coloring agent such as that of the instant claims, wherein up to 70% of coloring agent is present for the purpose of combination with a virgin thermoplastic to produce a colored final product.**

Similarly, in distinguishing the Burlone invention from the Industrial Colours reference, BASF stated:

> That the colored resins of Industrial Colours are not meant to be color concentrates for thermoplastic polymeric materials is clear from an observance of the colorant level of the resin, **which at 5% is too low to be useful in the coloration of a host polymer.**

These statements before the PTO, wherein BASF distinguished the Burlone color concentrate from materials with low pigment levels, point out the inconsistency between the prosecution history and the 1% pigment language of the patent.

(JTX 1, col. 9, 11. 13–18). To satisfy paragraph (A), the LUMENA polymer must be: 1) a "water- or polar organic solvent-dispersible polycondensation or addition polymer", and it must be 2) "polymerized from condensable or unsaturated monomers containing functional groups capable of solubilizing or dispersing the polymer in water or polar organic solvents." BASF contends that the sulfonated polymer that DuPont uses to make LUMENA satisfies both of these limitations. According to BASF, the phrase "capable of solubilizing or dispersing the polymer in water or in polar organic solvents" describes a required chemical property of the "functional groups". The specified functional groups, according to Burlone Claim 5, include sulfonates. (*E.g.*, Harris, Tr. at 277, 279). Thus, it is BASF's position that the LUMENA polymer satisfies paragraph (A) of Burlone Claim 1 because it contains sulfonates (functional groups), which have the inherent chemical property of being "capable of solubilizing or dispersing the polymer in water or in polar organic solvents."

On the other hand, DuPont contends that the polymer used in LUMENA is not a "water- or polar organic solvent soluble or dispersible polycondensation or addition polymer" as defined in Claim 1 of the Burlone patent. (D.I. 278 at 20; D.I. 294, Tr. at 501). Contrary to BASF's contentions, DuPont asserts that the "capable of" language in paragraph (A) does not merely describe an inherent chemical property of the functional groups; rather, the polymer must actually be rendered soluble or dispersible in water or in polar organic solvents by virtue of the presence of the functional groups, *i.e.*, the sulfonates. (*E.g.*, D.I. 294, Tr. at 515). According to DuPont, its polymer contains sulfonate groups in such small amounts, **[REDACTED]**, that the polymer is not rendered soluble or dispersible in water or in polar organic solvents and, therefore, it does not satisfy the limitations described in paragraph (A). (*E.g.*, D.I. 294, Tr. at 512).

Thus, the issue with regard to paragraph (A) is one of claim interpretation. Specifical-

ly, the Court must determine whether the described functional groups must merely have the chemical property of being able to solubilize or disperse the polymer in water or in polar organic solvents, or whether the functional groups must actually render the polymer soluble or dispersible.

The evidence presented at trial with regard to this issue consisted primarily of the conflicting testimony of Dr. Harris and Dr. Cohen. BASF's Dr. Harris testified that DuPont's catdye nylon satisfies the "water or polar organic solvent dispersibility" requirement of paragraph (A) because, based upon tests that he performed on the LUMENA polymer flake, the DuPont polymer is soluble in formic acid.[22] (D.I. 293, Tr. at 287; D.I. 294, Tr. at 350–51; BTX 550). According to Dr. Harris, formic acid is a common polar-organic solvent in the nylon industry. (D.I. 293, Tr. at 488; D.I. 294, Tr. at 351–52). With regard to the second requirement of paragraph (A), that the catdye polymer be polymerized from the claimed monomers, Dr. Harris testified that DuPont's catdye nylon satisfies this requirement. According to Dr. Harris, DuPont makes its catdye nylon from the very same monomer, 5–sulfoisophthalic acid, that is identified in some of the examples in the Burlone patent. (D.I. 293, Tr. at 288–89; D.I. 294, Tr. at 360). Thus, Dr. Harris's testimony supports BASF's construction of the "capable of" language as referring to an inherent property of the sulfonate functional group, and not to the amount or content of sulfonate present in the nylon. (*E.g.*, D.I. 293, Tr. at 290). According to Dr. Harris, DuPont's argument that its LUMENA polymer does not satisfy the requirements of paragraph (A) is an attempt to read an "amount" limitation into Claim 1 that does not exist.

In contrast, DuPont's Dr. Cohen testified that the functional groups called for in paragraph (A) of Claim 1 must function to solubilize or disperse the polymer in water or polar organic solvents. (D.I. 294, Tr. at 515, 523). Dr. Cohen testified that DuPont's polymer

---

**22.** Dr. Harris also testified that he knew, even before performing his tests, that DuPont's nylon flake would dissolve in formic acid. In fact, Dr. Harris indicated that he selected formic acid for his tests precisely because he knew it would dissolve the DuPont polymer. (D.I. 294, Tr. at 418).

706

contains sulfonate groups in such small amounts, about **[REDACTED]**, that the polymer is not rendered soluble or dispersible in water or in polar organic solvents. According to Dr. Cohen, Dr. Harris's choice of formic acid as the solvent for his tests was disingenuous and renders his tests meaningless because formic acid is an extremely strong solvent which dissolves nylon having no functional groups at all.[23] (D.I. 294, Tr. at 514–15). In other words, DuPont asserts, formic acid cannot distinguish a polymer containing functional groups capable of solubilizing or dispersing the polymer from polymers without such functional groups.[24] (D.I. 294, Tr. at 514–15). In contrast, Dr. Cohen testified that he performed tests using nylon with 0%, 3%, 9%, 28% and 36% sulfonate content in solvents and temperatures that are expressly described in the Burlone examples. (*See* D.I. 294, Tr. at 512; JTX 1, col. 3, Ex. 1, 11. 52–55; col. 4, Ex. 6, 11. 61–65). The solvents tested by Dr. Cohen include water, water/methanol, tetrahydrofuran, and acetone. (D.I. 294, Tr. at 502). Dr. Cohen's tests reveal that the 0%, **[REDACTED]** and 9% sulfonated nylons were not soluble or dispersible, whereas the 28% and 36% sulfonated nylons (which approximate the sulfonate level of the Burlone polymer) were dispersible.[25] (D.I. 294, Tr. at 502–03, 511–14; DDX 20, 21, 22). According to Dr. Cohen, his tests establish that neither the sulfonated host polymer used by DuPont to make LUMENA **[REDACTED]**, nor the polymer used to make DSDN **[REDACTED]** is a polymer "containing functional groups capable of solubilizing or dispersing the polymer in water or polar organic solvents ..." as described by the Burlone claims.

Upon review of the testimony of the experts and the other evidence presented at trial, the Court finds that BASF has failed to

demonstrate by a preponderance of the evidence that DuPont's sulfonated nylon polymer satisfies paragraph 1(A) of the Burlone patent. Based upon the language of the claims and the prosecution history of the Burlone patent, it appears to the Court that the "functional groups" of paragraph (A) must actually function to solubilize or disperse the polymer in water or in polar organic solvents; it is not enough that these groups have the inherent chemical capability of doing so. In this regard, the Court finds Dr. Harris's tests to be unpersuasive. The unrefuted evidence demonstrates that formic acid dissolves nylon, regardless of whether there are any functional groups present on the nylon polymer. BASF argues that this property of formic acid is not relevant because, as Dr. Harris testified, formic acid is a common solvent in the nylon industry. Notwithstanding this testimony, it seems to the Court that, for purposes of testing the requirement recited in paragraph (A) of Burlone Claim 1, the use of a solvent that cannot distinguish a nylon polymer with functional groups from a nylon polymer without such groups is inappropriate and ineffectual.

Dr. Cohen, on the other hand, selected solvents for his tests that are expressly identified in Burlone patent Examples 1 and 6: water and water/methanol. (*See* JTX 1, col. 3, Ex. 1, 11. 52–55; col. 4, Ex. 6, 11. 61–65; D.I. 294, Tr. at 525, 532–33). His tests of the LUMENA polymer in these solvents demonstrated that the DuPont polymer was not soluble and not dispersible, whereas the Burlone material was both soluble and dispersible. (D.I. 294, Tr. at 511–14; DDX 20, 21). Dr. Harris could have performed his tests with these solvents, but he did not. Instead, he used only formic acid. Although formic acid is identified in Example 17 of the Bur-

---

**23.** Indeed, Dr. Harris conceded that even unsulfonated nylon is soluble in formic acid. (D.I. 294, Tr. at 351). Dr. Harris opined, nevertheless, that formic acid is an appropriate solvent with which to test whether the LUMENA polymer meets the limitation recited in Claim 1(A).

**24.** Dr. Cohen testified that it is well-known that formic acid dissolves nylon that contains absolutely no functional groups whatsoever. He stated that "When you bring out the bottle of formic acid, you are desperate for a solvent." (D.I. 294,

Tr. at 514). The problem with using formic acid, according to Dr. Cohen, is that formic acid would not be able to distinguish between those materials covered by paragraph (A) and those materials covered by the prior art. (D.I. 294, Tr. at 563).

**25.** The sulfonated polyamides disclosed in the Burlone patent contain sulfonate groups in the amount of about 30 percent. (*E.g.*, D.I. 294, Tr. at 509).

lone patent, Dr. Harris himself testified that Example 17 is not within the scope of Claim 1. (D.I. 294, Tr. at 373–74). Thus, with regard to whether the LUMENA polymer satisfies the requirements of paragraph 1(A) of the Burlone patent, the Court finds the testimony of Dr. Cohen to be credible, and the Court rejects the testimony of Dr. Harris.

The Court's conclusion in this respect finds support in the prosecution history of the Burlone patent. As the file history reveals, when BASF first added the limitation that component (A) contain "solubilizing functional groups", (*see* JTX 2, at 49), the Patent Examiner rejected the claim, stating that "solubilizing functional groups" needed to be defined specifically. (JTX 2, at 60–61). Thereafter, BASF amended the claim to state "functional groups capable of solubilizing or dispersing the polymer in water or in polar organic solvents." (JTX 2, at 66). BASF explained the amendment, indicating that:

> "Solubilizing functional groups" has been expanded to recite "functional groups capable of solubilizing or dispersing the polymer in water or in polar organic solvents", eliminating any previous ambiguity. **The functional groups actually employed for this purpose** are now specifically recited in new claim 11.

(JTX 2, at 68) (emphasis added). BASF asserted further that:

> [T]he polyester of U.S. patent 4,098,741, which is incorporated in Example II, is described in detail in the patent in respect of its **water-dispersible properties resulting from the employment of solubilizing functional groups.**

(JTX 2, at 70) (emphasis added).

These statements to the Patent Office tend to support the Court's conclusion that the functional groups must actually function to render the polymer dispersible in water or in polar organic solvents. (*See generally* D.I. 294, Cohen, Tr. at 518–23). Thus, based upon the testimony of Dr. Cohen and the prosecution history of the Burlone patent, the Court finds that BASF has failed to prove that the LUMENA polymer meets the limitations described paragraph 1(A) of the Burlone patent.

### 3) *Claim 1, Subpart (A)(4)*

■ Subpart (A)(4) of Claim 1 provides that the polymer described in paragraph (A) must be capable of being:

> (4) melted with the thermoplastic polymeric material to be colored without substantial degradation or reaction and without any visible separation therefrom on a microscopic scale;

(JTX 1, col. 9, 11. 26–29). BASF contends that this recitation requires that the polymeric component (A) have the capability of being melted with another "thermoplastic polymeric material to be colored", such as ordinary nylon–6, without the occurrence of the adverse reactions that are normally associated with the melting together of incompatible nylons. (D.I. 273 at 33; D.I. 294, Tr. at 388). According to BASF, this limitation relates to a property called "compatibility". (*E.g.*, D.I. 294, Tr. at 356–57). Dr. Harris testified that the LUMENA polymer satisfies this limitation because it is capable of being melted with itself without substantial degradation or reaction or visible separation. (*E.g.*, D.I. 293, Tr. at 295–96; D.I. 294, Tr. at 355–56, 426, 428). Dr. Harris also testified that the LUMENA polymer satisfies this limitation because it is "compatible" with nylon–6. (D.I. 293, Tr. at 295; D.I. 294, Tr. at 347–49).

DuPont contends that, in order to determine whether there is any "visible separation" between the component (A) polymer and the thermoplastic polymeric material to be colored as required by subpart (A)(4), microscopic analysis is required. (D.I. 278 at 26; D.I. 294, Tr. at 425–26). DuPont points out that Dr. Harris did not perform any such microscopic analysis on the LUMENA polymer. (D.I. 294, Tr. at 426). According to DuPont, Dr. Harris's contention that the LUMENA polymer was being mixed with itself and therefore did not require any such microscopic analysis is absurd. Nevertheless, Dr. Cohen conceded that DuPont's sulfonated nylon could be melted with ordinary Nylon–6 and be fully compatible as described in subpart (A)(4) of Claim 1. (D.I. 294, Tr. at 592).

The Court observes that the plain language of subpart (A)(4) of Burlone Claim 1 demonstrates that the polymeric component (A) of the claimed invention must be capable of being *melted with the thermoplastic material to be colored* without reaction or separation. Even Dr. Harris conceded that there is no thermoplastic material to be colored in LUMENA. (D.I. 294, Tr. at 400). Dr. Harris also conceded that the polymeric component (A) is distinct from the material to be colored. (D.I. 294, Tr. at 402). Thus, BASF's argument that the LUMENA polymer satisfies the limitation recited in subpart (A)(4) because it can be melted with itself without reaction or separation is inconsistent with the plain language of the claim. (*See* D.I. 294, Tr. at 426–28). Subpart (A)(4) clearly requires that the polymeric component (A) of the claimed color concentrate be capable of being added to a separate thermoplastic material to be colored without reaction or separation. Accordingly, Dr. Harris's testimony that the LUMENA polymer satisfies this limitation because it is capable of being melted with itself is not persuasive, and the Court rejects the testimony of Dr. Harris on this point.

The Court finds that BASF has failed to demonstrate by a preponderance of the evidence that the LUMENA polymer satisfies the limitation recited in subpart (A)(4) of Claim 1 of the Burlone patent.

### 4) *Claim 1, Subpart (A)(5)*

■ Subpart (A)(5) of Burlone Claim 1 indicates that the polymeric component (A) must be capable of being "utilized to wet the surface of pigments by adhesion thereto." (JTX 1, col. 9, 11. 30–31). BASF contends that this property relates to the manner in which catdye nylon disperses pigment in the claimed invention. Dr. Harris testified that the term "wetting a surface" is almost synonymous with "giving a good dispersion or a good compatibility between the components." (D.I. 293, Tr. at 274). According to BASF, Dr. Harris performed dispersion tests which confirm that the LUMENA polymer satisfies this limitation. (D.I. 294, Tr. at 429–30; BTX 550). In addition, Dr. Harris testified that the Anton patent, pursuant to which DuPont makes the accused blend, indicates

that the sulfonate groups in DuPont's catdye nylon polymer operate to disperse pigment and to avoid fiber breaks during spinning. (D.I. 273 at 36; D.I. 293, Tr. at 297–98).

On the other hand, DuPont contends that Dr. Harris's tests were fatally flawed because Dr. Harris tested DuPont's polymer, not with a DuPont pigment, but with a sulfonated BASF pigment concentrate. (D.I. 278 at 27; D.I. 294, Tr. at 430–36, 438–42). It is DuPont's position that Dr. Harris's tests do not show whether it was the LUMENA polymer **[REDACTED]** or the sulfonated carrier polymer in BASF's pigment concentrate (with about 30% sulfonate by weight) that actually "wet the surface of the pigment by adhesion thereto." (D.I. 278 at 28; D.I. 294, Tr. at 437–42). Dr. Cohen conceded, however, that the sulfonate groups on the LUMENA polymer would wet the pigment surface to some extent. (D.I. 294, Tr. at 545). Nevertheless, DuPont contends that it is more likely that BASF's highly sulfonated carrier polymer wet the surface of the pigment in Dr. Harris's tests than the LUMENA polymer because of the affinity of sulfonates for pigment particles.

Again, the Court finds the testimony of Dr. Cohen to be more credible on this point than the testimony of Dr. Harris. It appears that Dr. Harris's tests do not establish that it was the sulfonated DuPont polymer, and not the sulfonated BASF concentrate, that performed the wetting of the pigment surfaces. Although it appears likely that the sulfonate groups on DuPont's polymer would indeed "wet" the pigment surface to some extent, the Court finds that BASF has not established by a preponderance of the evidence that the LUMENA polymer infringes subpart (A)(5) of Burlone Claim 1.

### 5) *Conclusion—Infringement*

For all of the foregoing reasons, the Court concludes that neither the blend used to make DuPont's LUMENA fibers, nor the fibers themselves infringe Claim 5 of the Burlone patent.

### 2. *Invalidity*

DuPont identifies three grounds in support of its contention that the Burlone patent is

invalid. First, DuPont argues that the Burlone patent as construed by BASF is invalid for anticipation in light of: 1) prior art disclosing blends of sulfonated nylon and titanium dioxide ("Ti02") pigment, and 2) prior art U.S. Patent No. 3,849,377. DuPont also contends that the Burlone patent is invalid for obviousness. Finally, according to DuPont, the Burlone patent is invalid for failure to comply with the best mode requirement of 35 U.S.C. § 112.

A patent is presumed valid. 35 U.S.C. § 282. The party asserting invalidity has the burden of proof. *Id.* This burden is satisfied only by proving the facts establishing invalidity by clear and convincing evidence. *Loctite,* 781 F.2d at 872; *Mobil,* 779 F.Supp. at 1488. The " 'clear and convincing' standard of proof of facts is an intermediate standard which lies somewhere between 'beyond a reasonable doubt' and a 'preponderance of the evidence.' " *Buildex Inc. v. Kason Industries, Inc.,* 849 F.2d 1461, 1463 (Fed.Cir.1988).

The Court will address each of DuPont's invalidity arguments in turn.

a. *DuPont's Assertion of Invalidity Based Upon Anticipation*

Title 35 U.S.C. § 102 provides in part:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, ...

Invalidity by reason of anticipation "requires that all of the elements and limitations of the claim are found within a single prior art reference." *Scripps Clinic & Research Foundation v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed.Cir.1991); *see Verdegaal Bros., Inc. v. Union Oil of California,* 814 F.2d 628, 631 (Fed.Cir.), *cert. denied,* 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987);

*Phillips Petroleum,* 673 F.Supp. at 1287. For an invention to be anticipated, there must not be any differences "between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps,* 927 F.2d at 1576. If more than one reference is needed to establish invalidity, then anticipation under § 102 cannot be found. *Continental Can Co. v. Monsanto Co.,* 948 F.2d 1264, 1267 (Fed.Cir.1991). Anticipation is a question of fact. *Scripps,* 927 F.2d at 1576.

At the outset, the Court observes that DuPont's arguments that the Burlone patent is anticipated by the prior art are based upon BASF's construction of the Burlone patent, *i.e.,* as claiming a blend of catdye polymer and pigment that is not limited to a color concentrate for coloring thermoplastic polymeric materials. The Court has already found, however, that the Burlone claims are limited by the preamble of the patent to "color concentrates for coloring thermoplastic polymeric materials". It therefore appears that DuPont's arguments in support of anticipation may well be moot. The Court will, nevertheless, address DuPont's two arguments in support of anticipation.

1) *Anticipation by Prior Art Blends of Sulfonated Nylon and Ti02 Pigment*

DuPont first contends that, if the Burlone claims were to be construed as BASF asserts for infringement purposes, *i.e.,* as a mere blend of catdye polymer and pigment that is not limited to a color concentrate for coloring thermoplastic polymeric materials, then the claims would necessarily be invalid as anticipated by the prior art. Specifically, DuPont asserts that the Burlone claims, as construed by BASF, read squarely on prior art blends of catdye sulfonated nylon and Ti02 pigment, such as are disclosed in U.S. Patent No. 3,389,549 (hereinafter "the David patent").[26] (DBX 123). According to DuPont, the catdye nylon polymers of David and Magat satisfy part (A) of Burlone Claim 1, and Ti02 is a pigment within the meaning

26. In a footnote, DuPont also mentions U.S. Pat-

ent No. 3,184,436 (hereinafter "the Magat pat-

of part (B).[27] Thus, DuPont argues that the Burlone claims as construed by BASF read squarely on these prior art blends.

On the other hand, BASF contends that DuPont has not satisfied its burden of demonstrating that the Burlone patent is anticipated by prior art blends of sulfonated nylon and TiO2 pigment. According to BASF, DuPont fails to rely individually upon either the Magat patent or the David patent to be an anticipatory prior art patent. BASF asserts that DuPont has similarly failed to identify any particular composition taught within either of these prior art references which allegedly anticipates Claim 5 of the Burlone patent. In fact, BASF points out that neither of DuPont's experts at trial presented any testimony whatsoever about either the David or Magat patents, or about any allegedly anticipatory prior art blend of 1.6% catdye nylon and TiO2 pigment. Accordingly, BASF contends that DuPont has failed to establish anticipation based upon these prior art blends.

After careful consideration of the evidence, the Court finds that DuPont has failed to satisfy its burden of demonstrating by clear and convincing evidence that Burlone Claim 5 is anticipated by prior art blends of sulfonated nylon and TiO2 pigment. Proof of anticipation "requires that all of the elements and limitations of the claim are found **within a single prior art reference.**" *Scripps Clinic & Research Foundation,* 927 F.2d at 1576 (emphasis added). DuPont has not fulfilled this requirement. Although DuPont refers generally to the David and Magat patents as anticipatory, and to the testimony of Dr. Burlone, the evidence of record does not support a finding that each element of Burlone Claim 5 is found within the four corners of either one of these prior art references.

At trial, DuPont's experts, Dr. Cohen and Dr. McGrath, offered no testimony about ei-

ther the David patent or the Magat patent. In support of its anticipation argument, DuPont relies solely upon the testimony of Dr. Burlone, wherein he stated generally that prior art catdye polymers with 1.6% sulfonate would be within the scope of part (A) of Claim 1 of his patent, and that TiO2 is a pigment within part (B). (D.I. 293, Tr. at 90–91, 99, 101, 105). Relying on these general statements by Dr. Burlone, DuPont asserts that "Dr. Burlone's unqualified admission that prior art catdye sulfonated nylon polymers satisfy part (A) of Claim 1 of his patent is also an admission that each of the subparts of part (A) of claim 1 are also satisfied."[28] (D.I. 274, at 11). DuPont is compelled to make this argument because it did not elicit any testimony or introduce any evidence at trial demonstrating specifically that each of the elements and limitations of Claims 1, 2, and 5 of the Burlone patent is present within either the David patent or the Magat patent or within any other (unnamed) single prior art reference disclosing a blend of catdye nylon and TiO2. Similarly, DuPont has failed to establish that there is no difference between the Burlone invention and the inventions claimed in either the David or Magat patents, as viewed by a person of ordinary skill in the art. *See id.* at 1576. The burden to prove invalidity rests with DuPont. In attempting to satisfy this burden, DuPont essentially attempts to infer anticipation from a general statement by Dr. Burlone,[29] instead of making an element-by-element comparison of the claims of the Burlone patent to the claims of either the David patent or the Magat patent, or to the unnamed blend of 1.6% sulfonated nylon and TiO2, to determine if all of the elements and limitations of Claim 5 were present within any of these references. In this regard, DuPont's proof is wholly insufficient. *See Continental Can,* 948 F.2d at 1267 (anticipa-

ent") as an invalidating reference. (JTX 10).

27. Titanium Dioxide, or TiO2, is a white pigment. (*E.g.,* D.I. 293, Tr. at 89–90).

28. Significantly, although DuPont broadly asserts that Dr. Burlone's testimony, that "prior art catdye sulfonated nylon polymers" satisfy part (A) of Burlone claim 1, constitutes an admission

that all of the subparts of part (A) are also satisfied, DuPont does not specifically reference any prior art patent wherein these allegedly invalidating sulfonated nylon polymers can be found.

29. In any event, Dr. Burlone did not testify that his invention was anticipated by the prior art.

tion cannot be established by combining more than one reference).

■ Accordingly, the Court finds that DuPont has failed to satisfy its burden of establishing by clear and convincing evidence that Claim 5 of the Burlone patent was anticipated by prior art blends of catdye nylon and TiO2.[30]

### 2) Anticipation by Prior Art United States Patent No. 3,849,377

■ As its second argument in support of anticipation, DuPont argues that the Burlone patent is anticipated by United States Patent No. 3,949,377 ("the '377 patent"), entitled "Polyester Containing Sulphonic Acid Groups."[31] (DTX 359). According to DuPont, the '377 patent, which issued on November 19, 1974, discloses a blend of a sulfo-

nated polyester polymer and a coloring agent that meets the requirements of the claims of the Burlone patent, as construed by BASF.[32]

The evidence presented at trial with regard to this issue consisted primarily of the conflicting testimony of Dr. McGrath and Dr. Harris. On direct examination, DuPont's Dr. McGrath testified that the '377 patent discloses a blend of sulfonated polyester and pigment dyestuff. (D.I. 295, Tr. at 737–38). According to Dr. McGrath, the sulfonated polyester of the '377 patent is water soluble, thus satisfying paragraph (A) of Burlone Claim 1. (D.I. 295, Tr. at 740; DDX 14). Dr. McGrath testified further that the limitations of the Burlone patent recited in subparts (A)(1), (A)(2), and (A)(3) of Burlone Claim 1 are present within Example 1 of the '377 patent.[33] (D.I. 295, Tr. at 741–42).

**30.** DuPont does not contend that the inventions claimed by the David patent and the Magat patent and the prior art blends of sulfonated nylon and TiO2 pigment are "color concentrates for coloring thermoplastic polymeric materials" within the meaning of Burlone Claim 5 as that term has been construed by this Court. Rather, as stated above, DuPont's anticipation arguments are based upon a construction of Burlone Claim 5 as *not* limited to color concentrates for coloring other materials. The Court has addressed DuPont's arguments as they were presented. However, it is well-settled that the claims of a patent must be construed the same way for validity and infringement purposes. *See W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1279 (Fed.Cir.1988). In this case, the Court has construed Claim 5 of the Burlone patent as limited to "color concentrates for coloring thermoplastic polymeric materials." DuPont has submitted no evidence suggesting that either the inventions claimed in the David or the Magat patents or the prior art blends of sulfonated nylon and TiO2 pigment are "color concentrates for coloring thermoplastic polymeric materials" within the meaning of Burlone Claim 5. Thus, DuPont has failed to establish invalidity for anticipation, not only under BASF's erroneous construction of Claim 5, but also under this Court's proper construction of the Claim as limited to "color concentrates for coloring thermoplastic polymeric materials".

**31.** Like DuPont's first argument in support of invalidity, this argument may also be moot in light of the Court's finding with regard to the effect of the Burlone preamble. Nevertheless, the Court will address this argument.

**32.** According to the testimony of Dr. McGrath, the '377 patent was not considered by the PTO in

connection with the Burlone patent application. (D.I. 295, Tr. at 736–37).

**33.** Example 1 of the '377 reference describes the mixing of polymer and pigment in a ball mill, which, according to Dr. McGrath, is a device composed of ceramic or metal balls that can provide a shearing force between components to be mixed. (D.I. 295, Tr. at 759).

With regard to his testimony that subparts (A)(1), (A)(2), and (A)(3) are present within Example 1 of the '377 reference, Dr. McGrath explained that, in Example 1, the sulfonated polyester is dissolved in 200 grams of water while stirred. (D.I. 295, Tr. at 741). Further, according to Dr. McGrath, Example 1 "indicates that 50% strength can be employed as a dispersing agent, and describes how to obtain anhydrous salt by either evaporation to dryness or spray dried, and after drying, is recovered in the form of a light brown, brittle powder." (D.I. 295, Tr. at 741). According to Dr. McGrath, this recitation anticipates subparts (A)(1) and (A)(2) of Burlone Claim 1, which require that the claimed polymer be capable of being "utilized in the preparation of 1–95% solution or dispersion" and "recovered from a 1–95% solution or dispersion thereof at a temperature which will not cause substantial volatilization or degradation thereof". With regard to the requirement recited in subpart (A)(3) of Burlone Claim 1, that the claimed polymer be capable of being "fused at a temperature between about 130 degrees C and 350 degrees C", Dr. McGrath testified that Example 1 satisfies this limitation because it indicates that after a vacuum of about 15 millimeters is applied, one can "reach a temperature of 130 degrees C, distill off the water, and take the hot viscous melt, and allow it to cool to solidify as indicated, and it provides a greenish solid mass." (D.I. 295, Tr. at 742).

With regard to the limitation recited in subpart (A)(4) of Burlone Claim 1, that the polymer be capable of being "melted with the thermoplastic polymeric material to be colored without substantial degradation or reaction and without any visible separation therefrom on a microscopic scale", Dr. McGrath did not indicate whether this limitation was present within the '377 patent because it was his understanding that if the Burlone color concentrate was not being used to color something else, then this limitation was irrelevant. (D.I. 295, Tr. at 742–43). With regard to the limitation recited in subpart (A)(5), that the polymer be capable of being "utilized to wet the surface by adhesion thereto", Dr. McGrath testified that this limitation is present within the '377 patent, which describes "an excellent dispersing agent and the pigments are properly wetted in conjunction with the sulfonated group." (D.I. 295, Tr. at 743). Dr. McGrath also testified that the coloring agent described in part (B) of Claim 1 was present within the '377 reference; however, with regard to the requirement recited in part (B) that the coloring agent cause no "visible chemical reaction with the thermoplastic polymeric to be colored", Dr. McGrath testified that this limitation could be ignored because, under BASF's claim construction, there need not be a material to be colored. (D.I. 295, Tr. at 743–45). As to the next requirement of part (B), that the coloring agent cause no "visible chemical reaction [with the polymer defined in part (A)]", Dr. McGrath testified generally that the dispersed dyestuffs identified in Example 1 of the '377 reference are well-known in the industry to be nonreactive. (D.I. 295, Tr. at 744–45). Finally, with respect to dependent Claims 2 and 5 of the Burlone patent, Dr. McGrath testified that these claims were satisfied by the sulfonated polyester of the '377 patent. (D.I. 295, Tr. at 736).

On cross-examination, Dr. McGrath conceded that he had not done any experiments to determine whether subpart (A)(2) of Burlone Claim 1 was satisfied by the materials discussed in the '377 reference. (D.I. 295, Tr. at 768). He conceded that one way to test the limitation recited in subpart (A)(2), that the polymer be capable of being "recovered from a 1–95% solution or dispersion thereof at a temperature which will not cause substantial volatilization or degradation thereof", would be to weigh the material, dissolve it in the solvent, remove it from the solvent, and then weigh it again. (D.I. 295, Tr. at 768). Dr. McGrath testified that the reason he did not conduct any tests was that he ran out of time. (D.I. 295, Tr. at 769). Dr. McGrath also testified that he did not perform any tests to determine whether subpart (A)(4) was present within the '377 reference. He indicated that he did not perform any such tests because he would "expect that a sulfonated polyester would blend with a polyester." (D.I. 295, Tr. at 770).

In direct contrast to Dr. McGrath, BASF's Dr. Harris testified that the '377 reference does not describe the subject matter of Claims 1, 2, and 5 of the Burlone patent. (D.I. 295, Tr. at 797). With regard to Example 1 of the '377 reference, Dr. Harris testified that this Example describes the preparation of a physical mixture in a ball mill, the end result of which is a small or fine powder. (D.I. 295, Tr. at 799). According to Dr. Harris, this physical mixture differs from the blend described in the Burlone patent, which discloses an intimate molecular mixture that is made, for example, by heating, melting and mixing the pigment and polymer. (D.I. 295, Tr. at 800). Dr. Harris explained that mixing components in a ball mill yields an entirely different type of product than the product described in the Burlone patent; according to Dr. Harris, merely physically mixing dye with polyester particles in a ball mill as described in the '377 reference will not produce a blend within the meaning of Burlone Claim 1. Dr. Harris further testified that, in order to determine whether subpart (A)(2) of the Burlone patent was present within the '377 patent, one would have to perform a test, such as the following four-step test: 1) characterize the material; 2) put it in solution; 3) recover it from the solution; and 4) characterize it again. (D.I. 295, Tr. at 804). According to Dr. Harris, such a test would be necessary because the '377 reference does not directly describe whether the sulfonated polyester has the property recited in subpart (A)(2) of Claim 1. (D.I. 295, Tr. at 804).

After carefully considering the evidence, the Court finds that DuPont has failed to demonstrate by clear and convincing evidence that the Burlone invention is anticipated by the '377 patent. On the one hand, Dr. McGrath testified that anticipation was present, but he neglected to perform any tests to determine whether the express limitations of the Burlone claims were present within the '377 reference. His reason for failing to perform any tests was that he ran out of time. Moreover, Dr. McGrath ignored the limitations recited in subpart (A)(4) and in part (B) of Claim 1 with regard to the capabilities of the polymer in reference to the thermoplastic polymeric material to be colored; his reason for ignoring these limitations was based upon his understanding that these limitations were irrelevant if the Burlone color concentrate was not going to be used to color anything else. With regard to the requirement of part (B) that the coloring agent cause no visible chemical reaction with the polymer defined in part (A), Dr. McGrath testified only that the dispersed dyestuffs identified in the '377 patent are well known in the industry to be nonreactive. (D.I. 295, Tr. at 744–45). On the other hand, Dr. Harris testified that the Burlone invention is not anticipated by the '377 reference. Significantly, he testified that to determine whether subpart (A)(2) of Burlone Claim 1 was present within the '377 reference, a test would have to be performed because it is not possible to determine from the patent itself whether the sulfonated polyester of the '377 patent would satisfy subpart (A)(2).

The burden of establishing invalidity rests with DuPont, and the Court finds that DuPont's attempt to satisfy this burden through the testimony of Dr. McGrath is insufficient. In rendering his opinion regarding anticipation by the '377 reference, Dr. McGrath performed no tests and ignored two claim limitations. The testimony of Dr. Harris, which the Court finds to be credible on this point, indicates that a test would have to be conducted to determine if subpart (A)(2) was satisfied. Based upon the evidence of record, the Court concludes that DuPont has failed to establish by clear and convincing evidence that all of the elements and limitations of Burlone Claim 5 are found within the four corners of the '377 patent.[34]

b. *DuPont's Assertion of Invalidity Based Upon Obviousness*

■■■■■■ A patent may also be invalidated for obviousness under 35 U.S.C. § 103. Under § 103, a Court must determine whether "the subject matter as a whole would have been obvious at the time the invention was made ..."[35] Obviousness is a question of law based upon factual inquiries established by the United States Supreme Court in *Graham v. John Deere*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). *See Panduit Corp. v. Dennison Manufacturing Co.*, 810 F.2d 1561, 1566–68 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987); *Loctite*, 781 F.2d at 872; *Phillips Petroleum*, 673 F.Supp. at 1312. The factors to consider in determining whether obviousness is present include: 1)

34. Again, DuPont does not contend that the invention disclosed in the '377 patent is a "color concentrate for coloring thermoplastic polymeric materials" within the meaning of Burlone Claim 5 as that phrase has been construed by this Court. Rather, as above, DuPont's anticipation argument is based upon a construction of Burlone Claim 5 as *not* limited to color concentrates for coloring other materials. The Court has addressed DuPont's arguments as they were presented. However, claims must be construed the same way for purposes of infringement and invalidity and, in this case, the Court has construed Claim 5 of the Burlone patent as limited to "color concentrates for coloring thermoplastic polymeric materials". DuPont has submitted no evidence suggesting that the *invention claimed in* the '377 patent is a "color concentrate for coloring thermoplastic polymeric materials" within

the meaning of Burlone Claim 5 as that phrase has been construed by this Court. Thus, DuPont has failed to establish anticipation by the '377 patent, not only under BASF's erroneous claim construction, but also under this Court's proper construction of Burlone Claim 5.

35. Section 103 provides in pertinent part:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art ...

35 U.S.C. § 103 (1994).

scope and content of the prior art; 2) differences between the prior art and the subject patent; 3) level of ordinary skill in the art at the time of the invention; and 4) secondary considerations such as commercial success, long felt but unresolved need, failure of others. *Graham,* 383 U.S. at 17, 86 S.Ct. at 694; *Loctite,* 781 F.2d at 872; *Mobil,* 779 F.Supp. at 1494. The "critical question, as § 103 makes plain, is whether the invention as a whole would have been obvious to one of ordinary skill in the art at the time it was made." *Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 894 (Fed.Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984).

■■■ In this case, DuPont asserts in a most conclusory fashion that the Burlone patent is invalid for obviousness. DuPont relies upon the testimony of Dr. McGrath, wherein he stated that, assuming that the Burlone patent was not anticipated by the '377 reference, then the differences between the Burlone patent and the prior art are such that it would have been obvious to one of ordinary skill in the art. (D.I. 295, Tr. at 745–46).

In response, BASF contends that DuPont has failed to establish obviousness. Specifically, BASF contends that: 1) DuPont has not identified the differences between the compositions of the '377 patent and the claims of the Burlone patent that it contends would have been obvious to one of ordinary skill in the art; 2) DuPont has not established the level of skill in the pertinent art, and 3) DuPont has failed to provide any evidence with regard to secondary considerations. In support of its contention, BASF relies upon the testimony of Dr. Harris indicating that the invention claimed in the Burlone patent would not have been obvious to one of ordinary skill in the art based upon the '377 patent. (D.I. 295, Tr. at 797–98).

The trial testimony of the experts on the issue of obviousness is equally conclusory. The burden of proof, however, rests with DuPont. At trial, neither Dr. McGrath, nor any other DuPont witness specifically identified the differences between the prior art and the invention claimed in the Burlone patent such as would render the Burlone invention

obvious. DuPont did not demonstrate that the prior art teachings would have suggested to one skilled in the art that the Burlone invention would have been obvious. *See W.L. Gore & Associates v. Garlock, Inc.,* 721 F.2d 1540, 1551 (Fed.Cir.1983) ("there must have been something present in those [prior art] teachings to suggest to one skilled in the art that the claimed invention before the court would have been obvious."), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). DuPont offered no evidence with regard to the level of ordinary of skill in the art at the time of the invention, nor did DuPont introduce any evidence with regard to secondary considerations such as commercial success, long felt but unresolved need, failure of others, etc. *See Graham,* 383 U.S. at 17, 86 S.Ct. at 694. Rather, the sum total of DuPont's testimony regarding obviousness is the conclusory statement of Dr. McGrath, which the Court finds to be entirely insufficient under *Graham.* Accordingly, because the evidence of record cannot support a finding of obviousness, the Court is compelled to conclude that DuPont has failed to satisfy its burden of establishing obviousness of the Burlone invention by clear and convincing evidence.

c. *DuPont's Assertion of Invalidity Based Upon Failure to Comply with the Best Mode Requirement of 35 U.S.C. § 112.*

■■■ DuPont also contends that the Burlone patent is invalid for failure to comply with the best mode requirement of 35 U.S.C. § 112. Section 112 provides in relevant part:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112. A failure to comply with the best mode requirement "amounts to concealing the preferred mode contemplated by

the applicant at the time of filing." *De-George v. Bernier,* 768 F.2d 1318, 1324 (Fed. Cir.1985). An analysis of an allegation of a best mode violation has two parts. First, a court must determine whether, at the time the patent application was filed, the inventor "knew of a mode of practicing his claimed invention that he considered to be better than any other." *Chemcast Corp. v. Arco Industries Corp.,* 913 F.2d 923, 927–28 (Fed. Cir.1990). This is the subjective component. The second part of the best mode analysis is objective in nature. If indeed the inventor contemplated such a preferred mode, then the court must compare what the inventor knew with what he disclosed in his patent to determine whether the disclosure was adequate to enable one skilled in the art to practice the best mode. *Id.; see also Scripps,* 927 F.2d at 1578. The issue of whether an inventor has complied with the best mode requirement of § 112 is a question of fact which turns on an evaluation of the testimony of the witnesses and the technological significance of the structure. *Diversitech Corp. v. Century Steps, Inc.,* 850 F.2d 675, 680 (Fed.Cir.1988).

■ In this case, DuPont contends that Dr. Burlone's best mode of carrying out his invention involved the use of a sulfonated nylon carrier polymer made from polycaprolactam, but his patent discloses only a different and inferior carrier polymer made from epsilon-caprolactam.[36] Based upon Dr. Burlone's failure to disclose his alleged best mode, DuPont contends that the Burlone patent is invalid under § 112.

Needless to say, BASF disagrees. Specifically, BASF contends that: 1) the Burlone patent discloses, not only what Dr. Burlone contemplated to be the best mode for carrying out his claimed invention, but it also discloses what DuPont alleges was concealed, *i.e.,* the alleged best mode of making catdye nylon; 2) Dr. Burlone neither invented nor claimed a method of manufacturing catdye nylon and, therefore, such a method is not

even a "mode" of his invention; and 3) at the time he filed his patent application, Dr. Burlone believed (and still believes today) that catdye nylon made with polycaprolactam is indistinguishable from catdye nylon made with caprolactam. (D.I. 280, at 33–34).

The first issue to be resolved is thus whether Dr. Burlone knew at the time he filed his patent application of a mode of practicing his invention that he considered to be better than any other. *See Chemcast,* 913 F.2d at 927–28. The first component of the Burlone color concentrate, the (A) component, is typically a sulfonated nylon. At trial, Dr. Burlone testified that when he joined BASF in 1976, he was sent to the company's Arnprior plant in Canada to learn how to make sulfonated nylon. (D.I. 293, Tr. at 67, 117). At that time, the Arnprior plant was using the technology described in United States Patent No. 3,846,507 ("the Thomm patent") to make its sulfonated catdye nylon, one version of which is called "C–68". (D.I. 293, Tr. at 67, 117–18, 122; JTX 15). According to Dr. Burlone, the polymeric component (A) of his claimed color concentrate is the catdye nylon taught in the Thomm patent; his experimental work at the Arnprior facility involved adding pigment to the catdye nylon of Thomm.[37] (D.I. 293, Tr. at 71, 77, 125). Thus, Dr. Burlone testified, if the coloration steps from Example 1 of his patent were removed, then the nature of the fiber produced would be the sulfonated catdye nylon of Thomm. (D.I. 293, Tr. at 76). In fact, Burlone Example 1 expressly references the "water dispersible polyamide of [the Thomm patent]." (JTX 1, col. 3, 11. 52–53). In addition, Examples 2–10 and 18 of his patent rely on the Thomm patent directly or indirectly. (D.I. 293, Tr. at 124).

On cross-examination, Dr. Burlone testified that the water-dispersible polyamide of Thomm is described in Example 4 of that patent as having four ingredients: 1) 5–sulfoisophthalic acid; 2) isophthalic acid; 3)

---

**36.** According to DuPont, the Burlone patent contains no independent disclosure of sulfonated nylon carrier polymers; rather, the only disclosure is indirect, by reference to the "water-dispersible polyamide" of U.S. Patent No. 3,846,507 ("the Thomm patent"), which in turn discloses

carrier polymers made from epsilon-caprolactam. (D.I. 274, at 27).

**37.** The Thomm patent issued in 1974. (D.I. 293, Tr. at 64; JTX 15).

hexamethylene diamine; and 4) epsilon-caprolactam. (D.I. 293, Tr. at 127; JTX 15, col. 4). The fourth reactant, epsilon-caprolactam, has the following properties: 1) a molecular weight of about 113; 2) a melting point of about 100 degrees C; and 3) water-solubility. (D.I. 293, Tr. at 128). Epsilon-caprolactam is the monomer used to make polycaprolactam, or polyepsilon-caprolactam, which is also the same as Nylon–6. (D.I. 293, Tr. at 128–29). In contrast to epsilon-caprolactam, polycaprolactam has the following properties: 1) molecular weight of about 15,000 or 20,000; 2) a melting point of about 225 degrees; 3) it is not water-soluble; and 4) it is fiber-forming. (D.I. 293, Tr. at 129–30). At trial, Dr. Burlone conceded that the physical properties of polycaprolactam are dramatically different from those of epsilon-caprolactam. (D.I. 293, Tr. at 130).

Dr. Burlone testified that, in making C–68, he used the first three ingredients taught in Example 4 of the Thomm patent: 5–sulfoisophthalic acid, isophthalic acid, and hexamethylene diamine. (D.I. 293, Tr. at 131). As to the fourth ingredient specified in Example 4 of Thomm, Dr. Burlone testified that he always used polycaprolactam instead of epsilon-caprolactam. (D.I. 293, Tr. at 131–32). He testified, however, that in his mind, the monomer and the polymer were entirely equivalent chemically. (D.I. 293, Tr. at 132). He explained:

> Physical properties were not important to manufacture C–68. I was interested in chemical properties. I think any chemist would agree, if you added that as a component of a reaction mixture and cooked it for 20–some hours, that polycaprolactam is depolymerizing to caprolactam and caprolactam is polymerizing to polycaprolactam.
>
> In my mind, they were indistinguishable, in my mind. I think it is clear when I referred to this composition, I referred to the 5–sulfoisophthalic, hexamethylene diamine, isophthalic acid and caprolactam and period. Then I would add a sentence after that that the caprolactam is in the form of a polycaprolactam. I think they are equivalent. The only difference is in the sense that water is different from ice, yes, their physical property is different, yes. They look different, but it is still water.

(D.I. 293, Tr. at 132–33). Dr. Burlone testified that in making C–68, he always used polycaprolactam instead of caprolactam because that was the way he learned to make it when he was in Canada in 1976. (D.I. 293, Tr. at 134–35).

At trial, DuPont attempted to demonstrate that, by the time Dr. Burlone filed his patent application in 1979 referencing the Thomm patent, Dr. Thomm and others at the Arnprior facility, including Dr. Burlone, knew that using polycaprolactam to manufacture C–68 was more effective than using epsilon-caprolactam. To this end, DuPont introduced into evidence several BASF documents. For example, in an internal BASF correspondence dated November 23, 1976, the following question and answer are reflected:

> *Dr. Thomm's Answers*
>
> Q. Why did you elect to add polycaprolactam to the additive rather than the tam monomer [38] originally used?
>
> A. The main reason for adding nylon in the polymer form rather than as a monomer was that the polymer addition slowed down the reaction and made it easier to obtain lower viscosity, softer additive materials.

(JTX 163 at 2). According to DuPont's expert, Dr. McGrath, the above-quoted excerpt from JTX 163 indicates that Dr. Burlone's colleagues at Arnprior knew in November of 1976 that C–68 made from caprolactam and C–68 made from polycaprolactam have different viscosities, and the lower-viscosity C–68 made from polycaprolactam is much more commercially feasible. (D.I. 295, Tr. at 730–31). In contrast, Dr. Burlone testified that, although the above-quoted excerpt indicates that polycaprolactam yielded a softer, lower viscosity material than epsilon-caprolactam, this was not important for his purposes; he testified that viscosity can be controlled simply by controlling the time and temperature during a reaction and it is not dependent

---

**38.** According to Dr. McGrath, "tam" is a well-known abbreviation for caprolactam. (D.I. 295, Tr. at 729).

upon whether the raw materials are in the form of caprolactam or polycaprolactam. (D.I. 293, Tr. at 141). In any event, according to Dr. Burlone, although he was working at the Arnprior facility at the time this memorandum was generated, information of this type was not made known to him while he was working there.[39] (D.I. 293, Tr. at, 135–36, 139).

In a memo dated October 5, 1973, Dr. Thomm and Mr. Knowlton indicated that "New C–68 batches did not cause any noticeable pressure build-up before the screen" whereas "Old C–68 batches caused rapid pressure increase before the screen".[40] (DTX 893). New C–68 refers to C–68 made from polycaprolactam; old C–68 refers to C–68 made from epsilon-caprolactam. Both Dr. Burlone and Dr. McGrath testified at trial that the pressure increase caused by the old C–68 as described in DTX 893 would be undesirable. (D.I. 293, Tr. at 144; D.I. 295, Tr. at 724).

In a report dated November 20, 1973, Dr. Thomm recommended that caprolactam be replaced with polycaprolactam for the manufacture of C–68. (DTX 894 at 2; D.I. 293, Tr. at 145–48). Later in that same report, Dr. Thomm indicated that the use of caprolactam caused dangerous pressure increases. (DTX 894, at 3). At trial, Dr. Burlone conceded that a pressure increase is not a good result. (D.I. 293, Tr. at 156).

Finally, DuPont introduced an entry from Dr. Burlone's notebook dated December 1, 1976 that reflects a conversation that he had with Dr. Thomm. According to these notes, Dr. Thomm informed Dr. Burlone that when caprolactam was used in the polymer matrix, but these problems were greatly reduced when polycaprolactam was used. (JTX 21 at 2). The notes also indicate that Dr. Thomm used caprolactam in his patent because it was less expensive. At trial, Dr. Burlone testified that his discussion with Dr. Thomm in 1976 was not the reason why he never used epsilon-caprolactam, the monomer, to make C–68. Instead, he always used polycaprolac-

tam because that was the only way that he learned to make it. (D.I. 293, Tr. at 161).

The conflicting testimony of the experts with regard to whether Dr. Burlone knew at the time he filed his patent application of a mode of practicing his invention that was better than any other can be summarized as follows. Dr. Burlone maintained that, notwithstanding the express reference in his patent to the water-dispersible polyamide of Thomm, he always used polycaprolactam to make C–68 (instead of caprolactam) because that was the only way he learned to make it. According to Dr. Burlone, epsilon-caprolactam and polycaprolactam are chemically equivalent, and the above-referenced documents do not indicate, as DuPont asserts, that using polycaprolactam yields dramatically different results than using epsilon-caprolactam. In fact, according to Dr. Burlone, catdye nylon made from polycaprolactam is indistinguishable from catdye nylon made from epsilon-caprolactam.

In contrast, Dr. McGrath testified that the above-referenced documents confirm his opinion that C–68 made with polycaprolactam is very different from C–68 made with epsilon-caprolactam. (D.I. 295, Tr. at 731). Based upon this testimony and the above-referenced documents, DuPont contends that Dr. Burlone knew at the time he filed his patent application in 1979 that polycaprolactam was much more effective as a reactant than caprolactam in making C–68, but in his patent, he only disclosed caprolactam by reference to the water-dispersible polyamide of Thomm.

After careful review of the evidence presented at trial, the Court is not persuaded that DuPont has demonstrated by clear and convincing evidence that at the time Dr. Burlone filed his patent application, he "knew of a mode of practicing his invention that he considered to be better than any other." First, DuPont's arguments are based upon an alleged best mode for *manufacturing* C–68. (*E.g.*, D.I. 295, Tr. at 722). In this regard, there is some force to BASF's argument that the Burlone patent is directed to a

---

**39.** He also testified that he had in fact seen the memo before, but he was not sure when he had seen it. (D.I. 293, Tr. at 135–36).

**40.** Mr. Knowlton is the second named inventor on the Thomm patent.

**718**

blend of catdye nylon and colored pigment, and is not directed to the *manufacture* of the nylon component. That is, Dr. Burlone does not teach or claim a mode for making catdye nylon; rather, he defines his polymeric component (A), which is typically a sulfonated nylon, by reference to subparts (A)(1) through (A)(5). The notes of Dr. Burlone's conversation with Dr. Thomm (JTX 21) do not compel a different conclusion. These notes reflect Dr. Thomm's beliefs about methods for manufacturing catdye nylon; Dr. Burlone does not claim a method for manufacturing catdye nylon.

Second, the subjective prong of the best mode analysis requires that the inventor "knew of a mode of practicing his invention that he considered to be better than any other." Thus, this inquiry turns on Dr. Burlone's subjective knowledge and belief. At trial, Dr. Burlone testified repeatedly that he used polycaprolactam in his C–68 synthesis because that was the only way he was taught to make it. The fact that he used polycaprolactam because that was the only way he was taught tends to negate a finding that he used polycaprolactam because he considered it to be better than any other mode of practicing his invention. The documents introduced by DuPont do not compel a different conclusion. Even if the report dated November 20, 1973 (DTX 894) and the memos dated November 23, 1976 (JTX 163) and October 5, 1973 (DTX 893) reflect that in making C–68, polycaprolactam yields better results than caprolactam, the evidence of record does not support a finding that Dr. Burlone had any knowledge of the contents of these documents when he filed his patent application. In fact, Dr. Burlone testified that he had not seen these documents.[41] (*E.g.,* D.I. 293, Tr. at 144, 146). Dr. Burlone also testified that Dr. Thomm was not working at the Arnprior facility while he was there and that he had never met Dr. Thomm. (D.I. 293, Tr. at 117, 126). Thus, notwithstanding the Court's conclusion that the documents are directed to the manufacture of C–68 which is not taught in the Burlone patent, the evidence at trial as to whether Dr. Burlone had access to the

documents represented by DTX 893, 894 and JTX 163 is far from convincing. Moreover, Dr. Burlone testified repeatedly that catdye nylon made from caprolactam is chemically indistinguishable from catdye nylon made from polycaprolactam. (*E.g.,* D.I. 293, Tr. at 252).

Finally, even if Dr. Burlone "knew of a mode of practicing his invention that he considered to be better than any other", as DuPont contends, DuPont has not established by clear and convincing evidence that the disclosure in the Burlone patent was inadequate to enable one skilled in the art to practice the alleged best mode. In arguing that the Thomm patent (as referenced in the Burlone patent) discloses only one method of making catdye nylon, *i.e.,* with caprolactam, DuPont references only Example 4 of Thomm. However, at trial, Dr. Burlone testified that the "water-dispersible polyamide in Thomm is not a single polyamide." Instead, according to Dr. Burlone, the Thomm patent discloses "a range of polyamides." (D.I. 293, Tr. at 119). At his deposition, Dr. Burlone testified that polycaprolactam is within the range of polyamides disclosed in Thomm. Specifically, he testified that in Example 5 of Thomm, "caprolactam is added in the form of both a monomeric caprolactam and a polycaprolactam." (JTX 47, Dep. at 574; *see also* JTX 15, col. 5, 11. 5–24). He testified further that although he chose to add caprolactam only in its polymeric form, he believed that the form of the caprolactam is not critical. (JTX 47 at 574).

DuPont has not pointed to any evidence contrary to Dr. Burlone's testimony that Example 5 of the Thomm patent discloses a method of making catdye nylon with polycaprolactam. Instead, DuPont merely states in its rebuttal brief that:

> [A]ll of the examples of the Thomm patent, including Example 5, on their face show only caprolactam as a *reactant.* The nylon 6 (polycaprolactam) referred to in Example 5 and Claim 2 is not a *reactant.* It is only *blended* in after polymerization.

---

41. With regard to JTX 163, Dr. Burlone testified that he had seen this document before, but he

was not sure when. (D.I. 293, Tr. at 135–36).

(D.I. 289 at 18) (emphasis in original). Although this statement indeed appears contrary to BASF's arguments with regard to the scope of the disclosure of Example 5 of Thomm, DuPont cites no testimony to support this proposition. Thus, even if DuPont had satisfied the subjective prong of the best mode analysis (which it has not), DuPont has failed to demonstrate by clear and convincing evidence that the disclosure in the Burlone patent would not enable one skilled in the art to practice the alleged best mode. In this regard, the cases cited by DuPont in support of its position do not compel a different conclusion as they are factually distinguishable.

For all of the foregoing reasons, the Court finds that DuPont has not demonstrated by clear and convincing evidence that the Burlone patent is invalid for failure to comply with the best mode requirement of § 112.

#### d. *Conclusion—Invalidity*

After careful consideration of the evidence and the arguments of the parties, the Court finds that DuPont has failed to establish by clear and convincing evidence that the Burlone patent is invalid.

### E. *Attorneys' Fees*

▮▮▮▮ DuPont contends that this case is exceptional under 35 U.S.C. § 285. Accordingly, DuPont argues that it is entitled to an award of attorney's fees. Section 285 provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." A case is exceptional if "it would be grossly unfair for the prevailing party to bear the cost of litigation, or where the conduct of the losing party is marked by bad-faith or unfairness." *Interspiro U.S.A., Inc. v. Figgie International, Inc.,* 815 F.Supp. 1488, 1521 (D.Del.1993), *aff'd,* 18 F.3d 927 (Fed.Cir.1994). Factors to consider in determining whether a case is exceptional include the closeness of the case, and the conduct of the parties, including evidence of bad faith. *Id.*

▮▮▮ The Court finds that this is not an exceptional case under § 285. Contrary to DuPont's contentions, the Court does not believe that this suit was vexatious or frivolous; BASF's construction of the Burlone patent claims was plausible. Moreover, the record does not support a finding of unfairness or bad faith on the part of BASF. The Court therefore concludes that it would not be "grossly unfair" for DuPont to bear the cost of litigation.

### III. *THE ANTON PHASE*

### A. *Technological Background*

The technology at issue in the Anton phase of this case, like the technology in the Burlone phase, relates to nylon fibers and, more specifically, to a process for manufacturing sulfonated, stain-resistant, solution dyed nylon fibers. The "stain resistance" that is at issue here refers specifically to acid dye stain-resistance, which is a property of the nylon fibers that derives from the presence of sulfonate groups. Acid dye stain-resistance is imparted to nylon carpet fibers in one of two ways. The first way is to topically apply sulfonated stain-blockers to conventionally dyed carpet fibers. (*E.g.,* D.I. 295, Sandukas, Tr. at 696). These carpet fibers that are topically treated with sulfonated stain-blockers are typically sold in the residential market. (*E.g.,* D.I. 295, Tr. at 633–34).

A second way to impart acid dye stain-resistance to nylon carpet fibers is to incorporate the sulfonate groups directly into the nylon polymer prior to spinning the nylon into fibers. Because the sulfonates in this second method are incorporated into the nylon prior to spinning, the resulting acid-dye stain resistance of the fibers has been termed "built-in" stain resistance to distinguish it from the acid stain resistance that results from the topical application of stain-blocking chemicals on already-formed carpet fibers. (*E.g.,* D.I. 295, Sandukas, Tr. at 633; *see also* D.I. 296, Scott, Tr. at 1061). These sulfonated, solution-dyed nylon fibers with "built-in" stain resistance, which result from the process that is at issue in this case, are used principally in the manufacture of carpets for commercial environments. (*E.g.,* D.I. 295, Tr. at 634).

### B. *The Anton Patent*

There are seven named inventors on the

Anton patent in suit.[42] The patent application was filed on December 14, 1988, and the patent ultimately issued on April 28, 1992. The Anton patent (U.S. Patent No. 5,108,684) is entitled "Process for Producing Stain–Resistant, Pigmented Nylon Fibers." (JTX 4). Claim 1 of the patent, the only independent claim, provides:

1. A process for producing stain-resistant, pigmented nylon fiber comprising the steps of:

a. forming a sulfonated nylon copolymer containing 0.25–4.0 weight percent of an aromatic sulfonate or an alkali metal salt thereof;

b. adding pigment to the copolymer to form a pigment/copolymer blend; and

c. spinning the pigment/copolymer blend into a fiber,

where the fiber so produced has a CIELAB L* value less than 88 or, if the CIELAB L* value is 88 or greater has a CIELAB C* value greater than 8.

(JTX 4, col. 8, ll. 67–68, col. 9, ll. 1–12).

The CIELAB L* value refers to a quantitative measure of lightness or darkness of a carpet fiber. (D.I. 309, Wilkes, Tr. at 1245). The CIELAB L* scale runs from 0 to 100, with 0 describing the very darkest fiber, and 100 describing the very lightest fiber. By limiting the fibers produced from the claimed process to those with CIELAB L* value of less than 88, the Anton patent excludes those fibers that are "very close to white." (D.I. 295, Sandukas, Tr. at 702).

Claims 2, 3 and 5 of the Anton patent are all dependent from Claim 1 and provide:

2. The process of claim 1 where the aromatic sulfonate is a sulfonated dicarboxylic acid or a sulfonated diester.

3. The process of claim 2 where the sulfonated dicarboxylic acid is 5–sulfoisophthalic acid.

. . . .

5. The process of claim 1, 2, 3, or 4 where the nylon copolymer is a nylon 6,6 copolymer.

(JTX 4, col. 9, ll. 14–19; col. 10, ll. 4–5).

Simply stated, Claim 1 of the Anton patent discloses a three-step process for manufacturing producer-colored, stain-resistant, sulfonated nylon fibers. Claims 2 and 3 further define the sulfonate component of Claim 1(a). Claim 5 discloses the use of nylon–6,6 as the nylon copolymer of Claims 1, 2 or 3. Pursuant to the process disclosed in the Anton patent, DuPont manufactures its LUMENA carpet fibers.

In this case, DuPont charges Monsanto with infringement of Claims 1, 2, 3, and 5 of the Anton patent. DuPont's charge of infringement against Monsanto is based upon the manufacture of ULTRON SD fibers and LEXES fibers. ULTRON SD is the Monsanto trademark for producer-colored nylon carpet fiber that is processed for Monsanto by CaMac Corporation using a sulfonated nylon copolymer supplied by Monsanto; LEXES is the CaMac trademark for producer-colored nylon carpet fiber sold by CaMac that is made from a sulfonated nylon copolymer supplied by Monsanto.

Also in this case, DuPont charges BASF with infringement of Claims 1, 2 and 3 of the Anton patent based upon the manufacture of CAMALON fibers by CaMac. CAMALON is the CaMac trademark for a producer-colored nylon carpet fiber made from a sulfonated nylon copolymer supplied by BASF to CaMac.

### C. Arguments of the Parties

#### 1. Infringement

##### a. Direct Infringement by Monsanto

According to DuPont, LUMENA carpet fibers, which are manufactured pursuant to the process described in the Anton patent, were introduced in 1989. Thereafter, DuPont alleges, Monsanto was pressured by one of its biggest customers, Shaw Industries, to develop a sulfonated, producer-colored carpet fiber that was highly stain-resistant. (D.I. 275 at 13–14). In response, DuPont asserts, Monsanto entered into a "toll processing" agreement with CaMac under which Monsanto would supply CaMac with a sulfonated nylon copolymer, and CaMac would, in turn, manufacture producer-colored fibers for

---

**42.** Anthony Anton is the first of the named inventors.

Monsanto. (D.I. 275 at 14; D.I. 309, Wilson, Tr. at 1463). DuPont contends that, under this toll processing agreement between Monsanto and CaMac, Monsanto first practices step (a) of Claim 1 of the Anton patent by manufacturing a sulfonated nylon–6,6 copolymer designated "46BJ". Then, DuPont alleges, Monsanto ships the 46BJ copolymer to CaMac, and CaMac processes the material into producer-colored nylon fiber for Monsanto. (D.I. 275 at 14–15). According to DuPont, CaMac adds pigment to the 46BJ copolymer to form a pigment/copolymer blend, which satisfies step (b) of Anton Claim 1, and then spins the blend into fibers, which satisfies step (c). (D.I. 275 at 15; D.I. 309, Wilkes, Tr. at 1253–54). DuPont asserts that CaMac uses these process steps to make producer-colored nylon fibers for Monsanto in two different physical forms: bulked continuous filament ("BCF") and staple, and Monsanto sells both under the name ULTRON SD.[43] According to DuPont, forty-three ULTRON SD BCF products meet the stain-resistance and CIELAB requirements of the Anton patent.[44]

In addition to the 46BJ polymer supplied by Monsanto to CaMac for the manufacture of ULTRON SD fibers, DuPont alleges that Monsanto also sells 46BJ copolymer to CaMac so that CaMac can manufacture its own producer-colored BCF fibers. (D.I. 275 at 16). CaMac's fibers, which DuPont contends are manufactured according to the process described in the Anton patent, are sold by CaMac under the name LEXES. DuPont asserts that twenty-five of the eighty-six available LEXES colors meet the stain-resistance and CIELAB requirements of the Anton patent. (D.I. 309, Wilkes, Tr. at 1251–52).

In sum, DuPont contends that Monsanto directly infringes Claims 1, 2, 3 and 5 of the Anton patent because the process used to manufacture ULTRON SD and LEXES fibers is the three-step process disclosed in Claim 1 of the Anton patent, and Monsanto's use of nylon–6,6 copolymer and 5–sulfoisophthalic acid meets the limitations of dependent claims 2, 3 and 5.[45] (See, e.g., D.I. 309, Wilkes, Tr. at 1250–51). According to DuPont, Monsanto is liable for direct infringement under 35 U.S.C. § 271(a) and (g) for the manufacture and sale of its ULTRON SD fibers, and for joint infringement under § 271(a) with respect to the manufacture of LEXES fibers.

In response, Monsanto asserts that it does not directly infringe the Anton patent under § 271(a) because it does not perform the claimed process. (D.I. 282 at 18). Rather, according to Monsanto, it manufactures sulfonated nylon copolymer and ships it to CaMac for conversion to Monsanto's ULTRON SD fiber. (D.I. 282 at 19). In addition, with regard to CaMac's LEXES fiber, Monsanto asserts that it only sells 46BJ sulfonated nylon copolymer to CaMac; it does not conduct the process to make CaMac's LEXES fiber. In any event, according to Monsanto, the process carried out by CaMac to make ULTRON SD and LEXES fibers does not infringe the Anton patent because the process does not result in stain-resistant fibers within the meaning of the patent claims. (D.I. 282 at 20). According to Monsanto, light colors in the ULTRON SD and LEXES lines stain unacceptably under the tests provided in the Anton patent. Therefore, Monsanto argues, because both product lines contain fibers that stain unacceptably when light shades of pigment are used, the process used to produce these fibers cannot and does not directly infringe the Anton patent. (D.I. 282 at 21).

b. *Direct Infringement by BASF*

After the introduction of LUMENA carpet fibers in 1989, according to DuPont, BASF

---

**43.** The differences between the ULTRON SD BCF product and the staple product are as follows. After being spun into fiber, the BCF product is "textured as a continuous filament. It's bulked." (D.I. 297, Wilson, Tr. at 1441). In contrast, the staple product is drawn, textured, cut and shipped in bale form, rather than in continuous filament form. (D.I. 297, Tr. at 1441).

**44.** At trial, DuPont limited its infringement proofs to the BCF fiber form; DuPont offered no evidence of infringement on the staple products. (See D.I. 297, Tr. at 1203–04).

**45.** Monsanto has indemnified CaMac Corporation against any liability for infringing the DuPont patent arising from CaMac's toll processing activities.

developed (at the request of CaMac Corporation) a sulfonated nylon copolymer specifically for use in a process for making fibers to compete with DuPont's LUMENA fibers. (D.I. 275 at 17). DuPont contends that BASF's manufacture of this copolymer, designated "BV–600C2", satisfies step (a) of Claim 1 of the Anton patent. (D.I. 309, Wilkes, Tr. at 1257). DuPont asserts further that BASF supplies its BV–600C2 copolymer to CaMac, which then practices step (b) of Anton Claim 1 by adding pigment to the BV–600C2 to form pigment/copolymer blends. (D.I. 309, Wilkes, Tr. at 1259). Then, according to DuPont, CaMac practices step (c) by spinning the pigment/copolymer blends into nylon fibers. (D.I. 275 at 18; D.I. 309, Tr. at 1260). CaMac sells these producer-colored nylon fibers made from BASF's BV–600C2 copolymer under the tradename CAMALON.[46] According to DuPont, at least twenty-five of the ninety-six available CAMALON fibers are stain-resistant and have the CIELAB L* values described in Claim 1 of the Anton patent. (*E.g.*, D.I. 309, Tr. at 1262–63). Thus, DuPont argues, these fibers are made by processes that satisfy all of the limitations of Claim 1. DuPont argues further that the use of 5–sulfoisophthalic acid in the BV–600C2 copolymer satisfies the limitations of Claims 2 and 3 as well.[47] (D.I. 309, Tr. at 1265–66).

In response, BASF contends that it does not directly infringe the Anton patent under § 271(a) because BASF does not "make, use or sell" the claimed three-step process. (D.I. 281 at 28). As to CaMac's activities, BASF contends that the process used by CaMac to manufacture CAMALON fibers does not infringe the Anton claims because the process does not result in stain-resistant fibers. (D.I. 281 at 33). According to BASF, unlike the LUMENA fibers which uniformly pass the stain tests across its entire color line, the light shades of CAMALON fail the stain tests specified in the Anton patent. Thus, BASF asserts, DuPont has failed to demonstrate direct infringement of the Anton patent.

### c. *Inducement of Infringement by Monsanto and BASF*

DuPont also argues that Monsanto and BASF actively induce infringement by CaMac. According to DuPont, Monsanto actively and knowingly aids and abets CaMac's infringement in connection with CaMac's manufacture of ULTRON SD carpet fibers and CaMac's manufacture and sale of LEXES carpet fibers, and BASF actively induces CaMac to infringe DuPont's Anton patent through its manufacture and sale of CAMALON fibers. DuPont contends that Monsanto and BASF have further encouraged CaMac's infringement by virtue of their indemnification of CaMac.

In response, Monsanto contends that sulfonated nylon copolymer, such as its 46BJ polymer, is a staple of commerce, and Monsanto's sale of the copolymer alone cannot constitute inducement of infringement. Monsanto contends further that, even if the process used to manufacture CaMac's LEXES fibers infringes the Anton patent, there is no evidence of record to support a finding that Monsanto has any influence over CaMac's use of Monsanto's 46BJ polymer in conducting the process to make LEXES fibers. Similarly, BASF contends that, even if CaMac's process for manufacturing CAMALON fibers infringes the Anton patent, BASF merely supplies the catdye polymer. BASF asserts that it has no involvement in CaMac's decision to use certain pigments or make certain colors. Rather, according to BASF, CaMac controls its pigment and coloring information very closely and does not share that information with BASF or any other competitor in the industry.

### d. *Willfulness*

DuPont contends that both Monsanto and BASF are liable as willful infringers. According to DuPont, both Monsanto and

---

**46.** CaMac has apparently replaced the "CAMALON" designation with the designation "Nylon SD". (D.I. 300, Hale, Tr. at 2004). For purposes of consistency within this Opinion, the Court will use the CAMALON designation.

**47.** BASF has indemnified CaMac against any liability for infringement of the Anton patent.

BASF had knowledge of the Anton patent in 1992, but both parties continued their activities despite notice of the patent. Needless to say, both Monsanto and BASF deny DuPont's charges of willfulness. Monsanto contends that when it learned of the Anton patent, it informed DuPont of its own application pending in the PTO with claims directed to the same subject matter. Monsanto contends that it independently developed its process for pigmenting cat-dye nylon fibers years before the Anton patent issued. Accordingly, Monsanto contends that its behavior since the commencement of this litigation reflects its good faith belief that the Anton patent is invalid.

BASF asserts that, upon learning of the Anton patent, it promptly obtained a written opinion from its outside patent counsel that the Anton claims were invalid and unenforceable. BASF contends that it considered the opinion to be thorough and competent and, in reliance upon it, BASF believed that it could continue to sell BV600 to CaMac without incurring liability. Thus, BASF contends, the evidence of record does not support a finding of willfulness.

### 2. *Invalidity*

Monsanto and BASF vigorously contend that the Anton patent is invalid. In support of this contention, they argue that: 1) the claims are invalid under 35 U.S.C. § 102(g) because Monsanto and BASF performed the claimed process first; 2) the claimed subject matter is anticipated by Example 9 of the Burlone patent; and 3) the invention disclosed in the Anton patent is obvious. Monsanto and BASF also contend that DuPont made material misrepresentations before the PTO which resulted in the issuance of the Anton patent.

DuPont points out that the Anton patent has been reexamined twice by the PTO at the request of CaMac, and in both reexaminations, the PTO confirmed the validity of all of the Anton patent claims. In any event, according to DuPont, Monsanto and BASF have failed in their proofs to establish invalidity.

### D. *Analysis*

In resolving the disputes arising under the Anton patent, the Court will first address the issues relating to DuPont's allegations of patent infringement. The Court will then address the issue of invalidity raised by Monsanto and BASF.

### 1. *Infringement*

As outlined in Section II.D.1., *supra*, the "issue of infringement raises at least two questions: (1) what is patented, and (2) has what is patented been made, used or sold by another." *Fromson*, 720 F.2d at 1569.

### a. *Claim Construction*

 The primary dispute between the parties in this case regarding the construction of the Anton patent claims revolves around the "stain-resistant" limitation. The patent claims a process for producing *stain-resistant*, pigmented fibers. At issue is whether the claimed stain-resistance must be evaluated by testing only light-colored fibers, or whether the stain-resistance can be evaluated on a fiber-by-fiber basis. That is, the ULTRON SD BCF product line consists of 44 colors, the LEXES product line consists of 86 colors, and the CAMALON product line consists of 96 colors. Advocating a fiber-by-fiber approach to the issue of infringement, DuPont contends that Monsanto and BASF are liable for infringement based upon the forty-three ULTRON SD BCF, twenty-five LEXES, and twenty-five CAMALON fibers that are stain-resistant within the meaning of the Anton claims.

In contrast, Monsanto and BASF contend that the stain-resistance claimed in the Anton patent can be measured only by testing light-colored carpet fibers. They contend that this construction of the term is supported by the patent specification, by the practice in the industry, and by common sense. According to them, DuPont's own stain testing demonstrates that some of the lightest colored carpet fibers in each of the accused product lines stain unacceptably under the stain tests described in the Anton patent, and yet, the same process is used to manufacture all of the fibers in the ULTRON SD product line, all of the fibers in the LEXES product line,

and all of the fibers in the CAMALON product line. Therefore, according to Monsanto and BASF, because light-colored fibers from each of these product lines stain unacceptably under the stain tests described in the Anton patent, the single process that is used to manufacture all of these products does not produce "stain-resistant" fibers within the meaning of the Anton patent.

To ascertain the meaning of the claims at issue and, in particular, the meaning of the claimed "stain resistance", the Court must examine the language of the claim, the specification, and the prosecution history. *ZMI Corp.*, 844 F.2d at 1579.

The Anton patent is entitled "Process for Producing Stain-Resistant, Pigmented Nylon Fibers." (JTX 4). The claimed process is comprised of three steps, all of which are disclosed in Claim 1 of the patent. The first step of the process, step (a), teaches the "forming a sulfonated nylon copolymer containing 0.25–4.0 weight percent of an aromatic sulfonate or an alkali metal salt thereof". (JTX 4, col. 9, 11. 1–4). The second step, disclosed in step (b), teaches the addition of "pigment to the copolymer to form a pigment/copolymer blend", and the third step, step (c), involves "spinning the pigment/copolymer blend into a fiber." (JTX 4, col. 9, 11. 6–8). As an additional limitation on the process disclosed in steps (a), (b), and (c), Claim 1 limits the scope of its coverage to those fibers produced according to steps (a), (b) and (c) that have a "CIELAB L* value less than 88 or if the CIELAB L* value is 88 or greater has a CIELAB C* value greater than 8." (JTX 4, col. 9, 11. 9–11). As explained above, the CIELAB L* value is a measure of the lightness or darkness of a fiber, with zero representing the very darkest fiber and 100 representing the whitest fiber. (*E.g.*, D.I. 309, Wilkes, Tr. at 1231, 1245). The CIELAB C* value is a measure of brightness. Simply put, Claim 1 of the Anton patent claims a three-step process for producing stain-resistant, sulfonated, pigmented nylon fibers with CIELAB L* values less than 88.[48]

The stain-resistance limitation of Claim 1 is defined by reference to the specification of the patent. The specification of the Anton patent discloses, in the section entitled "Description of Test Methods", three different stain tests by which to measure the stain-resistance of a fiber produced according to the process described in Claim 1. Each of the tests is directed to determining the resistance of the fiber to acid dye staining. The staining agent used in each of the tests is cherry-flavored, sugar sweetened Kool–Aid, which contains Red Dye 40, an acid dye. (*E.g.*, JTX 4, col. 4, 11. 56–57; D.I. 295, Sandukas, Tr. at 694; D.I. 309, Wilkes, Tr. at 1236, 1265, 1414; D.I. 299, Lesnoy, Tr. at 2041–42).

In Stain Test No. 1 of the Anton patent, 20 ml of Kool–Aid are poured onto the carpet sample, and the sample is left undisturbed for a period of 24 hours. (JTX 4, col. 4, 11. 61–65). After the 24–hour period has expired, excess stain is blotted with a white paper towel. (JTX 4, col. 5, 11. 1–9). The stain is then treated with a cleaning solution until the stain is no longer visible, or no further progress can be achieved. (JTX 4, col. 4, *see generally* 11. 10–26). The stain-resistance of the carpet is then visually determined by the amount of color that is left in the stained area after the cleaning treatments are completed. (JTX 4, col. 5, 11. 27–29). According to the specification, this process of evaluating the amount of stain left on the carpet is referred to as stain-rating, and it is performed by reference to the Stain Rating Scale that is illustrated in figure 1 of the patent. (JTX 4, col. 5, 11. 27–32). The Stain Rating Scale characterizes the colors of the stain remaining on the carpet after the cleaning treatments have been completed as follows:

5 = no staining

4 = slight staining

3 = noticeable staining

---

48. Claims 2 and 3 impose additional limitations upon the sulfonate group that is disclosed in step (a). Specifically, Claim 2 limits the aromatic sulfonate of step (a) to a sulfonated dicarboxylic acid or a sulfonated diester. (JTX 4, col. 9, 11. 14–16). Claim 3 limits the sulfonated dicarboxylic acid of Claim 2 to 5–sulfoisophthalic acid. (JTX 4, col. 9, 11. 18–19). Claim 5 of the patent limits the nylon copolymer described in Claim 1 to nylon–6,6. (JTX 4, col. 10, 11. 4–5).

2 = considerable staining

1 = heavy staining

(JTX 4, col. 5, 11. 38–42). With regard to this scale, the specification of the patent explains that:

> [A] stain-rating of 5 is excellent, showing excellent stain-resistance, where 1 is a poor rating, showing heavy staining. Although a rating of 5 is clearly preferred, a stain-rating of 4 is considered an indication of acceptable stain resistance.

(JTX 4, col. 5, 11. 43–47).

Stain Test No. 2 of the Anton patent is similar to Stain Test No. 1 except that Test No. 2 uses as its sample a piece of yarn that has been cut from a circular knit tubing and immersed into the cherry Kool–Aid. (JTX 4, col. 5, 11. 50–54). The third stain test that is described in the patent, Stain Test No. 3, starts with a carpet sample as in Test 1, and teaches the immersion of the carpet sample into a detergent solution prior to staining. (JTX 4, col. 5, 11. 61–68; col. 6, 11. 1–3). Both Stain Test No. 2 and Stain Test No. 3 use the same Stain Rating Scale that is used in Test 1 to evaluate the stained carpet. (JTX 4, col. 5, 11. 57–58; col. 6, 1. 3). As to the scope and meaning of the term "stain-resistant" within the Anton patent, the specification unequivocally states that "stain-resistant" within the meaning of the claims "refers to fibers or carpets made therefrom having a stain-rating of 4 or 5 as determined according to any of the Stain Tests" described in the patent. (JTX 4, col. 2, 11. 55–58).

After the "Description of the Test Methods" section, the specification of the Anton patent provides 16 examples. In each of the 16 examples, nylon fibers were formed according to process steps (a), (b), and (c) of Claim 1. In most of the 16 examples, the fibers were then tested for stain-resistance according to the stain tests disclosed in the patent.[49] In all of the examples in which stain-testing was performed, the samples achieved a stain-rating of 4 or 5. (*E.g.*, JTX 4, col. 7, 11. 4–5, 11. 24–26, 40–43, 45–47, 66–68; col. 8, 11. 3–5). The acid dye stain-resistance of the fibers produced by the Anton process is principally the result of the incorporation of the aromatic sulfonate in step (a) of Claim 1.[50] (*E.g.*, JTX 4, col. 1, 11. 17–21; D.I. 299, Lesnoy, Tr. at 2042).

As an initial matter, the Court observes that the parties do not dispute that the "stain-resistance" of the Anton patent is expressly directed to those fibers that achieve a 4 or 5 on the Stain Rating Scale after being subjected to any of the three Kool–Aid tests described in the patent. (*See, e.g.,* D.I. 299, Harris, Tr. at 2259–60). The dispute between the parties relates to whether the claimed stain-resistance can be evaluated on a fiber-by-fiber basis or whether the stain-resistance must be evaluated by testing light-colored fibers. The arguments of the parties in this regard can be summarized as follows. DuPont contends that Monsanto is liable for infringement based upon the forty-three UL-TRON SD BCF and twenty-five LEXES fibers that achieved a 4 or 5 on the stain-rating scale after being subjected to Kool–Aid Stain Test No. 2, and BASF is liable for infringement based upon the twenty-five CAMALON colors that achieved a 4 or 5; according to DuPont, the remaining fibers from those product lines that achieved less than a 4 or 5 on the stain-rating scale after Kool–Aid testing do not infringe the Anton patent.[51] Thus, DuPont essentially contends that "stain resistance" can appropriately be

---

**49.** In Examples 1 and 2, the samples were not tested for stain resistance because the shade of the fibers, medium blue, was sufficiently dark that stains were not likely to be visible. (JTX 4, col. 6, 11. 43–45).

**50.** According to BASF's Mr. Lesnoy, the sulfonate groups carry a negative molecular charge. Acid dyes, like those found in Kool–Aid, also carry negative molecular charges. Thus, when the acid dye comes in contact with the sulfonate groups, the two materials repel each other. (D.I. 300, Lesnoy, Tr. at 2044–45).

**51.** In fact, DuPont tested forty-four of the UL-TRON SD BCF products, only thirty of the eighty-six LEXES products, and forty-six of the ninety-six CAMALON products. (*See* D.I. 299, Hale, Tr. at 1910, 1927; Wilkes, Tr. at 1338–40). At trial, DuPont offered no evidence on the stain-resistance or CIELAB L* values of Monsanto's ULTRON SD *staple* fibers. (*See* D.I. 297, Tr. at 1203–04).

determined on a fiber-by-fiber basis. (*E.g.,* D.I. 309, Tr. at 1335). That is, each of the individual colored fibers in the ULTRON SD, LEXES, and CAMALON product lines can be subjected to Kool–Aid tests; those colors that achieve a 4 or 5 on the Stain Rating Scale satisfy the stain-resistant limitation of the Anton patent, and those that achieve a 3 or less do not satisfy this limitation and therefore do not infringe.

Monsanto and BASF disagree with Du-Pont's construction of the scope of the term "stain resistant". They contend that the whole objective of the Anton patent was to claim a process for producing stain-resistant fibers in a wide variety of colors and, particularly, in lighter colors because staining tends to be more visible on lighter colors. That DuPont achieved its objective is evidenced by DuPont's 52 LUMENA products, all of which are allegedly stain-resistant within the meaning of the Anton patent claims.[52] (D.I. 309, Wilkes, Tr. at 1275, 1309). Accordingly, Monsanto and BASF contend that the stain-resistance limitation of the Anton patent can be determined only by testing light-colored fibers. They assert that: 1) DuPont itself evaluated the stain resistance of its fibers by testing the lighter colors, and 2) it is standard industry practice to perform the Kool–Aid test on light-colored fibers because dark colors would mask the red Kool–Aid stain. Monsanto and BASF contend that DuPont's argument that stain resistance (and infringement) can be evaluated on a color-by-color basis is contrary to the whole purpose of the invention, which was to create a process that would produce stain-resistant fibers using a wide variety of pigments.

The evidence at trial with regard to the scope of the stain-resistance limitation of the Anton patent consisted primarily of the conflicting testimony of Dr. Wilkes and Mr. Lesnoy. DuPont's Dr. Wilkes opined that the patent's specification supports a construction of the stain-resistance limitation as being appropriately determined on a color-by-color or fiber-by-fiber basis. He testified:

Q: What do you find in the patent, itself, that teaches you whether or not you should test only light colors or you should test any color that you happen to be making, that you were interested in.

A: Well, my clear interpretation of the patent is that you test whatever material, whatever fiber you have, that you wish to find out whether you are within the scope of the patent.

(D.I. 309, Wilkes, Tr. at 1421). According to Dr. Wilkes, "you have to deal with each [color] package, each package as a separate—as separate issue, as a separate process." (D.I. 309, Tr. at 1312). He testified repeatedly that to evaluate stain-resistance under the Anton patent, it is necessary to look "at each fiber, one by one, as to whether it, indeed, it achieves this uniform stain resistance to give it, therefore, a 4 or above."[53] (D.I. 309, Tr. at 1314; *see also* Tr. at 1324, 1335, 1383).

In contrast, BASF's Mr. Lesnoy testified that to determine stain-resistance under An-

---

52. Monsanto does not necessarily concede that all of the LUMENA products are indeed stain-resistant within the meaning of the Anton patent. At trial, Monsanto vigorously challenged the validity of the stain tests of the 52 LUMENA fibers by DuPont's Dr. Wilkes on the ground that Dr. Wilkes had not himself contacted the carpet samples with Kool–Aid, nor did he himself determine the CIELAB L* values of the tested samples. Rather, Dr. Wilkes had been provided with already-stained samples by a DuPont employee, Dr. Shellenbarger. (*E.g.,* D.I. 297, Tr. at 1361–66). The CIELAB L* values were determined by a lab tech employed by DuPont. (D.I. 297, Tr. at 1273). Dr. Wilkes then assigned a stain rating to each of the samples. (D.I. 297, Tr. at 1366).

53. Monsanto and BASF vigorously challenge Dr. Wilkes' qualifications to testify as an expert on stain testing in this case. At trial, Monsanto conducted voir dire of Dr. Wilkes and elicited the following testimony: 1) Dr. Wilkes had never pigmented nylon before; 2) prior to this litigation, Dr. Wilkes had never made quantitative determinations of discolorations on fabric; 3) prior to this litigation, Dr. Wilkes had never conducted Kool–Aid tests or determined CIELAB L* values; and 4) to learn how to conduct his tests in this case, Dr. Wilkes was trained by DuPont personnel. (D.I. 297, Tr. at 1213, 1217, 1218, 1220). In its post-trial brief, Monsanto argues that "Dr. Wilkes had no meaningful experience or expertise about the subject matter of the Anton patent or the prior art. His were made-for-litigation opinions that do not reflect the knowledge or practice of one of skill in the art." (D.I. 282 at 8). BASF echoes this contention. (D.I. 281 at 17 n. 12).

ton Claim 1, the patent requires that light shades of fiber be tested. (D.I. 299, Lesnoy, Tr. at 2050). He explained that a given catdye nylon has a fixed ability to accept or repel Kool–Aid and so, the same level of stain resistance would be present throughout an entire color line, based on the stain results obtained in the light colored fibers.[54] (D.I. 299, Tr. at 2079). In support of his construction of the meaning of stain-resistant within the Anton patent, Mr. Lesnoy pointed to several statements in the specification. For example, he pointed to the section entitled "Background of the Invention", where the specification provides:

> Recently, yarn producers have begun incorporating colored pigments into nylon yarns to improve their resistance to degrading and fading in ultraviolet light, to give improved resistance to chemicals and noxious fumes and to give permanent coloration which is not removed by washing. **However, when light shades of pigment are used, acid dye stains from accidental spills are visible on the surface of the filaments.**

(JTX 4, col. 1, 11. 22–29; D.I. 299, Tr. at 2052) (emphasis added). According to Mr. Lesnoy, this statement in the specification supports the notion that to evaluate the acid dye stain-resistance of the Anton patent, only light fibers can be tested. As further support for his position that stain-resistance can be determined only by reference to the light-colored fibers, Mr. Lesnoy pointed to DuPont's own Stain Rating Scale that is illustrated in figure 1 of the patent, which employs only beige carpet samples. According to Mr. Lesnoy, "it would be difficult, if not impossible to correlate shade changes of the scale here to shade changes in dark shades of fiber." (D.I. 299, Tr. at 2053). Thus, Mr. Lesnoy opined, to determine infringement of

the Anton patent, a light-colored carpet yarn from the accused process would have to be subjected to any of the three Kool–Aid tests; if the stain-rating was less than 4, then the process used to produce that yarn would not infringe the process described by the Anton claims.

Mr. Lesnoy testified further that Examples 1 and 2 of the Anton patent, in which the samples were not tested for stain resistance because the shade of blue "was sufficiently dark that stains were not likely to be visible", evidence that the claimed stain-resistance can be evaluated only by reference to light colored fibers. (D.I. 299, Tr. at 2053). According to Mr. Lesnoy, common sense justifies his position; he testified that "it simply doesn't make sense to test dark-colored fibers." (D.I. 299, Tr. at 2054). As support for his contention that Kool–Aid tests on dark colored fibers are meaningless, Mr. Lesnoy described Kool–Aid tests that he performed on four, unsulfonated CAMALON fibers.[55] The colors that he tested were maroon, chocolate, navy, and black. Mr. Lesnoy testified that after he stained the samples with Kool–Aid pursuant to the Anton stain test protocol, he could not distinguish between the stained and the unstained samples. (D.I. 299, Tr. at 2056; BTX 499A). Thus, he opined that the stain-resistance claimed in the Anton patent must be evaluated by testing light-colored fibers because dark colors mask Kool–Aid stains.

On cross-examination, Mr. Lesnoy pointed to the following statement in the Anton specification to support his opinion that the whole objective of the Anton patent was to create a process for producing stain-resistant fibers in a wide variety of colors:

> Ways of avoiding the need to topically stain-proof pigmented nylon filaments and overcoming processing problems caused by

> Kool–Aid staining; therefore, one would not expect there to be resistance in the darker shades, because it is one process that CaMac uses.

(D.I. 300, Tr. at 2080).

54. Mr. Lesnoy testified that:
[O]ne would expect the same level of stain resistance throughout the entire line, based upon my testing of the light colors.... [I]t is quite evident, that even as you get to the darker shade or medium shade—I should say the darker range of light shades, that being light blue, you still see the staining, except it becomes more difficult as you move down because of masking effects. So, looking at the lighter shades, we see there is no resistance to

55. He selected the unsulfonated fibers because these fibers would have an even greater affinity for the Kool–Aid staining than the sulfonated ones. (D.I. 300, Tr. at 2056).

the pigment and copper would be greatly desired. It would be particularly useful to be able to use a wide selection of colored pigments, both organic and inorganic, **in order to make a complete range of styling colors** without encountering serious product deficiencies or operating deficiencies with any of them.

(JTX 4, col. 2, 11. 1–6) (emphasis added). He testified that this statement demonstrates that the objective of the patent was to produce stain-resistant fibers in a complete range of colors using a particular catdye nylon. (D.I. 299, Tr. at 2083). According to Mr. Lesnoy, "if you are dealing with a particular process in which staining occurs in the light shades of fiber, but results in still—you have a complete range of styling colors, then you are not meeting the objectives of the patent." (D.I. 299, Tr. at 2052–53). Consistent with Mr. Lesnoy's testimony, Dr. Wilkes acknowledged the desirability, from a technological standpoint, of having stain-resistance in the light colored fibers of a line of carpet fibers. (D.I. 309, Tr. at 1297). When asked whether the darker colored fibers would mask the Kool–Aid stains, Dr. Wilkes conceded that "[t]here may be some—certainly, some visual effects from the darkness." (D.I. 309, Tr. at 1396).

Monsanto and BASF also point to the "Summary of the Invention" section of the Anton patent, which contains the following statement:

It has now been found that ... pigmented nylon yarns may be made which not only resist staining by acid dyes but also can be made **from a wide range of pigments** with greatly reduced operability problems.

(JTX 4, col. 2, 11. 1–18; D.I. 282 at 11) (emphasis added). Further, under the section entitled "Brief Description of the Drawings", the patent states:

**A wide range of** both organic and inorganic **pigments may be added to the modified nylon copolymers of this invention.**

(JTX 4, col. 3, 11. 38–40; D.I. 299, Lesnoy, Tr. at 2087–88) (emphasis added).

As further support for the notion that DuPont itself evaluated stain-resistance by testing only light-colored fibers, Monsanto and BASF point to DuPont's STAINMASTER certification program which began in 1987.[56] The STAINMASTER certification requirements stated: "The five colors submitted [for stain-testing] should represent the five lightest colors in the line. In case one of these five colors fail the certification testing, that same color should be resubmitted for certification." (BTX 277 at 52559; D.I. 309, Wilkes, Tr. at 1355–58). Mr. Lesnoy testified that the official STAINMASTER certification color is beige. (D.I. 299, Tr. at 2047).

After careful consideration of the evidence with regard to the proper construction of the Anton stain-resistant limitation, the Court concludes that the language of the patent is quite clear on its face. Claim 1 claims a process for producing pigmented, *stain-resistant* fibers. Stain-resistant is expressly defined in the specification as achieving a 4 or 5 on any of the three Kool–Aid tests that are described in the patent. The patent does not limit the stain-resistance by color. That is, the patent does not indicate that stain-resistance can be measured only by reference to light-colored fibers; the patent does not claim a "Process for Producing Stain–Resistant, *Light–Colored* Nylon Fibers." Although the carpet samples in the stain-rating scale are all beige, the Court does not believe that this fact imposes a limitation on the claimed stain-resistance to light fibers. Moreover, the objective of the Anton patent may well have been, as Monsanto and BASF contend, to create stain-resistant fibers in a wide variety of colors. The Court does not, however, read a color restriction into this objective. Step (b) of the claim teaches the addition of *a* pigment, not any particular pigment. Thus, it appears to the Court that the stain-resistance of the Anton patent can be evaluated on a fiber-by-fiber basis. In other words, if a manufacturer practices steps (a), (b), and (c) of Claim 1 to produce a fiber, and if that fiber has a CIELAB L* value of less than 88 and achieves a 4 or 5 on the Kool–Aid test, then the process used to produce that fiber infringes the patent, re-

---

**56.** STAINMASTER is the DuPont certification mark for carpets made using topical stain resist treatment technology, as opposed to the "built-in" stain-resistance that is at issue in this case.

gardless of the fiber's color. In this regard, the Court rejects Monsanto's and BASF's contention that the stain-resistance of Claim 1 is limited to stain-resistant product lines because the Court finds it to be quite clear that the patent is directed to a process for producing stain-resistant fibers. To be sure, the Court recognizes the practical difficulties involved in evaluating red stains on dark fibers; however, the Court is unable to read a color limitation into this process patent.[57] Although the claimed CIELAB L* value limitation of "less than 88" indeed encompasses a wide spectrum of colors, the patent simply does not limit its claimed stain-resistance to the light colors. None of the stain test protocols in the specification indicates that only light fibers should be tested.[58] Accordingly, in view of the plain language of the patent, the Court rejects Monsanto's and BASF's contention that the Anton stain resistance can be evaluated only by testing light colors.

Based upon its review of the entirety of the patent and the evidence presented at trial, the Court rejects the testimony of Dr. Lesnoy to the effect that stain-resistance must be evaluated by testing light colored fibers.[59] The Court finds instead that the stain-resistance of the Anton patent is not limited by color and can appropriately be evaluated on a fiber-by-fiber basis.

b. *Application of the Claims to the Accused Processes*

Having construed Anton's claimed stain-resistance as not limited to any particular color(s) of fibers, the Court must now apply the properly construed claims to the accused processes. To establish literal infringement, DuPont must demonstrate that Monsanto and BASF practice "every limitation set forth in [the asserted claims of the Anton patent] ... exactly ..." *Johnston v. IVAC Corp.*, 885 F.2d at 1577.

1) *The "Stain–Resistant" Limitation*

■ The introductory phrase of the Anton patent discloses "A process for producing stain-resistant, pigmented nylon fiber comprising the steps of ..." The principal issue in this case with regard to this introductory phrase is whether the claimed process for producing "stain-resistant" fibers covers the process used by CaMac, which yields both fibers that are stain-resistant within the meaning of the Anton patent and fibers that are not stain-resistant within the meaning of Anton patent.

As discussed above, DuPont contends that stain-resistance can be evaluated on a fiber-by-fiber basis. On the other hand, according to Monsanto and BASF, the Anton patent discloses a *single* process for manufacturing pigmented, nylon fibers that achieve a stain rating of 4 or 5 on the Kool–Aid stain tests; in contrast, the *single* process that is used by CaMac to manufacture all of the colors within each of the accused product lines results in some fibers that achieve 3 or less on the required Kool–Aid stain tests. Accordingly, Monsanto and BASF argue, because the process used to manufacture the accused fibers, which is the same process used to produce all

---

57. Moreover, as DuPont points out, Monsanto and BASF never define what they mean by "light" or "dark" fibers, and they cite no meaningful evidence drawing a line between "light" and "dark" fibers.

58. Furthermore, although Monsanto and BASF contend that Kool–Aid staining must be performed on light-colored fibers because it is only on these light fibers that the Kool–Aid is perceptible, Dr. Wilkes' tests, discussed *infra*, demonstrate that Kool–Aid staining was indeed perceptible on fibers with CIELAB L* values less than 30. That is, as demonstrated by Dr. Wilkes' tests of CAMALON fibers, at least two fibers with CIELAB L* values less than 30, namely Dark Taupe (26.10) and Federal Blue (24.72), had a stain rating of 4, which translates into "slight staining." (D.I. 297, Tr. at 1419–20; DDX 34).

In contrast, the color "Rose", with a CIELAB L* value of 47.41, showed no visible staining and received a stain rating of 5. These results tend to contradict Monsanto's and BASF's argument that only light-colored fibers are capable of being tested under the patent.

59. The Court also rejects Monsanto's and BASF's argument that the statement in the Anton specification describing the fibers of this invention as "uniformly stain-resistant" refers to stain resistance across the entire color line. Instead, the Court finds the testimony of Dr. Wilkes to be credible on this point. Dr. Wilkes testified that the uniform stain resistance of the specification refers to the fact that the sulfonate additive is copolymerized throughout the nylon matrix, as opposed to being topically applied to the spun carpet fiber. (D.I. 297, Tr. at 1318).

of the colors in a single product line, yields some fibers that do not meet the stain-resistant limitation of the Anton patent, the single process that is used to manufacture these products does not infringe the process claimed in the Anton patent. Rather, "an accused infringer's process must wholly satisfy the limitations of the claim **across that color domain**." (D.I. 282 at 10) (emphasis added).

The Court's construction of the stain-resistance limitation of the Anton patent in section II.D.1.a. *supra* is dispositive of this issue. The Court has already construed the stain-resistance of the Anton patent as not limited to light-colored carpet fibers. Therefore, although Monsanto's and BASF's argument that a single process is used to produce all of their fibers is not without appeal, the argument misses the mark. The patent simply does not limit stain-resistance to light colors. Accordingly, the Court finds that, notwithstanding Monsanto's and BASF's argument that a single process is used to manufacture all of the fibers in each product line, the stain-resistance of fibers produced according to steps (a), (b), and (c) of the patent is appropriately measured on a fiber-by-fiber basis, regardless of color.

With regard to whether the accused products are indeed stain-resistant within the meaning of the Anton patent, DuPont relies upon the testimony of Dr. Wilkes. At trial, Dr. Wilkes testified that of the forty-four ULTRON SD BCF products that were subjected to Kool–Aid Stain Test # 2 of the Anton patent, forty-three of the fibers

achieved a 4 or above on the stain rating scale and had a CIELAB L* value less than 88. (D.I. 309, Wilkes, Tr. at 1233, 1244; DDX 35). With regard to the thirty LEXES products that were tested, Dr. Wilkes testified that twenty-five of these fibers achieved a 4 or 5 on the stain rating scale and had CIELAB L* values less than 88.[60] (D.I. 309, Tr. at 1251–52; DDX 36). As to the CAMALON fibers, Dr. Wilkes testified that he determined that twenty-five of these fibers achieved a 4 or greater on the stain rating scale and had CIELAB L* values less than 88.[61] (D.I. 309, Tr. at 1262–63, 1269; DDX 34).

Although Monsanto and BASF attack Dr. Wilkes' qualifications, neither party seriously disputes the results of his stain tests.[62] In fact, Monsanto states in its post-trial brief that "[n]either Monsanto nor BASF need take issue with the correctness of Dr. Wilkes' data because the data provide sufficient evidence that the accused process performed by CaMac does not infringe the Anton claims as properly construed." (D.I. 282 at 4 n. 5). In other words, because Monsanto and BASF take the position that the stain resistance of the Anton patent must be present in *all* of the colors of fibers that are produced by the accused process, the undisputed fact that some of their fibers failed the Kool–Aid test supports their position that their accused process does not meet the stain-resistant limitation of the Anton patent. Said yet another way, because light shades of fiber from the accused product lines are not stain-resistant, none of the fibers from the accused product

---

**60.** The thirty LEXES colors that were tested ranged from a CIELAB L* value of 20.46 (Cinder Black) to 93.29 (Pearl). (MTX 306). Five of those colors failed the Kool–Aid test. All of the tested fibers with a CIELAB L* value less than 56.80 passed the test.

**61.** The forty-six CAMALON fibers that were tested ranged from a CIELAB L* value of 16.7 (Black) to 81 (Lt. Gray). (BTX 162). Twenty-one of those colors failed the Kool–Aid test. (D.I. 297, Wilkes, Tr. at 1339; BTX 218–29). All of the fibers with a CIELAB L* value less than 39 passed the test.

According to Dr. Wilkes' tests, one ULTRON SD BCF product, five LEXES products, and twenty-one CAMALON products were not stain-resistant within the meaning of the Anton patent.

DuPont does not accuse the processes for making these products of infringement of the Anton patent. (D.I. 275 at 21 n. 11).

**62.** In fact, Kool–Aid tests performed by BASF's Mr. Lesnoy on six light shades of CAMALON fibers are consistent with Dr. Wilkes' test results in that all of these six shades stained unacceptably under the Anton patent. (D.I. 300, Lesnoy, Tr. at 2070–73; BTX 499B; D.I. 281 at 26). Mr. Lesnoy did not, however, test any CAMALON fibers other than the six light shades because of his position that the sulfonated nylon polymer has a fixed ability to repel Kool–Aid and, therefore, stain-resistance would be consistent across the color line. (D.I. 300, Tr. at 2079–80). In addition, according to Mr. Lesnoy, it would be impossible to stain test the dark colors under the Anton patent's protocols.

lines is stain-resistant. As Monsanto asserts in its post-trial brief, "the process as practiced by CaMac demonstrably does not protect the entire color domain which DuPont claimed." (D.I. 282 at 21).

Monsanto's and BASF's arguments are not without merit. The Court however has construed the stain-resistance limitation as capable of being evaluated on a fiber-by-fiber basis. In so construing this limitation, the Court rejects Monsanto's and BASF's argument that CaMac's process is outside the claims of the Anton patent merely because the process does not result in a complete range of styling colors that are all stain-resistant within the meaning of the patent. Having concluded that fibers can be evaluated individually, the Court is persuaded by the essentially unrefuted testimony of DuPont's Dr. Wilkes, which demonstrates that forty-three ULTRON SD BCF, twenty-five LEXES, and twenty-five CAMALON fibers meet the stain-resistance and CIELAB L* limitations of the Anton patent. Thus, based upon all of the evidence of record, the Court finds that these forty-three ULTRON SD BCF, twenty-five LEXES and twenty-five CAMALON products are stain-resistant within the meaning of the Anton patent claims. The Court also finds that these products satisfy the CIELAB L* limitation of Claim 1.

### 2) Claim 1, Step (a)

 The first step of the three-step process disclosed in Claim 1 of the Anton patent teaches the "forming a sulfonated nylon copolymer containing 0.25–4.0 weight percent of an aromatic sulfonate or an alkali metal salt thereof".[63] (JTX 4, col. 9, 11. 1–4). At trial, Dr. Wilkes testified that Monsanto generates a sulfonated nylon copolymer that contains 2.3 weight percent of an aromatic sulfonate. (D.I. 309, Wilkes, Tr. at 1224). This sulfonated copolymer, designated 46BJ, is shipped to CaMac Corporation where it is ultimately used to manufacture ULTRON SD and LEXES fibers. According to Dr. Wilkes, Monsanto's production of the 46BJ nylon copolymer satisfies step (a) of Claim 1

of the Anton patent. (D.I. 309, Tr. at 1223–25). Monsanto offers no contrary evidence.

Dr. Wilkes testified that BASF also practices step (a) of Claim 1. He testified that BASF forms a sulfonated nylon copolymer that contains 0.8 weight percent of an aromatic sulfonate. (D.I. 309, Tr. at 1257). BASF's copolymer, designated BV600C2, is also shipped to CaMac corporation, where it is ultimately used to manufacture CaMac's CAMALON fibers. (D.I. 309, Tr. at 1258).

BASF contends that it does not practice step (a) of Claim 1 of the Anton patent because it uses *nylon–6* instead of *nylon–6,6*, which DuPont uses. The Court is unpersuaded by BASF's argument. In the Burlone phase of this case, the alleged distinction between nylon–6 and nylon–6,6 did not prevent BASF from accusing DuPont of infringing the Burlone patent. (*See, e.g.,* D.I. 294, Harris, Tr. at 378–79). In any event, the specification of the Anton patent clearly indicates that the "process embodiments of this invention are useful in coloring and providing stain resistance to all types of nylon **including, without limitation, both nylon 6 and nylon 6,6** ..." (JTX 4, col. 4, 11. 34–37) (emphasis added).

Thus, the Court finds that DuPont has satisfied its burden of demonstrating by a preponderance of the evidence that Monsanto and BASF practice step (a) of Claim 1 of the Anton patent.

### 3) Claim 1, Step (b)

The second step of the three-step process of the Anton patent teaches "adding pigment to the copolymer to form a pigment/copolymer blend." (JTX 4, col. 9, 11. 5–6). At trial, Dr. Wilkes testified that CaMac practices step (b) with respect to both Monsanto's 46BJ copolymer and BASF's BV600C2 copolymer by adding pigments to these copolymers to form pigment/copolymer blends. (D.I. 309, Tr. at 1225, 1259, 1268). Neither Monsanto nor BASF introduced any contrary evidence.

The Court finds that DuPont has proven by a preponderance of the evidence that CaMac practices Claim 1(b) of the Anton patent

---

**63.** The sulfonated nylon copolymer used by DuPont to manufacture its LUMENA fibers contains approximately **[REDACTED]** of an aromatic sulfonate.

with respect to Monsanto's 46BJ polymer and BASF's BV600C2 polymer.

#### 4) *Claim 1, Step (c)*

The third step of the Anton process teaches the "spinning the pigment/copolymer blend into a fiber." (JTX 4, col. 9, 1. 8). At trial, Dr. Wilkes testified that CaMac uses Monsanto's 46BJ material to practice step (c). (D.I. 309, Tr. at 1226). According to Dr. Wilkes, when CaMac practices step (c) with regard to Monsanto's 46BJ copolymer, there are two product lines that result: ULTRON SD and LEXES. (D.I. 309, Tr. at 1227). Dr. Wilkes opined that CaMac also practices step (c) of the Anton patent with regard to BASF's BV600C2 polymer. (D.I. 309, Tr. at 1260, 1268). The resultant fibers from this process fall under the trade name of CAMALON. Neither Monsanto nor BASF introduced any contrary evidence.

The Court finds that DuPont has demonstrated by a preponderance of the evidence that CaMac practices step (c) of the Anton patent with regard to Monsanto's 46BJ polymer and BASF's BV600C2 polymer.

#### 5) *Claim 2*

Claim 2 of the Anton patent limits the aromatic sulfonate of Claim 1(a) to a sulfonated dicarboxylic acid or a sulfonated diester. (JTX 4, col. 9, 11. 14–16). Dr. Wilkes testified that both Monsanto's 46BJ copolymer and BASF's BV600C2 copolymer meet this limitation because both use a sulfonated dicarboxylic acid. (D.I. 309, Tr. at 1250, 1265). Neither Monsanto nor BASF disputes Dr. Wilkes' testimony.

Accordingly, the Court finds that DuPont has demonstrated that both Monsanto and BASF practice Claim 2 of the Anton patent.

#### 6) *Claim 3*

Claim 3 of the Anton patent limits the sulfonated dicarboxylic acid of Claim 2 to 5–sulfoisophthalic acid. (JTX 4, col. 9, 11. 18–19). According to Dr. Wilkes, both Monsanto's 46BJ copolymer and BASF's BV600C2 copolymer satisfy this limitation. (D.I. 309, Tr. at 1250–51, 1266). Neither Monsanto nor BASF contend otherwise.

Thus, the Court concludes that DuPont has demonstrated by a preponderance of the evidence that Monsanto and BASF practice Claim 3 of the Anton patent.

#### 7) *Claim 5*

Claim 5 of the Anton patent, which is asserted only against Monsanto, limits the nylon copolymer to a nylon–6,6 copolymer. (JTX 4, col. 10, 11. 4–5). The evidence at trial demonstrates that Monsanto's nylon copolymer is indeed a nylon–6,6 copolymer. (D.I. 309, Tr. at 1251). Monsanto does not dispute this. Accordingly, the Court finds that DuPont has satisfied its burden of demonstrating that Monsanto practices Claim 5 of the Anton invention.

#### 8) *Conclusion*

Based upon careful review of the evidence, including the testimony of Dr. Wilkes, the Court concludes that the process(es) used to manufacture the forty-three accused UL-TRON SD BCF and twenty-five accused LEXES fibers satisfies each of the limitations of Claims 1, 2, 3, and 5 of the Anton patent, and the process used to manufacture the twenty-five accused CAMALON fibers satisfies each of the limitations of Claims 1, 2, and 3. The Court's conclusion in this regard is limited to the forty-three ULTRON SD BCF, twenty-five LEXES, and twenty-five CAMALON fibers that satisfied the stain-resistant limitation of the Anton patent. With regard to the fibers from the accused product lines that DuPont did not subject to any of the Kool–Aid tests described in the Anton patent, the Court is compelled to conclude that DuPont has failed to demonstrate infringement by a preponderance of the evidence as to these fibers.[64] Specifically, DuPont offered no evidence of the stain-resistance of Monsanto's ULTRON SD staple fibers and, therefore, the Court finds that DuPont has failed to satisfy its burden of demonstrating infringement by a preponderance of the evidence with regard to these fibers. Similarly, DuPont has offered no evidence of the stain-resistance of the fifty-eight untested LEXES fibers and fifty untested

---

**64.** This conclusion is supported by the testimony of DuPont's Dr. Wilkes, who testified that in order to determine infringement of the process claimed in the Anton patent, each color would have to be tested. (D.I. 297, Tr. at 1402–03).

CAMALON fibers. Accordingly, DuPont has failed to establish infringement as to these untested fibers.[65]

Having concluded that the accused processes employed to produce forty-three ULTRON SD BCF fibers, twenty-five LEXES fibers, and twenty-five CAMALON fibers meet the limitations of the Anton patent, the Court must now examine the statutory bases for liability.

### c. *Statutory Bases for Liability*

Dupont contends that Monsanto is liable for direct infringement under 35 U.S.C. § 271(a) and (g) for the manufacture and sale of ULTRON SD fibers, and under § 271(a) for its joint manufacture of CaMac's LEXES fibers. With regard to BASF, DuPont contends that liability is predicated upon § 271(a) for BASF's joint manufacture of CaMac's CAMALON fibers. DuPont also contends that both Monsanto and BASF are liable under § 271(b) for inducement of infringement by CaMac. Finally, DuPont contends that both Monsanto and BASF are liable as willful infringers.

#### 1) *Direct Infringement*

Title 35 U.S.C. § 271(a) provides:

(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271(a) (1984 & Supp.1994). Based upon the Court's previous findings and conclusions, it seems clear that CaMac directly infringes the Anton patent under § 271(a) with regard to the forty-three infringing ULTRON SD BCF products, twenty-five LEXES products, and twenty-five CAMALON products that it manufactures pursuant to the claimed process. The question before the Court is whether Monsanto and/or BASF are also liable as direct infringers under § 271(a) for their activities in connection with the manufacture of the infringing products.

#### a) *ULTRON SD*

■ DuPont's allegations of direct infringement against Monsanto are predicated upon 35 U.S.C. §§ 271(a) and (g). As stated above, § 271(a) imposes liability for making, using, or selling a patented invention. Section 271(g) provides in pertinent part:

(g) Whoever without authority ... sells ... within the United States a product which is made by a process patented in the United States shall be liable as an infringer ...

35 U.S.C. § 271(g) (1994).

It is undisputed that, under its toll processing agreement with CaMac, Monsanto manufactures its 46BJ copolymer and ships it to CaMac. CaMac then adds pigment to the copolymer and spins it into fibers. Monsanto then sells these fibers under the name ULTRON SD. Because the process used to manufacture the forty-three accused ULTRON SD BCF fibers infringes the Anton

---

65. With regard to these untested fibers, DuPont contends that if it did not test certain LEXES fibers, "it was because Monsanto and its collaborator CaMac failed to produce them." (D.I. 275 at 77). DuPont contends that, during discovery, it asked Monsanto to provide samples of each of the colors from the LEXES product line. When Monsanto informed DuPont that DuPont would have to obtain these samples from CaMac, DuPont proceeded to enforce a subpoena in the Western District of Virginia against CaMac. In response, according to DuPont, CaMac represented that it would "produce samples of each color of pigmented sulfonated nylon fiber made from nylon supplied by Monsanto which CaMac manufactures and sells." (*See* D.I. 167 at C33–34). Then, DuPont asserts, CaMac produced thirty LEXES fibers. DuPont tested all of these fibers. At trial, DuPont was apparently surprised when a witness testified that CaMac manufac-

tures eighty-eight LEXES colors. DuPont asserts that "[t]o allow Monsanto and CaMac to benefit from their own failure to provide discovery would be contrary to the basic notions of equity which underlie § 283." (D.I. 275 at 77).

Notwithstanding Dupont's arguments, the Court cannot conclude that DuPont has established infringement with regard to fibers that it did not test, particularly in light of the testimony of its own expert to the effect that infringement of the claimed process can only be determined by performing one of the three Kool–Aid tests on the resulting fibers. Moreover, the Court observes that CaMac is not a party to this litigation, and Monsanto has represented that it had no control over CaMac's documents or things. (D.I. 282 at 24). Monsanto also states that its counsel never represented CaMac; rather, its counsel represented Monsanto's interests exclusively.

patent, the Court finds that Monsanto is clearly liable under § 271(g) for selling these fibers.[66]

In light of the Court's finding that Monsanto is liable under § 271(g) for its sale of the forty-three infringing ULTRON SD BCF products, the Court need not decide whether Monsanto is also liable under § 271(a) with respect to these same products.

### b) *LEXES*

DuPont contends that Monsanto is liable for direct infringement under § 271(a) for its joint manufacture of CaMac's LEXES fibers. In response, Monsanto asserts that it is not liable as a direct infringer under § 271(a) for CaMac's sale of its LEXES fibers because Monsanto does not conduct the process to make CaMac's LEXES fibers. (D.I. 282 at 19).

In support of its position that Monsanto can be liable as a direct infringer for its joint activities with CaMac, DuPont cites *McDermott v. Omid International, Inc.,* 723 F.Supp. 1221 (S.D.Ohio 1988), *aff'd,* 883 F.2d 1026 (Fed.Cir.1989). There, both the manufacturer and seller of the patented article were liable as infringers. The *McDermott* court held that "[w]here the infringement is the result of the participation and combined actions of the defendants, they are joint infringers and are jointly liable for the infringement." *Id.* at 1236. DuPont also cites *Shields v. Halliburton Co.,* 493 F.Supp. 1376 (W.D.La.1980), *aff'd,* 667 F.2d 1232 (5th Cir. 1982), where the court stated that "[i]nfringement of a patented process or method cannot be avoided by having another perform one step of the process or method." *Id.* at 1389. *See also Crowell v. Baker Oil Tools, Inc.,* 143 F.2d 1003, 1004 (9th Cir.) ("It is obvious that one may infringe a patent if he employ an agent for that purpose or have the offending articles manufactured for him by an independent contractor."), *cert. denied,* 323 U.S. 760, 65 S.Ct. 93, 89 L.Ed. 608 (1944); *Metal Film Co., Inc. v. Metlon Corp.,* 316 F.Supp. 96, 110 n. 12 (S.D.N.Y.1970) ("That defendants choose to have the vacuum metallizing, which was a conventional step . . ., done by outside

suppliers does not mitigate their infringement of the overall process.").

In support of its position that it is not liable as a direct infringer, Monsanto contends that DuPont relies only upon nonbinding district court decisions as authority. (D.I. 282 at 19). In contrast, Monsanto relies upon *Joy Technologies, Inc. v. Flakt, Inc.,* 6 F.3d 770 (Fed.Cir.1993), where the court held that "the sale of equipment to perform a process is not a sale of a process within the meaning of section 271(a)." *Id.* at 773. The *Joy Technologies* Court reasoned that "[t]o hold that the sale of equipment which performs a patented process is itself a direct infringement would make that portion of section 271(c) relating to the sale of an apparatus for use in practicing a patented process meaningless." *Id.* at 774. Based upon *Joy,* Monsanto contends that its sale of 46BJ copolymer to CaMac is not a sale of a process under § 271(a). Monsanto asserts that to hold that its sale of the 46BJ polymer renders it liable for direct infringement would make § 271(c), which imposes liability upon one who sells a material for use in practicing a patented process, meaningless. Monsanto points out that DuPont does not accuse Monsanto of contributory infringement under § 271(c). (D.I. 282 at 19). According to Monsanto, DuPont has not asserted liability under § 271(c) because the material at issue, Monsanto's 46BJ polymer, is a "staple article or commodity of commerce suitable for substantial noninfringing use". 35 U.S.C. § 271(c); D.I. 282 at 19.

None of the cases cited by either DuPont or Monsanto involves exactly the same factual scenario that is present here. For example, in *Joy Technologies,* the Court faced the issue of whether the sale of equipment to perform a patented process constituted direct infringement under § 271(a). In this case, Monsanto does not sell equipment to CaMac to perform the process claimed in the Anton patent. Rather, Monsanto actually practices step (a) of the claimed process and sells the resulting copolymer to CaMac, who then practices steps (b) and (c). Thus, to the

---

**66.** Without conceding liability, Monsanto does concede that, if it were liable, then § 271(g) would be the appropriate statutory basis upon which to predicate its liability as a direct infringer in connection with the forty-three infringing ULTRON SD products. (D.I. 282 at 18).

extent that *Joy* relates to the sale of equipment to perform a process, it is inapplicable here. Nevertheless, the Court finds the reasoning in *Joy Technologies* to be instructive. As the *Joy* court reasoned, § 271(c) would be rendered meaningless if the sale of equipment to perform a patented process constituted direct infringement. Similarly, in this case, it seems that if Monsanto were liable as a direct infringer under § 271(a) for making and selling a component of the claimed process, then § 271(c), which imposes liability for "sell[ing] a ... material ... for use in practicing a patented process" would be superfluous. DuPont does not, however, assert liability under § 271(c) against Monsanto. Instead, DuPont alleges that Monsanto is liable under § 271(a) on a theory of joint infringement or joint manufacture.

Although DuPont's theory of joint infringement is interesting, the Court declines to find that Monsanto is liable as a direct infringer under § 271(a) in connection with its conduct in practicing step (a) of the claimed process and selling the resulting copolymer to CaMac for manufacture of its LEXES products. The cases cited by DuPont in support of its joint infringement theory are distinguishable. The *Shields, Crowell,* and *Metal Film* cases establish that a party cannot avoid liability for infringement by having someone else perform one or more steps of a patented process for them. It seems to the Court that this principle is more appropriately applied to CaMac than to Monsanto. That is, under *Shields, Crowell,* and *Metal Film,* CaMac cannot avoid liability for infringement of DuPont's process patent by paying Monsanto to practice step (a) of the patented process for it. *See Ralston Purina Co. v. Far–Mar–Co., Inc.,* 586 F.Supp. 1176, 1226 (D.Kan.1984) ("[i]t is well settled that a party cannot avoid infringement merely by having a third party practice one or more of the required steps."), *aff'd in part,* 772 F.2d 1570 (Fed.Cir.1985). None of these cases holds, however, that the third party who performs one step of a patented process and then sells the resulting product to the direct infringer, as Monsanto does, is also liable as a *direct* infringer under § 271(a). Clearly, the direct infringer in this case is CaMac, who buys the 46BJ polymer from Monsanto and then uses it to perform

the process claimed in the Anton patent. *See Joy Technologies,* 6 F.3d at 773 ("process claim is directly infringed only when the process is performed"). Thus, neither *Shields,* nor *Crowell,* nor *Metal Film* compels a conclusion that Monsanto directly infringes the Anton patent by making its 46BJ copolymer and selling it to CaMac in connection with the manufacture of LEXES products. The *McDermott* case that is cited by DuPont is also distinguishable because, unlike the defendants in that case who were jointly liable where one of them manufactured the infringing article and the other sold it, Monsanto is neither the manufacturer nor the seller of the infringing LEXES products. *E.g.,* 723 F.Supp. at 1230, 1234.

After careful consideration of this issue, the Court concludes that, although CaMac is a direct infringer for its production of the twenty-five infringing LEXES products, Monsanto is not liable as a direct infringer for its manufacture and sale of its 46BJ polymer to CaMac. Section 271(a) simply provides no basis to hold Monsanto liable for its conduct in connection with the manufacture of CaMac's LEXES products.

#### c) *CAMALON*

DuPont contends that BASF, like Monsanto, is liable as a direct infringer under § 271(a) in connection with CaMac's manufacture and sale of its CAMALON fibers. In response, BASF contends that it does not "make, use or sell" the claimed three step process. (D.I. 281 at 28).

For the same reasons that Monsanto is not liable as a direct infringer under § 271(a) in connection with CaMac's manufacture of its infringing LEXES products, BASF is not liable as a direct infringer under § 271(a) in connection with its manufacture and sale of its BV600C2 sulfonated copolymer to CaMac for use in the manufacture of the twenty-five infringing CAMALON products.

#### 2) *Inducement of Infringement*

DuPont next alleges that Monsanto and BASF actively induce infringement by CaMac under 35 U.S.C. § 271(b). Section 271(b) provides:

(b) Whoever actively induces infringement of a patent shall be liable as an infringer. 35 U.S.C. § 271(b) (1984 & Supp.1994). Liability for active inducement of infringement is dependent upon the existence of direct infringement. *Joy Technologies*, 6 F.3d at 774. Active inducement requires that a party *knowingly* aids and abets another's direct infringement. *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed.Cir.), *cert. denied*, 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988). The Federal Circuit has stated that "[a]lthough section 271(b) does not use the word 'knowing,' the case law and legislative history uniformly assert such a requirement." *Id.* In this regard, mere knowledge of the acts alleged to constitute inducement is not enough. *Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544, 553 (Fed.Cir.1990). Rather, a plaintiff must demonstrate that "the alleged infringer's actions induced infringing acts *and* that he knew or should have known his actions would induce actual infringements." *Id.* (emphasis in original). Knowing intent may be proven by direct or circumstantial evidence. *Water Technologies*, 850 F.2d at 668.

### a) *Inducement by Monsanto*

 The evidence offered by DuPont in support of its argument that Monsanto actively induces infringement by CaMac in connection with CaMac's production of its LEX-ES fibers includes the following. According to the deposition testimony of John Moore, CaMac received a letter from DuPont in April, 1992 "informing them that DuPont's patent for 46BJ polymer and another pigmented yarn" would be issued by the Patent Office shortly thereafter.[67] (JTX 102, Moore Dep. at 47; DMX 78). In a memo written on April 25, 1992, Mr. Moore wrote that "[b]ecause of the legal issues that could get involved with us assisting CaMac and them violating duPont patent I'm not sure what Monsanto's management & lawyers will instruct us to do." (JTX 102 at 48–49; DMX 78). Mr. Moore testified that as of the date of his memo, he recognized that there was at least an issue as to whether CaMac was

violating the Anton patent. (JTX 102 at 49). At around the same time, CaMac asked Monsanto for assistance in running tests to show that the Anton patent was invalid. (DMX 78).

According to the 30(b)(6) deposition testimony of Rupert Snooks, Monsanto began looking for alternative polymer recipes in the event that the Anton patent was held valid. (JTX 130, Snooks (30(b)(6)) Dep. at 83). Monsanto tried to change its polymer or develop alternate polymers so as to improve its product without violating the DuPont patent. (JTX 105, Mullis Dep. at 27–28). Nevertheless, Mr. Snooks testified, the composition of Monsanto's 46BJ polymer has not been changed since July, 1992 with respect to the amount of sulfonation contained in it. (JTX 130 at 83). Apparently, CaMac was reluctant to change from the regular 46BJ polymer supplied by Monsanto to an alternate polymer because it was concerned that the alternate polymer would have decreased stain-resistance. (JTX 102, Moore Dep. at 72; JTX 130, Snooks Dep. at 94). In a letter from Monsanto to CaMac dated July 15, 1992, Monsanto indemnified CaMac for liability for infringing the Anton patent in connection with CaMac's manufacture of solution-dyed fiber for Monsanto. (DMX 21). Based upon the foregoing evidence, DuPont contends that Monsanto actively induces CaMac to infringe the Anton patent.

In response, Monsanto contends that it first learned of the content of the Anton patent claims in February, 1992. (DMX 20). However, Monsanto had entered into its Sales Contract for 46BJ polymer with CaMac on July 18, 1991, more than six months earlier. Thus, Monsanto asserts, DuPont argues inducement from evidence of acts that occurred *before Monsanto even knew that the Anton patent was to be issued by the PTO.* (D.I. 282 at 25). According to Monsanto, such evidence of acts that occurred prior to its knowledge of the Anton patent claims cannot constitute "knowing intent" to induce infringement. Monsanto also argues that: 1) it has no influence over CaMac's use of its

---

67. Apparently, Monsanto had received notice of the content of the Anton patent claims in February, 1992. (*See* DMX 20; D.I. 282 at 25).

46BJ polymer in conducting the process to make CaMac's LEXES fibers; 2) the technical assistance provided by Monsanto to Ca-Mac is the same type of assistance that Monsanto provides to any polymer customer; 3) the evidence of communications by DuPont between Monsanto and CaMac involved very general assistance—not assistance to conduct the claimed process, and 4) Monsanto indemnifies CaMac only with respect to Monsanto's ULTRON SD fibers, not with respect to CaMac's LEXES fibers and, therefore, the indemnification is not probative of Monsanto's alleged inducement of CaMac regarding LEXES fibers. (D.I. 282 at 25–30).

After careful consideration of the evidence, the Court finds that DuPont has established by a preponderance of the evidence that Monsanto actively induces CaMac to infringe the Anton patent in connection with the manufacture of its LEXES product.[68] Monsanto knew that CaMac was using the 46BJ polymer to manufacture solution dyed nylon fibers. In February, 1992, Monsanto became aware of the Anton claims. Thereafter, Monsanto knew that there was an issue with regard to CaMac's infringement of the Anton patent. CaMac, too, was concerned "because the product that they were producing was in conflict with the patent." (JTX 102, Moore, Dep. at 44–45). Yet, Monsanto continued to supply its 46BJ polymer to CaMac while it looked for alternative polymer recipes that would be outside the Anton claims. CaMac was, however, reluctant to accept an alternate polymer, and no such alternate polymer was ever supplied to CaMac. Indeed, Monsanto has agreed to indemnify CaMac from any liability for infringing the Anton patent in connection with "CaMac's preparation of spun solution dyed nylon 6,6 for Monsanto". (DMX 21). With regard to this agreement, Monsanto contends that its indemnification of CaMac is not relevant to the issue of whether Monsanto induces infringement in connection with the LEXES fibers because that agreement applies only to CaMac's production of ULTRON SD fibers. The Court believes,

however, that even if the indemnification agreement only covers the production of the ULTRON SD fibers, the agreement nevertheless has some probative value with regard to the LEXES fibers because the agreement operates to reduce CaMac's overall potential liability for infringing the Anton patent, which ultimately reduces the patent's deterrent effect. *See Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1470 (Fed.Cir.1990) (intent to induce infringement can be inferred from an indemnification agreement when the primary purpose of the agreement is to overcome the deterrent effect that the patent laws have on would-be infringers). Nevertheless, the Court does not (and need not) place great evidentiary weight upon this indemnification agreement in reaching its conclusion regarding Monsanto's inducement.

The evidence of record is more than sufficient to support the Court's finding that Monsanto knowingly aided and abetted CaMac's direct infringement. In this regard, the Court rejects Monsanto's argument that it has no influence over CaMac's use of its 46BJ polymer in conducting the process to make LEXES fibers. The evidence shows that Monsanto knew of the content of the Anton patent claims in February of 1992, and it continued to supply its 46BJ polymer to CaMac with full knowledge that CaMac was using the polymer to manufacture solution dyed fibers. Thus, by continuing to supply CaMac with the 46BJ polymer, Monsanto actively induced CaMac's infringing LEXES production, and Monsanto knew or should have known that its actions would induce such direct infringement. *See Manville*, 917 F.2d at 553. In addition, Monsanto provides technical support to CaMac in connection with CaMac's production of fiber from the 46BJ flake. (JTX 130 at 86–87; JTX 55, Day Dep. at 107–08). Accordingly, based upon the totality of the circumstances, the Court concludes that Monsanto is liable for infringement under § 271(b) for its activities in connection with CaMac's production of its

---

**68.** The predicate act of direct infringement is present because the Court has already concluded

that CaMac directly infringes the Anton patent by

infringing LEXES products.[69] Monsanto's liability in this regard is limited to its activities after February of 1992, when Monsanto received notice of the content of the Anton patent claims. The Court is of the opinion that, prior to its knowledge of the Anton patent claims, Monsanto cannot be liable for "knowingly" inducing infringement. *See L.A. Gear, Inc. v. E.S. Originals, Inc.*, 859 F.Supp. 1294, 1300 (C.D.Cal.1994) (knowledge of the patent is essential to demonstrate a specific intent to induce infringement).

### b) *Inducement by BASF*

■ The evidence offered by DuPont in support of its contention that BASF actively induces infringement includes the following. At trial, CaMac's vice president of support, Michael Hale, conceded that after the introduction of DuPont's LUMENA, there was pressure from a marketing standpoint to develop a product to compete with LUMENA.[70] (D.I. 299, Hale, Tr. at 1985–86). Thereafter, CaMac asked BASF to supply an acid stain-resistant polymer to compete with DuPont's LUMENA polymer. (D.I. 300, Johnson, Tr. at 2557; D.I. 299, Hale, Tr. at 1994). According to the deposition testimony of Andrew Mueller, there was some concern at BASF that if it could not offer a stain-resistant nylon polymer to its customers, then these customers might look to BASF's competitors for that polymer. (JTX 104, Mueller Dep. at 122). BASF then began to develop a copolymer with improved acid stain-resistance.

Throughout the period of development of the BV–600 material, representatives from BASF visited CaMac's facilities on a regular basis; during these visits, discussions about BASF's progress in the development of its BV–600 material took place. (D.I. 299, Hale, Tr. at 2001). BASF was aware that CaMac

was going to use the sulfonated polymer to manufacture solution-dyed, stain-resistant nylon fibers. (*See, e.g.*, D.I. 301, Johnson, Tr. at 2582; JTX 136, Trexler (30(b)(6)) Dep. at 26–27; JTX 68, Hahn Dep. at 33; JTX 126, Shirey (30(b)(6)) Dep. at 88–90, 115). BASF's parent corporation, BASF AG, provided technical service to CaMac with respect to the BV–600 polymers. (D.I. 301, Johnson, Tr. at 2587). Moreover, CaMac is BASF's only customer for the BV600 material. (D.I. 301, Johnson, Tr. at 2582).

Then, sometime in early 1992, CaMac became aware of the possible issuance of the Anton patent. In a monthly report dated March 1992, BASF's Business Director, Karen Johnson, wrote that DuPont was "making a lot of noise in the market place" regarding its patent on cationic solution dyed yarn. (DBX 504). Ms. Johnson wrote that "CaMac has told us they are very concerned." (D.I. 301, Tr. at 2590; DBX 504). In response to CaMac's concerns, BASF recommended that CaMac talk to a good patent attorney to obtain an opinion. (*See* DBX 504). Ms. Johnson wrote in her report that "All this activity makes it urgent that we find a different way to produce a stain-resistant polymer." (DBX 504).

By letter of April 16, 1992, DuPont notified CaMac that DuPont believed that the Anton patent was about to issue. (D.I. 300, Tr. at 2541; D.I. 298, Hale, Tr. at 1927; JTX 263; DBX 23). Sometime thereafter, Ms. Johnson called a meeting of BASF's inside counsel, outside counsel, and her immediate management to discuss the issues arising from the issuance of the Anton patent. (D.I. 300, Tr. at 2544). The result of the meeting was that BASF would try to arrive at a business solution with DuPont; if unable to do so, then BASF would indemnify CaMac and seek

manufacturing the twenty-five accused LEXES products.

69. The Court rejects DuPont's argument that Monsanto is also liable under § 271(b) in connection with CaMac's production of the ULTRON SD fibers because the Court has already found that Monsanto is liable as a direct infringer under § 271(g) in connection with these products. *See MAGICorp. v. Kinetic Presentations, Inc.*, 718 F.Supp. 334, 346 n. 8 (D.N.J.1989) ("It is well settled that the doctrine of actively induc-

ing infringement ... is not available as a separate source of liability against one who is alleged to be a direct infringer."); *see also SureSafe Industries, Inc. v. C & R Pier Manufacturing*, 850 F.Supp. 869, 873 (S.D.Cal.1993) (plaintiffs who alleged direct infringement had no standing to assert inducement of infringement).

70. In fact, prior to DuPont's introduction of its LUMENA product, CaMac did not market a pigmented nylon fiber made from a sulfonated nylon copolymer. (D.I. 300, Hale, Tr. at 1982).

to have the Anton patent invalidated. (D.I. 300, Tr. at 2545). BASF also notified Du-Pont at this time that DuPont was in violation of BASF's Burlone patent.

Thereafter, BASF agreed to indemnify Ca-Mac for any liability for infringing the Anton patent. (*See* D.I. 298, Hale, Tr. at 1966; DBX 135). BASF entered into the indemnification agreement with CaMac for two main reasons: 1) to allay CaMac's fears about infringing the Anton patent, and 2) to prevent the Anton patent from deterring CaMac from buying the sulfonated polymer from BASF. (D.I. 301, Tr. at 2589). Based upon the all of the foregoing evidence, DuPont contends that BASF actively induces infringement by CaMac.

BASF contends that DuPont has failed to establish active inducement. Principally, BASF argues that: 1) BASF has no involvement in CaMac's decision to use certain pigments or make certain colors; 2) BASF had no "actual intent" and no reason to know that CaMac's acts could possibly constitute infringement; 3) BASF's catdye polymer is the same polymer developed and sold by BASF for other catdye applications and was developed before knowledge of the Anton patent or the composition of LUMENA; 4) there is no evidence that BASF assisted CaMac in carrying out the processes that infringe the patent, and 5) the purpose of the indemnification agreement was not to overcome the deterrent effect of the Anton patent. (D.I. 281 at 35–37).

After careful consideration of the evidence, the Court finds that DuPont has satisfied its burden of establishing by a preponderance of the evidence that BASF actively induces infringement by CaMac.[71] The evidence demonstrates that BASF supplied its sulfonated nylon copolymer to CaMac in response to CaMac's request for a polymer to compete with DuPont's LUMENA. BASF knew that CaMac was going to use the copolymer to manufacture solution dyed nylon carpet fibers. After BASF and CaMac became aware of the Anton patent, CaMac was concerned. BASF recommended that CaMac

talk to a good patent lawyer. In June of 1992, BASF assured CaMac that BASF would continue both to supply the BV–600C2 product to CaMac and to provide technical service. (DBX 130). At some point, CaMac asked BASF whether BASF could reduce the sulfonate content of its polymer so as to be outside the Anton claims. BASF did not reduce its sulfonate content, but it did eventually indemnify CaMac so that CaMac would not be deterred from purchasing BASF's catdye polymer. *See Hewlett–Packard*, 909 F.2d at 1465 (intent to induce infringement can be inferred from an indemnification agreement when the main purpose of the agreement is to overcome the deterrent effect that the patent laws have on would-be infringers).

The Court is quite convinced by the evidence of record that BASF knowingly aided and abetted CaMac's direct infringement. In this regard, the Court rejects BASF's argument that it has no control over CaMac's decision with regard to pigment selection, color, etc. BASF's control or lack of control over pigment selection is immaterial in light of all of the evidence demonstrating that when BASF supplied its BV600–C2 polymer to CaMac, it knew what CaMac was going to do with it; after learning of the Anton patent in April, 1992, BASF continued to supply the polymer and, in addition, it indemnified Ca-Mac from any liability for infringing the patent in connection with its manufacture of solution dyed fibers from BASF's sulfonated polymer. In short, the Court does not believe that control over pigment selection is a prerequisite to a finding of active inducement in this case. Instead, the Court is persuaded by the evidence of record, including the testimony of Ms. Johnson, the documentary evidence and the indemnification agreement, that BASF knowingly and actively induced CaMac to infringe the Anton patent. *See Water Technologies*, 850 F.2d at 669 ("[t]he requisite intent to induce infringement may be inferred from all of the circumstances."). Accordingly, BASF is liable as an infringer under § 271(b). Like Monsanto, BASF's lia-

---

**71.** The predicate act of direct infringement is present because the Court has already concluded that CaMac directly infringes the Anton patent by manufacturing the twenty-five accused CAMAL-ON products.

bility under § 271(b) is limited to its activities after April, 1992, when BASF received notice of the Anton patent.[72]

### 3) *Willfulness*

■■■■ DuPont contends that both Monsanto and BASF are liable as willful infringers. Title 35 U.S.C. § 284 provides in part:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement. . . . [T]he court may increase the damages up to three times the amount found or assessed.

35 U.S.C. § 284 (1984 & Supp.1994). One purpose of increasing a damage award is "to deter willful infringement by punishing the willful infringer." *Avia Group International, Inc. v. L.A. Gear California*, 853 F.2d 1557, 1566 (Fed.Cir.1988). In determining whether willfulness exists, a court must examine the totality of the circumstances, including the following: 1) the infringer's deliberate copying of the ideas of another; 2) the infringer's knowledge of the patent rights of another; 3) any good faith belief of invalidity or non-infringement formed by the infringer after an investigation of the patent rights of another, and 4) the infringer's behavior as a litigant. *Mobil*, 779 F.Supp. at 1484. Actual notice of another's patent rights imposes a duty of due care upon the potential infringer. *Avia Group*, 853 F.2d at 1566; *Mobil*, 779 F.Supp. at 1484. This duty of due care generally requires the potential infringer "to obtain competent legal advice of counsel before infringing or continuing to infringe." *Avia Group*, 853 F.2d at 1566; *see also Minnesota Mining and Manufacturing v. Johnson & Johnson*, 976 F.2d 1559, 1580 (Fed.Cir.1992).

■■■■ A party seeking to establish willful infringement must prove the bad faith of the infringer by clear and convincing evidence. *Mobil*, 779 F.Supp. at 1484.

### a) *Monsanto*

■■■■ DuPont bases its argument that Monsanto willfully infringed the Anton patent upon a variety of evidence. First, Du-

Pont points to the fact that Monsanto had knowledge of the content of the Anton claims as of February, 1992. In light of this knowledge, DuPont contends, Monsanto had a duty of due care which required it to seek the advice of counsel. Monsanto did not, however, seek the advice of counsel, but it nevertheless continued its production and sale of its 46BJ polymer to CaMac and its own sale of ULTRON SD fibers. Further, DuPont argues, Monsanto continued its activities despite its awareness of both reexaminations of the Anton patent and the PTO's two decisions to uphold the patent. According to DuPont, "[t]his type of aggressive conduct, unsupported by any competent advice of counsel, is exactly the type of activity that supports a finding of willful infringement." (D.I. 275 at 67).

As further evidence in support of its willfulness argument, DuPont points to a July, 1992 memorandum by Monsanto's Director of Contract Carpet Marketing that listed the "DuPont patent" as a "risk" associated with Monsanto's SDN marketing plan. (D.I. 309, Wilson, Tr. at 1468–71; DMX 26 at 2435). This risk was balanced against the "rewards", which included "5M lbs. new BCF business by '95". DuPont also points to notes taken by Monsanto's Director of Nylon Carpet, Hugh Wilson, after he learned about the Anton claims. Mr. Wilson's notes appear to reflect three possible courses of action for Monsanto to take with regard to the Anton patent and the positives and negatives associated with each. (DMX 47; D.I. 309, Wilson, Tr. at 1466, 1480–81). Further, DuPont points to the fact that after Monsanto's patent applications were rejected, Monsanto abandoned them; according to DuPont, Monsanto never appealed the Examiner's rejection of the claims. Finally, DuPont asserts that Monsanto cannot rely upon the PTO's granting of two reexaminations of the Anton patent as a basis for a good faith belief that the patent was invalid. (D.I. 275 at 69).

According to Monsanto's Mr. Shear, when Monsanto learned of the Anton patent claims in February, 1992, Monsanto attorney Thomas Wallin informed DuPont attorney Mark

---

**72.** The Court finds that BASF received actual notice of the content of the Anton patent claims

when it received DuPont's letter in April, 1992. (*See* DBX 23).

Caplan that Monsanto had its own application pending in the PTO with claims directed to the same subject matter.[73] (D.I. 301, Shear, Tr. at 2628; MTX 303). Specifically, Monsanto asserts, its patent claims were directed to a pigmented nylon carpet fiber that would resist acid dye staining, and a process to make that stain-resistant pigmented nylon fiber by forming a sulfonated nylon polymer, adding a nonwhite pigment and then spinning the resulting pigment/polymer mixture into fiber.[74] (D.I. 301, Shear, Tr. at 2629; MTX 303, Claims 1, 11; JTX 282 at 16). Monsanto argues that, even before it became aware of the Anton patent claims, it learned of the Anton patent's European counterpart and cited that reference to the PTO. (D.I. 301, Tr. at 2646–47). When it learned of the Anton European counterpart, Monsanto suggested to the patent office examiner on or about February 7, 1992, that he set up an interference between Monsanto's patent application, which had been filed on October 5, 1989, and the U.S. counterpart of the Anton European application.[75] (D.I. 301, Tr. at 2649; JTX 282 at 56). In early March, 1992, Monsanto added process Claims 11–14 to its pending patent application. (D.I. 301, Tr. at 2650, 2663; JTX 282 at 57–61). At the same time, Monsanto again requested the PTO to establish an interference with the Anton patent application. On or about May 31, 1991, Monsanto filed an affidavit under Rule 131 with the PTO alleging that its invention had been reduced to practice prior to the effective date of the Anton patent. (D.I. 301, Tr. at 2648; JTX 282 at 40–48). Monsanto contends that it had every reason to believe that it could prevail on prior inventorship. (D.I. 282 at 43; *see also* MTX 100).

Further, Monsanto argues that it had ongoing negotiations with DuPont from 1989 through the Summer of 1992 regarding a Monsanto patent covering topically applied anti-stain carpet.[76] (*See* D.I. 301, Shear, Tr. at 2626–31). Monsanto alleges that, in an effort to settle this dispute, Monsanto suggested that the companies could grant each other royalty-free cross licenses on the stain-resistant SDN technology. (D.I. 301, Tr. at 2635–38; MTX 99; MTX 100). According to Monsanto, "[t]he complete tenor of the negotiation process between the parties evidences that Monsanto was acting in good faith with regard to the alleged patent rights of DuPont." (D.I. 282 at 44). It is undisputed, however, that DuPont had not even accused Monsanto of infringing the Anton patent during this period. (*E.g.,* D.I. 301, Tr. at 2632).

In August 1992, after its patent application had been rejected, Monsanto filed a continuation of its application containing a preliminary amendment; because the Anton patent had already issued by this time, Monsanto again requested the PTO to initiate an interference.[77] (D.I. 301, Tr. at 2651–53; JTX 282 at 88, 21, 63). No interference was ever granted. (JTX 282 at 67; D.I. 301, Tr. at 2666). On October 26, 1992, the PTO rejected Monsanto's pending application. (D.I. 301, Tr. at 2653, 2667–68; JTX 282 at 91–92). On that same date, DuPont sued Monsanto for infringing the Anton patent. Thereafter, Monsanto allowed its own patent applications

---

**73.** From about 1989 through 1992, Mr. Shear had supervisory responsibility for ten attorneys who had responsibility for patent matters in the Chemical Group of Monsanto. (D.I. 302, Tr. at 2624). Mr. Wallin was a patent attorney who reported to Mr. Shear. (D.I. 302, Tr. at 2625).

**74.** Monsanto's process claims were not added until shortly after Monsanto received the letter from DuPont advising Monsanto of the Anton claims. (D.I. 302, Tr. at 2663–64). In its amendment, Monsanto stated that "[t]he process claims are substantially the same as the claims in Anton ..., i.e., both define nonwhite, pigmented, stain-resistant nylon fibers." (JTX 282 at 59; D.I. 302, Tr. at 2663–64).

**75.** An interference proceeding is a proceeding within the PTO to determine who was the first to invent the claimed subject matter. (D.I. 302, Tr. at 2637).

**76.** According to Mr. Shear, Monsanto believed that DuPont's sale of its STAINMASTER carpet was infringing Monsanto's patents, and so Monsanto wanted to talk to DuPont about the potential licensing of those patents to DuPont. (D.I. 302, Tr. at 2626).

**77.** According to DuPont, although Monsanto "suggested" that the patent examiner institute an interference between the Anton application and its own applications, Monsanto nevertheless acquiesced in the Examiner's refusal to declare an interference and never petitioned the Commissioner to overcome the Examiner's decision not to institute an interference. (D.I. 275 at 68).

to lapse and become abandoned. (D.I. 301, Tr. at 2656–57). Subsequently, the Anton patent was subjected to two reexaminations before the PTO. (JTX 6, 7). The PTO eventually reissued the Anton patent in March, 1994. Monsanto contends that it continued to pursue avenues of settlement with DuPont after the filing of this lawsuit, and the parties continued to negotiate a license regarding the Anton patent throughout this case. (D.I. 282 at 45). In sum, Monsanto asserts that its behavior since this litigation began reflects its good faith belief that the Anton patent is invalid.

██ Based upon its review of the totality of the circumstances, the Court finds that DuPont has not satisfied its burden of establishing by clear and convincing evidence that Monsanto willfully infringed the Anton patent. It is true that Monsanto did not obtain the opinion of counsel after it gained knowledge of the content of the Anton claims. Although this factor is an important one, the failure to seek an opinion of competent counsel does not require a finding of willfulness. *Studiengesellschaft Kohle, m.b.H. v. Dart Industries,* 862 F.2d 1564, 1579 (Fed.Cir.1988); *Nickson Industries, Inc. v. Rol Manufacturing Co., Ltd.,* 847 F.2d 795, 800 (Fed.Cir. 1988); *Kloster Speedsteel AB v. Crucible Inc.,* 793 F.2d 1565, 1579 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987). Rather, a court must look to the totality of the circumstances to determine whether willfulness is present. *Minnesota Mining,* 976 F.2d at 1581. In this case, the Court is persuaded by the evidence of record that Monsanto indeed had a good faith belief that the Anton patent was invalid. Specifically, Monsanto had filed its own patent application directed to pigmented, acid stain-resistant nylon carpet fibers on October 5, 1989. When it learned of the European counterpart to the Anton application, Monsanto cited this reference to the PTO and requested an interference between its own patent and the U.S. counterpart of the European application. Upon receipt of DuPont's letter in February of 1992 advising Monsanto of the Anton claims, Monsanto promptly advised DuPont of its own pending applications. Monsanto did, subsequently, amend its application to include process claims. At the same time, Monsanto again requested an interference from the PTO. In a letter to DuPont dated October 2, 1992, Monsanto expressed confidence that it would be able to prove a date of invention prior to DuPont's filing date. (MTX 100). In this litigation, which was instituted in October of 1992, Monsanto has vigorously pursued its allegation that DuPont's Anton patent is invalid;[78] in fact, one of Monsanto's arguments in support of invalidity is directed to prior invention.[79] With regard to Monsanto's invalidity case, the Court believes that Monsanto's arguments have some merit. Indeed, the prior art to the Anton patent is, at a minimum, very close. In short, the Court does not believe that the evidence of record establishes that Monsanto acted in disregard of the Anton patent. *See Electro Medical Systems v. Cooper Life Sciences,* 34 F.3d 1048, 1056 (Fed.Cir.1994) ("Willfulness is shown when, upon consideration of the totality of the circumstances, clear and convincing evidence establishes that the infringer acted in disregard of the patent, that the infringer had no reasonable basis for believing it had a right to engage in the infringing acts."). All of this evidence leads the Court to conclude that Monsanto's conduct since February 1992 reflects its good faith belief that the Anton patent is invalid. In addition, DuPont has not pointed to any evidence suggesting that Monsanto's behavior as a litigant reflects bad faith, and the Court is aware of none.

Accordingly, the Court's review of the totality of the circumstances compels a conclusion that DuPont has failed to establish by clear and convincing evidence that Monsanto's infringement of the Anton patent was willful.[80]

78. This is not to say that Monsanto has not also vigorously pursued its non-infringement defense.

79. Monsanto also alleges invalidity based upon obviousness and anticipation.

80. *Compare Avia Group International,* 853 F.2d at 1566–67 (infringement was willful where: 1) infringer received notice of patent; 2) in a subsequent correspondence with its manufacturer, infringer noted the risks its sales incurred and the copying aspects of its product; 3) infringer con-

## b) *BASF*

■ DuPont's contention that BASF willfully infringes the Anton patent is based upon the following. DuPont contends that BASF learned of the allowance of the Anton application in April, 1992. Thereafter, according to DuPont, BASF knew it was infringing the Anton patent, but nevertheless continued to do so. (D.I. 275 at 70). Although BASF obtained an opinion of counsel in June 1992, DuPont points to the fact that the opinion does not even discuss the issue of infringement. Instead, the opinion is directed solely to invalidity, and it relies upon prior art references that had already been considered by the PTO. (D.I. 275 at 71). Further, according to DuPont, BASF's failure to obtain an updated opinion after either of the two reexaminations of the Anton patent evidences BASF's willfulness. DuPont asserts that the "reexaminations were of such obvious significance to the validity of the Anton patent, and to the merit of BASF's defenses, that this failure to reevaluate its opinion after the reexaminations constitutes a breach of BASF's duty of due care to avoid infringement." (D.I. 275 at 71).

In response, BASF asserts that, upon learning of the Anton patent, it promptly obtained a written opinion from its outside patent counsel that the Anton claims were invalid. According to BASF, it "considered the opinion to be thorough and competent and, in reliance on it, believed that it could continue to sell BV600 to CaMac without incurring any liability." (D.I. 281 at 48). BASF alleges that it tried to arrive at a business solution with DuPont, but was unable to do so.

After careful and thorough review and consideration of this issue, the Court finds that DuPont has failed to satisfy its burden of demonstrating by clear and convincing evidence that BASF willfully infringes the Anton patent. In reaching this conclusion, the Court is persuaded by the following evidence. Shortly after learning of the Anton patent's

issuance, BASF obtained an opinion of outside counsel that the Anton patent is invalid. (*See* BTX 323). To be sure, "that an opinion of counsel was obtained does not always and alone dictate a finding that the infringement was not willful." *Kloster Speedsteel*, 793 F.2d at 1579. Nevertheless, BASF's conduct in obtaining the opinion of outside counsel is probative. The opinion itself is detailed and comprehensive. (BTX 323). At trial, BASF's Ms. Johnson testified that BASF believed the opinion of counsel to be competent and thorough, and it relied upon the opinion to believe that it could continue to sell its polymer to CaMac without incurring liability for infringing the patent. (D.I. 300, Tr. at 2543–44). The Court finds the testimony of Ms. Johnson to be credible on this point, and the Court rejects DuPont's argument that BASF had a duty to obtain an updated opinion of counsel following the two reexaminations of the Anton patent. BASF, like Monsanto, has vigorously pursued its challenges to the validity of the Anton patent in this litigation and, as above, the Court believes that its arguments have some merit. Accordingly, the Court finds that BASF had a good faith belief that the Anton patent was invalid. In addition, DuPont has not pointed to any evidence suggesting that BASF's behavior in this litigation constitutes bad faith.

Based upon the totality of the circumstances, the Court concludes that DuPont has not established willful infringement by BASF. In reaching this conclusion, the Court has carefully considered DuPont's contention that BASF deliberately copied DuPont's LUMENA technology. Based upon the evidence offered in support of this contention, the Court is unable to conclude one way or the other whether in fact BASF deliberately copied DuPont's LUMENA. Even if the Court were to conclude that the evidence on this point weighs in DuPont's favor, the Court would nevertheless be unable to find that DuPont has satisfied its

tinued sales despite notice, and 4) infringer did not seek advice from counsel); *Kloster Speedsteel*, 793 F.2d at 1578–80 (infringement was willful where, after notice of allowance of certain claims, infringer: 1) assumed that it would be infringing the allowed claims; 2) assumed that

the patents were valid and infringed and merely developed a strategy to check validity and to get its infringing products into the United States market, and 3) did not seek the advice of counsel).

burden of demonstrating willfulness by clear and convincing evidence.

The Court has also considered DuPont's contention that two of the three prior art references relied upon by BASF's outside counsel in formulating its opinion of invalidity had already been considered by the PTO by the time trial commenced. This factor, though perhaps weighing somewhat in DuPont's favor, must be considered against the totality of circumstances and, in this case, the totality of the circumstances compels a finding of non-willfulness.

### 2. *Invalidity*

Monsanto and BASF raise three arguments in support of their contention that the Anton patent is invalid. First, they argue that the claims are invalid under 35 U.S.C. § 102(g) because Monsanto and BASF performed the claimed process first. Second, they assert that the claimed subject matter is anticipated by Example 9 of the Burlone patent. Finally, they argue that the invention disclosed in the Anton patent is obvious. Monsanto and BASF also contend that DuPont made material misrepresentations before the PTO which resulted in the issuance of the Anton patent.

As outlined in Section II.D.2 above, Monsanto and BASF have the burden of establishing invalidity by clear and convincing evidence. The Court will address each of their invalidity arguments in turn.

### a. *Monsanto's and BASF's Assertion of Invalidity Based Upon Prior Invention*

 Monsanto's and BASF's first argument in support of invalidity is based upon § 102(g). Section 102(g) provides:

A person shall be entitled to a patent unless—

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

35 U.S.C. § 102(g) (1984 & Supp.1994).

It is clear that DuPont is entitled to a reduction to practice date of its Anton patent no later than the December 1988 filing date of its patent application. *See, e.g., Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1376 (Fed.Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). Therefore, Monsanto and BASF have the burden of proving a reduction to practice without suppression, abandonment, or concealment earlier than December of 1988. If Monsanto and BASF satisfy this burden, then the burden of going forward with rebuttal evidence shifts to DuPont. Nevertheless, the ultimate burden of proving invalidity rests with Monsanto and BASF at all times. *Innovative Scuba Concepts v. Feder Industries,* 26 F.3d 1112, 1115 (Fed. Cir.1994).

According to Monsanto and BASF, both Scott Osborn of Monsanto and Matthew Hoyt of BASF were making sulfonated SDN fibers and testing them with red fruit drink in 1987. Monsanto and BASF each contend that they did not abandon, suppress or conceal the claimed process. Further, they contend that DuPont has failed to establish either an earlier reduction to practice or a prior conception linked to a later reduction to practice by diligence.

To demonstrate a prior reduction to practice, Monsanto and/or BASF must prove that they performed every step of the claimed process, and that their processes performed as intended. *Newkirk v. Lulejian,* 825 F.2d 1581, 1582 (Fed.Cir.1987). In support of their prior reduction to practice claim, Monsanto and BASF point mainly to the testimony of Mr. Osborn and Dr. Hoyt. Monsanto's Mr. Osborn testified that in July of 1987, he requested the pilot plant to blend green Astroturf color concentrate with 35JT polymer, which is the designation for Monsanto's cationic dyeable polymer, to be spun into fiber. (D.I. 298, Osborn, Tr. at 1750–55; MTX 18A). These fibers were tested for their stain-resistance with red Kool–Aid. (D.I. 298, Tr. at 1811–13; MTX 18H). According to Mr. Os-

born, the fibers exhibited excellent stain-resist properties. (D.I. 298, Tr. at 1816; MTX 18H at 3). He testified that he continued to work on his process through 1988. (D.I. 298, Tr. at 1822–24). Eventually, on October 5, 1989, Mr. Osborn and a Mr. Nicholson filed a patent application covering the stain-resistant SDN fibers.

On cross-examination, Mr. Osborn conceded that: 1) the only document that he had been able to find that demonstrated the composition of the 35JT polymer was JTX 278; 2) he had neither personally made the 35JT polymer, nor observed it being made; 3) he did not personally blend the 35JT polymer with pigment; 4) he had not been present when the blends were spun into fiber; 5) he had not personally carried out the stain-testing; 6) he could not be certain what kind of Kool–Aid was used in the stain testing reflected in MTX–18H, dated September 24, 1987, and 7) he was not aware as to whether the CIELAB values of the fibers made in 1987 were ever determined.

BASF's Dr. Hoyt, who holds a Ph.D. in fiber and polymer science, testified that in February of 1987, he drafted an invention disclosure which describes an acid dye resistant, stain-resistant polyamide fiber. (D.I. 297, Tr. at 1650–52; BTX 323A). The purpose of his fiber was to resist stains, particularly red drink stains. According to Dr. Hoyt, the fibers of his invention resisted staining by red drinks via two mechanisms: 1) end group blocking, and 2) catdye nylon. (D.I. 297, Tr. at 1653). He explained end group blocking as follows:

> The nylon fiber ends typically in an amino end group, an NH2 group, which is the site where dyeing or staining takes place. Through the addition of an amino end group blocker, we have a colorless chemical then react with this amino end group. And by being colorless, it then deprives the stains and dyes of a site for them to attach to and discolor the fiber.

(D.I. 297, Tr. at 1653–54). As to the sulfonated nylon, on the other hand, the sulfonate groups repel the acid stain materials. Dr.

Hoyt testified that the procedure described in his invention disclosure, which was reduced to practice in late December of 1986 or early January of 1987, resulted in producer-colored, red drink stain resistant nylon fibers. (D.I. 297, Tr. at 1660–70; BTX 178, BTX 178A). Dr. Hoyt also testified that he drafted patent claims to cover his invention; the claims identify the sulfonate content as from about .3 through 3.5% aromatic sulfonate. (D.I. 297, Tr. at 1671; BTX 323A at 560528). Dr. Hoyt first filed a patent application on his work in June of 1991.[81] (D.I. 297, Tr. at 1683). According to Dr. Hoyt, the application was based upon his invention disclosure of February 1987. (BTX 143B). Dr. Hoyt testified that he worked continuously on his invention from the time he conceived of it until the application was filed. His work during this period included developing the appropriate levels of sulfonation and end group blocking and evaluating health and safety concerns. According to Dr. Hoyt, he carried out the steps of the Anton patent in late 1986 or early 1987, as reflected by his invention disclosure. (D.I. 297, Tr. at 1688).

On cross-examination, Dr. Hoyt conceded that 50 months had elapsed between his alleged reduction to practice and the filing of his application in the patent office. He also conceded that, during that 50–month period, his work was never published outside of BASF. (D.I. 297, Tr. at 1696). He testified that his stain-resistance tests were based upon only 15 minutes of contact between the fiber samples and the red fruit drink. (D.I. 297, Tr. at 1701). His tests also demonstrated significant staining of the sulfonated nylon fiber samples that did not have end group blocking. (D.I. 297, Tr. at 1702). In addition, Dr. Hoyt conceded that a portion of the earlier-published DuPont European application was copied verbatim into his patent specification and, at trial, he was unable to give an explanation for this. (D.I. 297, Tr. at 1707–08). He testified that he did not personally write that part of the specification. (D.I. 297, Tr. at 1712).

---

81. Dr. Hoyt testified that his application would result in a patent the following month. (D.I. 297, Tr. at 1682).

■ The Court finds that neither Monsanto nor BASF has satisfied its burden of demonstrating by clear and convincing evidence that the Anton patent is invalid based upon § 102(g). It is settled that "an inventor's testimony respecting the facts surrounding a claim of ... priority of invention cannot, standing alone, rise to the level of clear and convincing proof." *Price v. Symsek,* 988 F.2d 1187, 1194 (Fed.Cir.1993). Instead, such inventor testimony must be supported by some type of corroborating evidence. *Id.* According to the Federal Circuit, a "rule of reason" analysis must be applied to determine whether an inventor's prior invention testimony has been corroborated. *Id.* at 1195. That is, "[a]n evaluation of *all* pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Id.* (emphasis in original).

In this case, Monsanto's Mr. Osborn testified that the formation of his 35JT polymer satisfied step (a) of Anton Claim 1. However, Mr. Osborn conceded that the only document that he had been able to find that shows how the 35JT polymer was made was JTX 278. (D.I. 298, Tr. at 1842). The document reflected at JTX 278, which includes a Special Instruction Sheet authored by C.D. Flamand, does not expressly indicate that the 35JT polymer is a sulfonated nylon copolymer containing 0.25–4.0 weight percent of an aromatic sulfonate, as defined in Anton claim 1. Instead, the document contains a "Textile Polymer Process Specification" and reflects an additive called "F561". Although Mr. Osborn testified that F561 contains sulfonated material within the range specified in Anton claim 1, (D.I. 298, Tr. at 1784), there is no indication on JTX 278 itself as to the composition of F561, nor is there any express indication that the 35JT polymer would contain *0.25–4.0 weight percent* of an aromatic sulfonate. To compensate for the deficiencies of this document, Mr. Osborn explained at trial that:

> F561 contains 30–percent sodium salt of 5–sulfoisophthalic acid. If you take .3 times that, that additive target [which is indicated on JTX 278], you should be able to tell how much was in the polymer.

(D.I. 298, Tr. at 1785–86). Mr. Osborn went on to explain that this particular 35JT polymer referred to in JTX 278 contained 2225 parts per million sulfur, which was consistent with the 35JT polymer normally made by Monsanto.

As additional support for his testimony regarding the composition of the 35JT polymer, Mr. Osborn referred to an earlier page in JTX 278, which indicates that "35JT is like 35JX except it has *no* NA–88". (JTX 278). According to Mr. Osborn, "NA–88" is the designation for titanium dioxide; therefore, the *35JT* polymer was the *35JX* polymer without Ti02. (D.I. 298, Tr. at 1754–55). Mr. Osborn then pointed to the document reflected at MTX 61, dated 9/23/86, which indicates that Monsanto's 35JX polymer contains "Sulpher: 2225 + / − 200"; Mr. Osborn testified that this quantity translated to about 1.9 weight percent aromatic sulfonate. (D.I. 298, Tr. at 1756–57; MTX 61). Thus, he testified that the 35JT polymer, which is "like 35JX except it has no NA–88", contained 1.9 weight percent aromatic sulfonate, which is within the range specified in the Anton patent.

In sum, the evidence offered by Monsanto in support of its contention that the 35JT polymer satisfied the limitations of step (a) of the Anton patent includes: 1) Mr. Osborn's uncorroborated trial testimony regarding the composition of the additive "F561" (JTX 278); 2) the document indicating that 35JT is "like 35JX except it has no NA–88" (JTX 278), and 3) MTX 61, which, according to Mr. Osborn, reveals that the 35JX polymer contained 1.9% sulfonate.

Although the question is indeed close, the Court finds that this evidence does not constitute clear and convincing evidence that Monsanto practiced step (a) of the Anton patent in 1987 by virtue of its manufacture of the 35JT polymer. First, Mr. Osborn's testimony as to the composition of F561 is uncorroborated. Second, although JTX 278, which indicates that 35JT is "like 35JX except it has no NA–88", suggests that the two polymers are indeed compositionally *alike,* the Court does not believe that this statement is "clear and convincing" evidence that the 35JT polymer contains aromatic sulfonate

within the Anton range. Essentially, Monsanto requests the Court to find corroboration for Mr. Osborn's testimony that the composition of the 35JT polymer satisfies step (a) of Anton claim 1 in JTX 278 and MTX 61. However, applying the Federal Circuit's rule of reason, the Court does not believe that these documents satisfy the corroboration requirement. Moreover, Mr. Osborn conceded at trial that although Mr. Flamand had requested that samples of the 35JT polymer be submitted to the Chem Lab for analysis of their sulfur and Ti02 content, Mr. Osborn had been unable to find the reports or results of any of the Chem Lab's analyses of this particular 35JT polymer. (D.I. 298, Tr. at 1787–88, 1847). Based on the foregoing, the Court does not believe that Monsanto has demonstrated that the 35JT polymer that was used to make the SDN fibers in 1987 satisfies step (a) of the Anton patent.

In addition, the Court does not believe that Monsanto's evidence with regard to the stain-resistance of its 1987 fibers demonstrates that these fibers would be stain-resistant within the meaning of Anton claim 1. At trial, Dr. Osborn testified that his fibers were Kool–Aid stain resistant. The documentary evidence relied upon by Mr. Osborn in support of the claimed stain resistance is a memo reflected at MTX 18H. MTX 18H is a memo from K.F. Gosline to R.J. Smith dated 9/24/87. The memo indicates that the J polymer fibers spun with green pigment achieved an 8.0 on Monsanto's 8–point stain scale, which means no staining at all, after being subjected to an 8–hour stain test. Mr. Osborn testified that this document reflects that these fibers exhibited excellent stain-resistance, although he was unfamiliar with the specific details of the stain testing. (D.I. 298, Tr. at 1812–13, 1816–17, 1837–38; MTX 18H).

The Federal Circuit has stated that prior invention is one type of anticipation, and "[i]t is axiomatic that for prior art to anticipate under § 102 it has to meet every element of the claimed invention ..." *Hybritech,* 802 F.2d at 1379. Accordingly, it seems to the Court that for a prior invention to invalidate a patent, the prior invention must anticipate

the invention claimed in the patent, *i.e.,* the prior invention must meet *every* element of the claimed invention. With that standard in mind, the Court observes that, even assuming that Monsanto's 1987 fibers satisfied an 8–hour Kool–Aid stain test, the details of which Mr. Osborn knew little, Monsanto has not demonstrated that these fibers met the stain-resistance element of the Anton claims. That is, Monsanto has not demonstrated that its 1987 fibers would achieve a 4 or 5 when subjected to one of the three 24–hour Kool–Aid stain tests described in the Anton specification. Although it is indeed possible that Monsanto's fibers would satisfy the stain tests disclosed in the Anton patent, Monsanto has not demonstrated by clear and convincing evidence that its fibers necessarily would do so. Accordingly, the Court is compelled to conclude that Monsanto has not demonstrated that the 1987 invention of Mr. Osborn meets the stain-resistance element of the Anton patent.

With regard to BASF's Dr. Hoyt, his testimony about his alleged prior invention is also insufficient. Although Dr. Hoyt testified that the fibers of his process were red drink stain-resistant, he conceded that the longest time period for which his fibers were contacted with the stainant was fifteen minutes. (D.I. 297, Tr. at 1668, 1701; BTX 178 at B115498). Perhaps more significantly, he also conceded that the sulfonated fibers without end group blocking exhibited significant staining after fifteen minutes. (D.I. 297, Tr. at 1702). Thus, like Monsanto, BASF has failed to demonstrate that Dr. Hoyt's fibers would achieve a 4 or 5 when subjected to one of the three 24–hour Kool–Aid stain tests described in the Anton specification. Moreover, BASF has not demonstrated a correlation between its fifteen-minute stain test and DuPont's 24–hour test. In addition, the only corroboration for Dr. Hoyt's testimony regarding the stain testing or any other aspect of his activities are the pages from his own laboratory notebook; BASF has offered no independent corroboration of Dr. Hoyt's testimony. (D.I. 297, Hoyt, Tr. at 1666–67; BTX 178 at B115480–B115498). The Court also observes that at least 50 months elapsed between Dr. Hoyt's alleged reduction to practice and the filing of his patent applica-

tion; during that fifty month period, there was no public disclosure of his invention. (D.I. 297, Tr. at 1709). Although Dr. Hoyt testified that he continued to work on his invention throughout the 50–month time period, the evidence offered in support of this testimony is not corroborated. Based upon the foregoing, the Court is compelled to conclude that BASF has not demonstrated that the 1986–87 invention of Dr. Hoyt meets the stain-resistance element of the Anton patent. Accordingly, BASF has failed to demonstrate by clear and convincing evidence that Dr. Hoyt's invention anticipates the invention claimed in the Anton patent.

In sum, the Court is unable to conclude from the evidence of record that Monsanto and BASF have demonstrated by clear and convincing evidence that they reduced the process claimed in the Anton patent to practice before the filing date of the Anton patent application.[82] Based upon this conclusion, the Court need not reach DuPont's contention that it reduced the invention claimed in the Anton patent to practice in 1985–86.[83]

b. *Monsanto's and BASF's Assertion of Invalidity Based Upon Anticipation By Burlone Example 9*

■ Monsanto and BASF contend that the Anton patent is invalid under § 102(b) for anticipation by example 9 of the Burlone

patent. For a discussion of the legal standards for anticipation, *see supra* Section II. D.2.a.

Example 9 of the Burlone patent provides:

The procedure of Example 1 was repeated except that American Hoechst pigment Novoperm Red BL was used, and the pigment was compounded directly into the molten polyamide of U.S. Pat. No. 3,846,-507 [the Thomm patent] using a high shear process rather than dispersed into an aqueous dispersion of polymer using a high speed mixing process. A color concentrate containing 25% pigment was obtained. One part of this solid color concentrate was blended with 24 parts of uncolored nylon–6 polymer containing 0.03% titanium dioxide and spun and drawtwisted into yarn as described in Example 1. Deeply colored red fiber containing 1% pigment was obtained.

(JTX 1, col. 5, 11. 39–51). Monsanto and BASF contend that: 1) the catdye nylons that are pigmented in Burlone example 9 would have a sufficient sulfonate content to meet the limitations of Anton claim 1; 2) the fiber exiting the spinnerette in both the Anton process and the Burlone process is a pigmented sulfonated nylon fiber containing an amount of sulfonation that would impart acid dye resistant properties,[84] and 3) the red

**82.** However, the Court finds that the work of Mr. Osborn and Dr. Hoyt is probative on the question of obviousness, discussed *infra*.

**83.** In rebuttal to Mr. Osborn and Dr. Hoyt, DuPont offered Dr. Pearlman, who is one of the seven named inventors on the Anton patent. Dr. Pearlman testified that, notwithstanding the 1988 filing date of the Anton patent, he first practiced the process described in Anton Claim 1 in October/December 1985. (D.I. 302, Tr. at 2950). He testified that it was not until June of 1986 when he first recognized that the process that he practiced in October and December of 1985 could be used to produce a pigmented, stain-resistant fiber. (D.I. 302, Tr. at 2953). At that time, he testified, he tested the fibers of his process with, among other things, Kool–Aid. (D.I. 302, Tr. at 2973; DTX 208 at B556). Dr. Pearlman conceded however, that during his deposition prior to trial, he had been unable to find documented corroboration of his June 1986 stain tests. Yet, at trial, he testified that he had subsequently found information about the June 1986 stain tests that refreshed his recollection that the tests had been conducted at that time. Nevertheless,

he admitted that there is no specific document describing any details of the stain testing allegedly conducted in December of 1985 or June of 1986. (D.I. 302, Tr. at 3082–84).

Because of the Court's findings with regard to Monsanto's and BASF's failure of proof by Mr. Osborn and Dr. Hoyt, the Court need not reach Dr. Pearlman's testimony. If the Court were to reach his testimony with regard to his alleged reduction to practice in December of 1985 or June of 1986, however, the Court would reject it as utterly lacking in credibility. At his depositions, Dr. Pearlman had been unable to identify either of those dates; it was only after he had allegedly refreshed his recollection that he was able to remember this very, very crucial evidence. Yet, he was unable to produce any specific document describing Kool–Aid stain testing in December 1985 or June 1986.

**84.** Monsanto and BASF argue that the acid dye resistant properties of the fibers so produced would be inherent.

fiber produced in Burlone example 9 would have a CIELAB L* value of less than 88.

The Court finds that Monsanto and BASF have failed to demonstrate by clear and convincing evidence that the Anton process is anticipated by Burlone example 9. First, the Court is persuaded that the Anton process, unlike the process described in Burlone example 9, consists of three distinct, sequential steps.[85] Such a construction of the Anton claims is supported by the language of claim 1, which expressly delineates three separate steps, and the specification of the patent. For example, under the Summary of the Invention in the Anton specification, the patent describes three separate steps:

> It has now been found that by adding to nylon-forming monomer(s) certain materials which confer cationic dyeability on nylon, such as aromatic sulfonates ..., polymerizing the nylon-forming salt to form a copolymer, mixing pigment into the molten copolymer, and then spinning the pigment/polymer blend into fiber ...

(JTX 4, col. 2, 11. 9–16). In addition, each of the examples in the patent describes the forming of the sulfonated nylon copolymer first, and then the adding of pigment. The specification also expressly indicates that the cationic dyeability additive is added "at the salt stage, before polymerization and before pigment is added." (JTX 4, col. 3, 11. 33–36). Moreover, both DuPont's Dr. Liotta and BASF's Dr. Harris agreed at trial that the Anton patent requires three separate process steps. (D.I. 299, Tr. at 2259; D.I. 301, Tr. at 2686, 2695–96; D.I. 300, Tr. at 2383). Only Monsanto's Dr. Wagener opined that the three steps in the Anton patent occur simultaneously, i.e., that during formation of the copolymer, pigment is added and the spinning occurs. (D.I. 300, Tr. at 2438, 2484). However, Dr. Wagener's trial testimony with regard to this issue differed from his deposition testimony and from statements in his expert report wherein he opined that the Anton process is composed of three sequential steps. (D.I. 300, Tr. at 2484, 2487–88). Furthermore, in the second reexamination of the Anton patent, the PTO distinguished Burlone based upon the fact that "Burlone does not teach forming a **sulfonated nylon copolymer** containing **0.25 to 4.0 weight percent** of an aromatic sulfonate or an alkali metal salt thereof as set forth in patented claim 1, step (a)." (emphasis in original). (JTX 7 at 47). In short, the Anton process is composed of three distinct steps: 1) forming a sulfonated copolymer; 2) adding pigment to the sulfonated copolymer; 3) spinning the pigment/copolymer blend into fiber. In contrast, Burlone example 9 describes a process for adding colored pigment to a small amount of highly sulfonated nylon to make a sulfonated color concentrate, which, once formed, is added to a large amount of unsulfonated nylon and then spun into fiber.[86]

Second, the Court observes that Burlone example 9 starts with a nylon containing 30% to 50% sulfonate, whereas the copolymer to which pigment is added in the Anton process contains only 0.25–4.0 weight percent sulfonate. (E.g., D.I. 300, Harris, Tr. at 2371–72; Wagener, Tr. at 2428). Significantly, in the first reexamination of the Anton patent, the PTO distinguished Burlone because "Burlone alone ... does not teach the amount of aro-

---

85. Monsanto and BASF concede that in Burlone example 9, polymer formation and pigment addition are accomplished simultaneously rather than sequentially. (D.I. 276 at 44–45; D.I. 301, Wagener, Tr. at 2429–30).

86. The case cited by Monsanto and BASF in support of their argument that the simultaneous process of Burlone example 9 anticipates the three-step process of Anton, *Swift Agricultural Chemicals Corp. v. Farmland Industries*, 499 F.Supp. 1295 (D.Kan.1980), aff'd, 674 F.2d 1351 (10th Cir.), cert. denied, 459 U.S. 860, 103 S.Ct. 132, 74 L.Ed.2d 113 (1982), is distinguishable. In *Swift*, the court found anticipation where the only difference between the prior art patent and the patent-in-suit was that the prior art patent spoke of separate heating and neutralization steps, whereas the subject patent described a process in which the two steps occurred simultaneously. *Id.* at 1297. However, the *Swift* court went on to say that:

> [W]here process patents are concerned, the nature of the method involved is the crucial factor. Moreover, ... the [prior art patent] teaches "on its face" a simultaneous process ...

*Id.* Thus, in *Swift*, both patents actually taught simultaneous processes. In contrast, in this case, the Burlone patent teaches a simultaneous process, whereas the Anton patent expressly teaches a process composed of three, distinct, sequential steps.

matic sulfonate in the nylon copolymer and the amount of pigment and copper in the blend." (JTX 6 at 40–41; *see also* JTX 6 at 67–68). The Court finds this distinction to be significant for purposes of anticipation and rejects Monsanto's and BASF's characterization of this distinction as a "hypertechnical literal" one.

Third, there is no indication in Burlone example 9 as to the stain-resistance of the fibers produced. In fact, the Burlone patent says absolutely nothing about stain-resistance. Even assuming that some stain-resistance would be present in the fibers of Example 9 as a result of the presence of the sulfonates, there is no evidence in the record demonstrating that the fibers so produced would necessarily be stain-resistant within the meaning of the Anton patent, *i.e.*, that the fibers would achieve a 4 or 5 on the 24–hour Kool–Aid test.[87] Neither Monsanto nor BASF introduced any evidence whatsoever of the stain-resistance of the fibers formed by the process described in Burlone example 9. (*E.g.*, D.I. 300, Harris, Tr. at 2385–86). *See Gore v. Garlock*, 721 F.2d 1540, 1554 (Fed. Cir.1983) (no anticipation where, *inter alia*, the record did not contain any evidence of tests in which the alleged anticipatory processes were conducted, nor were the products of the processes placed in evidence), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). Accordingly, the Court finds that Monsanto and BASF have failed to demonstrate that the stain-resistance element of Anton claim 1 is found, either expressly or inherently, in the Burlone reference.

In sum, the Court finds that Monsanto and BASF have not demonstrated by clear and convincing evidence that all of the elements and limitations of Anton claim 1 are found within the Burlone patent.[88]

### c. Monsanto's and BASF's Assertion of Invalidity Based Upon Obviousness

Monsanto and BASF contend that the Anton patent is invalid for obviousness under § 103. To determine whether "the subject matter as a whole would have been obvious at the time the invention was made ...",[89] the Court must consider the factors established by the United States Supreme Court in *Graham v. John Deere*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). These include: 1) level of ordinary of skill in the art at the time of the invention; 2) scope and content of the prior art; 3) differences between the prior art and the subject patent, and 4) secondary considerations such as unexpected results, commercial success, long felt but unresolved need, failure of others. *Graham*, 383 U.S. at 17, 86 S.Ct. at 694; *Loctite*, 781 F.2d at 872; *Mobil*, 779 F.Supp. at 1494. Obviousness is a question of law based upon the factual inquiries outlined in *Graham*. *See Panduit Corp.*, 810 F.2d at 1566–68.

### 1) Level of Ordinary Skill in the Art

A person of ordinary skill in the art is a hypothetical individual who is presumed to be aware of all of the relevant prior art. *Mobil*, 779 F.Supp. at 1442 (citing *Custom Accessories, Inc. v. Jeffrey–Allan Industries, Inc.*, 807 F.2d 955, 962 (Fed.Cir.1986)). To determine the level of ordinary skill in the art, a court must consider: 1) the types of problems existing in the art; 2) the known solutions to the problems; 3) the rate at

---

87. In fact, BASF's Mr. Rennie conceded at trial that fibers covered by the Burlone patent are not regarded as having built-in stain-resistance. (D.I. 302, Rennie, Tr. at 2616–17).

88. The Court's findings with regard to the differences between the Anton patent and Burlone example 9 compel a conclusion that the Burlone patent does not anticipate the Anton patent. In light of this conclusion, the Court need not reach DuPont's argument that Monsanto and BASF have not demonstrated that the CIELAB L* value of the fibers of example 9 would be below 88, although the Court finds it likely from the evidence of record that the fibers would inherently

satisfy this requirement. The Court also need not reach the parties' arguments about whether transamidation would or would not occur in the extruder in Burlone example 9, (*compare, e.g.*, D.I. 301, Liotta, Tr. at 2691–93 *with* D.I. 293, Burlone, Tr. at 226; D.I. 300, Harris, Tr. at 2384, and Wagener, Tr. at 2535–36), because, regardless of whether any transamidation would or would not occur, the other differences between the two patents which the Court has found mandate a conclusion that there is no anticipation.

89. *See supra* note 35 for the text of § 103.

which new inventions are developed in the field; 4) the complexity of the technology, and 5) the educational level of scientists working in the field. *Id.* A determination of the level of skill in the art must of course be made upon the facts of each case. *Id.*

■■■ In this case, the art was concerned with manufacturing nylon fibers and, particularly, solution dyed, acid dye stain-resistant nylon fibers. SDN had been in the art since the 1970s, and it was known that SDN fibers exhibited increased colorfastness and cleanability. It was also known in the art that aromatic sulfonates imparted acid dye stain-resistance to nylon.

The Court agrees with Monsanto and BASF that the level of ordinary skill in the relevant art would be typified by an engineer of several years experience familiar with nylon fiber production. (D.I. 276 at 69). The Court finds that such an individual would have been familiar with SDN and with catdye polymers made with additives such as 5–sulfoisophthalic acid. The individual would also have been familiar with the concept that sulfonate groups imparted acid dye stain-resistance to nylon, whether applied topically to a fiber or incorporated into the nylon polymer.

*2) Scope and Content of the Prior Art*

The scope of the relevant prior art is defined as that " 'reasonably pertinent to the particular problem with which the inventor was involved.' " *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1535 (Fed.Cir.1983) (quoting *In re Wood,* 599 F.2d 1032, 1036 (Cust. & Pat.App.1979)).

In this case, the Anton inventors sought to create a process for producing solution dyed, acid-stain resistant nylon fibers in various colors without encountering operating difficulties with any of the colored pigments. As to the scope and content of the relevant prior art, the Anton inventors stated in the first column of the Anton patent that:

> The current way of avoiding [acid dye] staining is to topically apply to the surface of the [nylon] filaments materials which function as stain-blockers or stain-resist

agents, thus preventing acid stains from permanently coloring the yarn. . . .

Alternatively, it is known from Flamand U.S.Pat. No. 3,542,743, Crampsey U.S.Patent No. 3,640,942 and Ucci U.S.Patent No. 4,579,762 that small amounts of certain materials which confer cationic dyeability on nylon, such as aromatic sulfonates and their alkali metal salts may be copolymerized with the nylon as a means of rendering the nylon resistant to staining by acid dyes.

Recently, yarn producers have begun incorporating colored pigments into nylon yarns to improve their resistance to degrading and fading in ultraviolet light, to give improved resistance to chemicals and noxious fumes and to give permanent coloration which is not removed by washing.

(JTX 4, col. 1, ll. 9–14, 15–27). These statements in the Anton patent acknowledge that, at the time of the Anton invention: 1) solution dyed nylon was known in the art, and 2) it was known in the art that resistance to acid dye staining could be imparted to nylon fibers either through the use of topical stain-blockers, or by copolymerizing certain materials, such as aromatic sulfonates, with the nylon, as disclosed by Flamand, Crampsey, and Ucci. Accordingly, the scope of the prior art is defined as the art of manufacturing nylon fibers, including SDN fibers and acid dye stain-resistant fibers. The content of the prior art includes the references cited in the Anton specification and the references considered by the Examiner during the Anton prosecution and reexaminations.

*a) Prior Art Solution Dyed Nylon*

As explained above in section II.A.2., solution dyed nylon ("SDN") or "producer-colored" nylon fibers are those that are colored prior to the spinning process.[90] They are generally made by adding pigment to the nylon prior to spinning. The pigment/polymer blend that is used to make SDN fibers provides those fibers with certain advantages over fibers that are dyed after the spinning process, such as lightfastness, color fastness,

---

**90.** Prior to the introduction of SDN, nylon fibers were generally dyed in a high temperature dye bath, after they were spun. (D.I. 302, Liotta, Tr. at 2679–80).

and bleach resistance. (*See, e.g.,* D.I. 295, Sandukas, Tr. at 672).

SDN fibers were known in the art since the early 1970s when they were first manufactured by CaMac. (D.I. 298, Hale, Tr. at 1907). CaMac marketed its SDN fibers under the name CAMALON. BASF started to manufacture and sell SDN in 1977; these SDN fibers are now marketed under the brand name ZEFTRON. (D.I. 301, Rennie, Tr. at 2598, 2602). DuPont did not begin manufacturing SDN until the mid–1980s. At that time, DuPont's experience with producing SDN "may have approached zero." (D.I. 295, Corey, Tr. at 890). As DuPont's Mr. Corey conceded at trial, during the 1988–89 time frame, both CaMac and BASF manufactured more colors of SDN fibers than DuPont. (D.I. 295, Corey, Tr. at 886–88).

The Burlone patent, which issued in 1983, discloses a color concentrate composed of a sulfonated nylon carrier polymer and colored pigment(s). In example 9 of the Burlone patent, the claimed color concentrate is added to an unsulfonated nylon host polymer, and the resultant blend is spun into sulfonated, solution-dyed fibers. (JTX 1, col. 5, 11. 39–51).

### b) *Prior Art Acid Dye Stain–Resistance*

At the time of the Anton invention, it was known that acid dye stain-resistance could be imparted to nylon by topically applying stain-blockers,[91] or alternatively, by copolymerizing with the nylon "small amounts of certain materials which confer cationic dyeability on nylon, such as aromatic sulfonates and their alkali metal salts". (JTX 4, col. 1, 11. 15–21; D.I. 299, Caplan, Tr. at 2126–27).

Two early prior art references considered by the PTO during the Anton prosecution and reexaminations are the Magat and David patents. United States Patent No. 3,184,436 ("the Magat patent") issued on May 18, 1965 and is entitled "Polycarbonamides of Improved Dye Affinity Having the Benzene Sulfonic Acid Salt Moiety as a Integral Part of the Polymer Chain". (JTX 10). This patent

is directed to sulfonated, acid dye resistant fibers. (*See* D.I. 301, Liotta, Tr. at 2770–71; D.I. 299, Tr. at 2213). The polymer of Magat is made from monomers. (D.I. 300, Tr. at 2422). United States Patent No. 3,389,549 ("the David patent") issued on June 25, 1968 and is entitled "Aromatic Dicarbonyl Sulfonate Modified Polycarbonamides." (MTX 2–G). This patent disclosed the use of the 5–sulfoisophthalic acid comonomer to produce cationic-dyeable, acid-dye resistant fibers. (D.I. 300, Tr. at 2417; D.I. 301, Tr. at 2770–71). Together, the David and Magat patents teach the forming of nylon fibers that: 1) contain Ti02, and 2) have a sulfonation amount within the range of step (a) of the Anton patent. (D.I. 300, Tr. at 2418; D.I. 301, Tr. at 2779–80). The purpose of the sulfonates in both of these processes is to render the polymer cationic-dyeable and acid dye resistant in the dye bath. (*E.g.,* D.I. 300, Wagener, Tr. at 2455; D.I. 301, Liotta, Tr. at 2682).

United States Patent No. 3,640,942 ("the Crampsey patent"), which is referenced in the Anton patent, issued on February 8, 1972. The patent is entitled "Manufacture of Delustred Nylon Filaments". (JTX 8). Claim 1 of the Crampsey patent claims:

A method of making delustred polyamide **filaments which are resistant to acid dyes,** comprising blending chips of a first polymer consisting of a substituted co-polyamide containing covalently bound anionic sulphonate groups with chips of a second polymer different from said first consisting of a polyamide containing a dispersion of titanium dioxide particles, melting the blended chips and extruding the molten blend to form filaments.

(JTX 8, col. 3, 11. 25–30; col. 4, 11. 1–2) (emphasis added). The Crampsey patent thus discloses a method of making acid-dye resistant fibers by forming a sulfonated nylon copolymer, blending chips of the sulfonated copolymer with chips of a regular polymer containing Ti02 particles, melting the chips,

---

**91.** Monsanto was the first to publish the fact that the topical application of sulfonated material on nylon fibers would repel stains from household stainants. (D.I. 295, Tr. at 696–97). Thereafter, in 1986, DuPont began selling its STAINMAS-

TER carpets, which are nylon carpets with a topically-applied sulfonated coating. The sulfonated coating is used to guard against acid stain-like materials. (D.I. 295, Sandukas, Tr. at 696).

and then extruding the molten blend.[92] (JTX 8, col. 3, 11. 25–30; col. 4, 11. 1–2; D.I. 299, Caplan, Tr. at 2130–31). The resulting white fibers are subsequently dyed in a dye bath.

Another patent relied upon during the Anton reexaminations was United States Patent No. 3,846,507 ("the Thomm patent"). The Thomm patent, which issued on November 5, 1974, is directed to a process for producing fiber-forming polyamides with acid dye resistance. (JTX 15; D.I. 300, Tr. at 2420; D.I. 301, Liotta, Tr. at 2727, 2770–71). Like the Crampsey patent, and unlike Magat and David, the copolymer of the Thomm patent is made by melt-blending two separate polymers together.[93] (D.I. 300, Tr. at 2422). Nevertheless, the function of the Thomm polymer is the same as the functions of the polymers of David, Magat and Crampsey. (D.I. 300, Tr. at 2420–21, 2425–26).

Finally, United States Patent Number 4,579,762 ("the Ucci '762 patent"), which is also referenced in the Anton specification, issued on April 1, 1986 and is entitled "Stain Resistant Carpet with Impervious Backing". (JTX 16). The patent claims in part: "A carpet ... being characterized in that said fibers are shaped from nylon 66 or nylon 6 polymer modified to contain as an integral part of its polymer chain **aromatic sulfonate units in an amount sufficient to improve the acid dye-resist properties of said fibers** ..." (JTX 16, col. 6, 11. 58–65) (emphasis added). At trial, Mr. Ucci testified that the sulfonate groups of his '762 patent are built into the nylon polymer system and act as stain-blockers. (D.I. 297, Ucci, Tr. at 1579; *see also* D.I. 300, Wagener, Tr. at 2413).

The acid dye resistance of the fibers of the Ucci patent is tested by using red Kool–Aid. (JTX 16, col. 5, 11. 5–35). According to the trial testimony of Dr. Wagener, the Ucci '762 patent demonstrated to the art that the sulfonate group has two roles in life: it can be used either to convey cationic dyeability, or to convey acid stain-resistance and, specifically, household stain-resistance.[94] (D.I. 300, Wagener, Tr. at 2419). In other words, the Ucci '762 patent taught the art that acid-*dye* resistance (*i.e.*, in a dye bath) was equivalent to acid-*stain* resistance (*i.e.*, in the household). (D.I. 300, Tr. at 2419, 2535). Dr. Wagener testified further that it is clear from the Ucci '762 patent that increasing the sulfonate content would improve the stain-resistance of the nylon. (D.I. 300, Tr. at 2416).

The Court's consideration of the relevant prior art weighs in favor of a finding of obviousness in this case. Solution dyed nylon had existed commercially for over ten years prior to the Anton patent. The Magat, David, Crampsey, Thomm and Ucci '762 patents taught the art generally to spin a sulfonated nylon polymer into fibers that would exhibit acid dye resistance, albeit in a dye bath.[95] Standing alone, the Crampsey patent taught the addition of TiO2, a white pigment, into a sulfonated polymer to produce white-pigmented, acid dye-resistant fibers. Significantly, after Crampsey, the Ucci '762 patent taught that the acid dye resistance imparted by the sulfonates was equivalent to household acid stain-resistance under room temperature conditions.[96] (*See* D.I. 297, Ucci, Tr.

---

92. The sulfonated nylon of Crampsey is prepared by combining existing polymers. According to Monsanto's Dr. Wagener, a sulfonated copolymer, such as is disclosed in step (a) of the Anton patent, can be made either by melt-blending existing polymers, as in the Crampsey and Thomm patents, or by polymerizing monomers, as in the Magat, David, and Ucci '762 patent. (D.I. 301, Wagener, Tr. at 2395; MDX 27).

93. In Thomm, a small amount of highly sulfonated nylon, *i.e.*, 10% to 50% by weight, is melt-blended with a large amount of unsulfonated nylon; the melt blend is then spun into catdye nylon fiber. (*See* D.I. 301, Harris, Tr. at 2327).

94. DuPont's Dr. Liotta conceded that the Ucci '762 patent taught the art that a cat-dye

polymer had two functions. (D.I. 301, Tr. at 2779).

95. The Crampsey and Ucci patents established that acid-dye resistance could be imparted to nylon through the incorporation of aromatic sulfonates into the nylon polymer. (*See, e.g.,* D.I. 300, Harris, Tr. at 2271–72).

96. Although it is certainly true, as DuPont argues, that the Ucci '762 patent describes a particular carpet system which is constructed with a water impervious backing, the patent also indicates that the fibers of the system would be made from polymers modified with sufficient sulfonate units so as to improve the acid dye resist properties of the fiber. (*See* JTX 16, col. 2, 11. 21–24). In addition, in the patent examples, the fibers are tested with red Kool–Aid.

at 1587; D.I. 300, Wagener, Tr. at 2413–14, 2419). The Court is persuaded that, after the Ucci '762 patent, it was understood that Crampsey would exhibit resistance to red Kool–Aid stains. (*See* D.I. 300, Tr. at 2435). Finally, the Burlone patent taught the art to add pigment to the sulfonated polymer of Thomm to form a color concentrate, to add the claimed concentrate to a regular host nylon polymer, and then to spin the resultant blend into nonwhite, solution dyed nylon fiber.

On this record, it would appear to have been obvious to add colored pigments to a sulfonated nylon copolymer to produce solution-dyed, acid stain-resistant nylon fibers. DuPont's argument that the fibers of Magat, David, Crampsey, Thomm and Ucci '762 are dyed in a dye bath as opposed to being producer-colored does not change the Court's analysis. When the fibers of the Crampsey process exit the spinnerette, prior to being dyed in a dye bath, these fibers are acid stain-resistant, white-pigmented fibers; the Ucci '762 patent taught that the fibers of Crampsey would be resistant to household acid stains. That the Crampsey fibers are subsequently dyed is, for obviousness purposes, irrelevant to the issue of whether Crampsey discloses a process for producing pigmented, acid stain-resistant, nylon fibers.

### 3) *Differences Between the Prior Art and the Anton Patent*

The Anton patent discloses a process for producing pigmented, stain-resistant nylon fibers by: 1) forming a sulfonated nylon polymer containing 0.25–0.4 weight percent aromatic sulfonate; 2) adding pigment, and 3) spinning the resultant blend into fiber with CIELAB L* values of less than 88. Monsanto and BASF contend that the Anton process is merely the Crampsey process performed with a different color. According to Monsanto and BASF, Crampsey disclosed the claimed process using a single pigment— white TiO2; DuPont merely changed the color of the end fiber by selecting different pigments in performing its process. They argue that DuPont then drafted the claims of the Anton patent to claim all colors except white so as to avoid Crampsey.

In support of their contention of obviousness based upon Crampsey, Monsanto and BASF rely primarily upon the testimony of Dr. Wagener, Mr. Caplan, and the proceedings in the PTO. Monsanto's Dr. Wagener, who is a professor of organic and polymer chemistry, testified that the Crampsey patent discloses the forming of an acid dye-resistant polymer containing about 1.8% sulfonate, which is within the Anton range. (D.I. 300, Wagener, Tr. at 2410; *see also* D.I. 301, Liotta, Tr. at 2782). Then, according to Dr. Wagener, Crampsey teaches the addition of titanium dioxide, a white pigment, into the sulfonated polymer. The vehicle used to introduce the TiO2 is regular nylon. (D.I. 300, Tr. at 2410–11; D.I. 301, Tr. at 2782). Finally, according to Dr. Wagener, Crampsey discloses spinning the pigment/copolymer blend into a fiber. (D.I. 300, Tr. at 2411–12). Accordingly, Dr. Wagener testified that the Crampsey patent directly describes the process claimed in the Anton patent with the exception of the color of the fiber that is produced. (D.I. 300, Tr. at 2435–36). Consistent with Dr. Wagener's testimony, DuPont's Dr. Liotta testified that, prior to the dye bath step of Crampsey, the processes of Anton and Crampsey are "indistinguishable".[97] (D.I. 301, Tr. at 2787).

Monsanto and BASF also point to the testimony of Dupont's in-house patent attorney, Mark Caplan, who drafted the original Anton application. Mr. Caplan testified at trial that Crampsey discloses forming a sulfonated nylon copolymer within the meaning of step (a) of the Anton patent, adding a pigment to the copolymer, and spinning the pigment/copolymer blend into fiber. (D.I. 299, Caplan, Tr. at 2130–31). Indeed, Mr. Caplan also testified that the CIELAB L* limitation in the Anton patent was added to differentiate the claimed process from processes like Crampsey, wherein white fibers delustered with TiO2 are claimed. (D.I. 299, Tr. at 2131–33, 2140). The CIELAB L* value of "less than 88" that is claimed in the Anton patent cov-

---

97. Dr. Liotta is a professor of chemistry at Georgia Tech. He has served as a consultant to DuPont since 1972. (D.I. 301, Tr. at 2674).

ers colors darker than the color that would be imparted solely by TiO2. (D.I. 299, Tr. at 2133).

As further support for their obviousness argument, Monsanto and BASF point to the proceedings in the PTO with regard to both Monsanto's own patent application and to the Anton application. On October 5, 1989, while the Anton application was pending, Monsanto filed a patent application based upon the work of Mr. Osborn and Mr. Nicholson entitled "Pigmented Stain–Resistant Nylon Fiber". (JTX 282). This fiber was made from sulfonated nylon polymer and pigment; the patent was directed to the product of the process. In the first office action on the Monsanto application, the claims were rejected as anticipated and/or as obvious over Crampsey in view of Elbert.[98] In rejecting the Monsanto claims, Examiners Davis and Morris stated:

Crampsey teaches polyamide filaments delustered with titanium dioxide particles and resistant to acid dyes (column 1, lines 22–23).... **These polyamides have pigments, in this case titanium dioxide,** dispersed therein by melt blending (Column 1, lines 26–31 and Column 3 lines 2–6). These polyamide filaments incorporate covalently bound anionic sulphonate groups in order to ... render the filaments resistant to acid dyes (column 1, lines 36–40).... **Crampsey is silent as to his fiber's resistant to RDTC Red Dye 40, but since Crampsey's material is taught to be stain resistant toward acid dyes, it is inherent that his material would contain sulfonated groups in sufficient quantity to impart the claimed stain resistance. In the alternative, since Crampsey desires stain resistance column 1, line 230, it would have been obvious to one with ordinary skill in the art to include enough of the sulfonated groups to render the material resistant to acid dyes to the degree claimed here.**
[JTX 282 (8/8/90 Office Action) at 22–24 (emphasis added); D.I. 301, Shear, Tr. at 2645–46].

In response to the rejection, Monsanto amended its claims in an attempt to avoid the white fibers of Crampsey. The amended claims recited "A carpet fiber ... containing a sufficient amount of a pigment composition dispersed therein to impart a desired shade of color to said fiber...." (JTX 282 at 28). A second time, Examiners Morris and Davis rejected Monsanto's application over Crampsey, stating that they recognized TiO2 as a white pigment. The Examiners charged Monsanto "with the burden of proving that the small amount of TiO2 employed by Crampsey does not act as a pigment, in that it cannot 'impart a desired shade of color' to a fiber." [JTX 282 (2/4/91 Office Action) at 36].

In a third rejection of Monsanto's patent application, Examiners Morris and Lesmes stated:

**The Examiner continues to hold TiO2 as a pigment that imparts the color white to the polyamide filaments described.**

**Applicant's objection to this rejection is in essence that Crampsey adds TiO2 to his fibers as a delustrant, not as a pigment and further, that white is not a color.**

**The Examiner finds appellants remarks unpersuasive. First, white can and is considered a color** when describing hue or appearance of an object. The color of milk is white. See Webster's Ninth New Collegiate Dictionary; white (lb) "of the color of new snow or milk"; specifically: of the color white. Also a pigment is defined as a substance that imparts color to other materials. The 11th edition of the Merck Index describes TiO2 as a pigment.

[JTX 282 (3/16/92 Office Action) at 65–66 (emphasis added) ]. Thus, Monsanto's patent application was rejected over Crampsey because the Examiners concluded that: 1) it would have been obvious from Crampsey to add enough sulfonate so as to render the fibers acid stain-resistant within the meaning of Monsanto's claims [see JTX 282 (8/8/90 Office Action) at 22–24], and 2) the TiO2 of Crampsey is a "pigment", and the white of the Crampsey fibers is a "color". Accordingly, Monsanto's claims for pigmented, stain-

98. The Elbert patent is a Monsanto patent that

covered Astroturf. (D.I. 300, Tr. at 2151).

resistant fibers were found to be obvious under § 103.

Thereafter, Monsanto filed an Amendment to its claims. (JTX 282 at 85; D.I. 301, Shear, Tr. at 2652). At the same time, Monsanto requested that an interference be set up with the Anton patent. (JTX 282 at 88; D.I. 301, Tr. at 2653). In response, the PTO again rejected Monsanto's claims, stating that:

> However, the entire argument is irrelevant when Crampsey is taken in view of Elbert et al who teach that it is known to incorporate pigments into aryl sulfonamide modified polyamides. **From this teaching, it would have been obvious to the skilled artisan to include in the fibers of Crampsey pigments known in the art of polyamide pigmenting, motivated by the expectation of providing superior coloring properties** (Elbert et al, column 5, lines 5–6).

[JTX 282 at 91 (emphasis added); D.I. 301, Tr. at 2653–54]. Monsanto filed a divisional application in May of 1992. These claims were also rejected by the PTO in view of Crampsey. [JTX 282 (8/19/92 Office Action) at 29–31; D.I. 301, Tr. at 2654–55].

In comparison, Monsanto and BASF point to the prosecution history of DuPont's Anton patent. The Anton claims were first rejected by the PTO on July 2, 1990, as unpatentable under § 103 over Crampsey in view of Elbert. PTO Examiner Lorin explained that Crampsey teaches the manufacture of a sulfonated fiber, but "does not show incorporating a pigment"; Elbert, on the other hand "shows incorporating a pigment". (JTX 5 at 42–43; D.I. 299, Tr. at 2144, 2146–47, 2151). Thus, the Anton claims were obvious in light of those two references.

In response to the PTO's rejection, DuPont did not argue that the combination of Crampsey and Elbert was not obvious. (D.I. 299, Tr. at 2152–55; JTX 5 at 71–72). Instead, DuPont stated that:

> As correctly pointed out by the Examiner, Crampsey discloses the use of aromatic sulfonates such as 5–sulfoisophthalic acid to make nylon copolymers for spinning fibers, but Crampsey does not teach the use of colored pigments to make pigment-

ed fibers from such copolyamides. As a secondary reference, the Examiner cites Elbert, who does incorporate colored pigment (including copper) into nylon fibers....

> Accepting for the sake of this discussion that it would be obvious for one skilled in the art to combine these references, the application discloses that the combination yields unexpected results. As shown in Examples 1–4 (page 16, Table B), the use of an aromatic sulfonate to form a nylon copolymer significantly reduces the number of breaks incurred in spinning the pigmented fiber....

(JTX 5 at 71–72). Thus, DuPont "accepted for the sake of discussion that it would have been obvious" to combine Crampsey and Elbert, and then distinguished the Crampsey and Elbert references by claiming the "unexpected results" of improved operability and decreased spinning problems. Thereafter, the Anton claims were allowed.

Monsanto and BASF contend that Examiner Lorin's statement that Crampsey "does not show the incorporation of a pigment" was incorrect because Crampsey does indeed disclose the incorporation of TiO2, a white pigment. They contend further that DuPont knew that Examiner Lorin had erred when he stated that Crampsey did not include pigment, but DuPont failed to inform the Examiner of this obvious error. Instead, they contend, DuPont responded to the rejection stating: "As *correctly* pointed out by the Examiner, Crampsey ... does not teach the use of colored pigments ..." Monsanto and BASF contend that DuPont then went on to argue patentability over Crampsey only by claiming "unexpected results". Yet, Monsanto and BASF argue, DuPont has not demonstrated the claimed spinning improvements or any other unexpected results and, therefore, the Anton patent is obvious in view of Crampsey.

In the fall of 1992, CaMac requested a reexamination of the Anton patent, and on November 24, 1992, the PTO granted CaMac's request. (JTX 6 at 39–41). CaMac's request was based upon both the Burlone patent alone, and upon the Burlone patent in

combination with the Thomm patent. (JTX 6 at 40). As a result of this reexamination, the Anton claims were rejected under § 103 as being unpatentable over Burlone in combination with Thomm. (JTX 6 at 58; D.I. 299, Tr. at 2164–65). Following the rejection, DuPont representatives had an interview with Patent Examiner Tentoni. Examiner Tentoni's Interview Summary Record reflects that: 1) DuPont proposed changing "polymer" to "copolymer" in Claim 1; 2) the level of sulfonation in Thomm exceeds the maximum amount claimed, and 3) in the claimed process, a *random* copolymer is formed in step (a). (JTX 6 at 62; D.I. 299, Tr. at 2174–74). Thereafter, DuPont amended the Anton patent. Specifically, "copolymer" was substituted for "polymer" in steps (b) and (c). (JTX 5 at 67; D.I. 299, Tr. at 2178). Also in the Amendment, DuPont discussed the "unexpected results" of the claimed process, including the reduced number of breaks and decreased spinning problems. (JTX 5 at 71). DuPont did not amend the claims to recite a "random copolymer" which, according to Mr. Caplan, was one of the differences that distinguished Anton from Burlone. (D.I. 299, Tr. at 2197). DuPont submitted its Amendment on March 29, 1993.

On April 29, 1993, CaMac filed a second request for reexamination of the Anton patent based upon the Burlone, Thomm, Magat, and David patents. (JTX 7; D.I. 299, Tr. at 2212). In an Office Action dated October 12, 1993, Claims 1–10 of the Anton patent were rejected under § 103 over the Burlone patent in combination with the Thomm, Magat, and David patents. (JTX 7 at 51). In response to the rejection, DuPont stated that the David and Magat references were cumulative to the teachings of Crampsey. (JTX 7 at 60; D.I. 299, Tr. at 2217). DuPont stated further:

> Crampsey teaches sulfonated nylon copolymer used as a fundamental fiber-forming polymer spun into white nylon fiber, where the level of sulfonation for that copolymer overlaps with the "0.25–4.0 weight percent" range recited in the Anton patent claim 1.

The Crampsey patent was discussed during the original prosecution for the Anton patent when Examiner Lorin relied upon the Crampsey patent as the primary obviousness reference and stated that it disclosed a fiber from a copolyamide comprising a small amount of aromatic sulfonate. . . .

(JTX 7 at 60). So, in this second reexamination, DuPont referred the Examiner back to the original prosecution wherein Examiner Lorin had concluded that Crampsey does not show the incorporation of pigment. (D.I. 299, Tr. at 2219–20). DuPont then went on to characterize the relevant prior art as falling into two categories. According to DuPont, the first category related to the production of white nylon fibers where a sulfonated nylon copolymer without colored pigment is spun, as described in Crampsey.[99] DuPont distinguished this first category of prior art from the Anton invention based upon the fact that Crampsey uses TiO2 as a delustrant, and upon the fact that the resultant fibers are white. Thus, DuPont's own arguments to the PTO suggest that the only apparent distinction between the Crampsey process and the Anton process was that Crampsey used TiO2, whereas Anton used nonwhite pigments.

The second category of prior art, according to DuPont, related to the production of fibers where colored pigments were introduced into *un*sulfonated nylon as the fundamental fiber-forming polymer, as disclosed in the Burlone patent. In contrast, the Anton patent teaches the addition of colored pigments into a previously-formed, *sulfonated* nylon copolymer as the fundamental fiber-forming polymer.[100] In short, according to DuPont, the Anton invention was patentable over the prior art because there was "no affirmative teaching in any prior art reference to add, prior to spinning, colored pigment (either alone or in a color concentrate) to a previously-formed sulfonated nylon copolymer which is the fundamental fiber-forming polymer and to spin that blend to produce a colored nylon fiber." (JTX 7 at 67). In that sen-

---

99. CaMac's request for reexamination was not, however, based upon the Crampsey reference.

100. Notably, however, the DuPont claims do not contain the "previously-formed" or the "fundamental fiber-forming polymer" language.

tence, the word that distinguishes the Crampsey reference is the word "colored". (*See* D.I. 299, Tr. at 2223–24).

The Anton claims were allowed by the PTO. In allowing the patent, Examiner Tentoni essentially adopted DuPont's argument, stating that:

A principal reason why claim 1 is patentable over the prior art references presently of record is that none of the prior art references, alone or in combination, disclose, suggest, or teach a process of making a stain-resistant, pigmented, nylon fiber including adding, prior to spinning, pigment to a previously-formed sulfonated nylon copolymer, which sulfonated nylon copolymer contains 0.25–4.0 weight percent of an aromatic sulfonate or an alkali metal salt thereof as set forth in patentable claim 1.

(JTX 7 at 83). Thus, in his Reasons for Allowance, Examiner Tentoni did not mention the color distinction between Crampsey and Anton that DuPont had delineated in distinguishing Anton from the first category of prior art. This color distinction was, according to Monsanto and BASF, the only distinction to which DuPont pointed as existing between Crampsey and Anton. Accordingly, Monsanto and BASF contend that the above-quoted reason for allowance, which does not mention color differences, was insufficient to overcome Crampsey because Crampsey does in fact teach a "process of making a stain-resistant, pigmented, nylon fiber including adding, prior to spinning, pigment to a previously-formed sulfonated nylon copolymer, which sulfonated nylon copolymer contains 0.25–4.0 weight percent of an aromatic sulfonate or an alkali metal salt thereof as set forth in patentable claim 1". They argue that, by failing to include the word "colored" before pigment, Examiner Tentoni failed to overcome the Crampsey reference.

Based on the foregoing, Monsanto and BASF contend that the differences between the prior art Crampsey reference and the Anton patent are such as to render the Anton patent invalid for obviousness. They contend that the Anton process is the same process that is disclosed in the Crampsey patent except for the color of the resultant

fibers, and DuPont's attempt to distinguish Crampsey's use of TiO2 as a delustrant rather than a pigment must fail, particularly in light of the statements of the Patent Examiners in rejecting Monsanto's patent claims. That is, Examiners Morris, Davis, and Lesmes rejected Monsanto's claims for stain-resistant, nonwhite fibers over Crampsey because the Examiners considered TiO2 to be a pigment. Thus, in light of the Examiners' statements in rejecting Monsanto's application, DuPont's attempt to claim patentability of the Anton invention over Crampsey based merely upon arbitrary CIELAB L* values, which define color, must fail. Monsanto and BASF also contend that dependent claims 2, 3, and 5 of the Anton patent are all expressly disclosed in the Crampsey patent. (D.I. 300, Wagener, Tr. at 2436–37).

Furthermore, Monsanto and BASF assert that neither of the two reexaminations of the Anton patent was based upon the Crampsey reference. Therefore, they argue, the only time that the PTO considered the Crampsey patent was in the original prosecution of the Anton patent wherein Examiner Lorin incorrectly stated, in direct contrast to Examiners Davis, Morris and Lesmes during the Monsanto prosecution, that Crampsey does not show the incorporation of pigment. According to Monsanto and BASF, DuPont failed to inform Examiner Lorin of his error. As a result, Examiner Tentoni ultimately failed to distinguish Anton over Crampsey in the second reexamination because he relied upon Examiner Lorin's mischaracterization of Crampsey as not showing the incorporation of pigment. Thus, although the Anton claims were ultimately allowed by Examiner Tentoni after the second reexamination, Monsanto and BASF argue that he is "but one of the many PTO examiners who have considered this matter." Notwithstanding their contention that Examiner Lorin erred in the original prosecution by concluding that Crampsey did not teach the incorporation of pigment, Monsanto and BASF point out that DuPont nevertheless "accepted for the sake of discussion" that the combination of Crampsey and Elbert would have been obvious, and DuPont overcame those two references during the original prosecution only by claiming unex-

pected results. They contend, however, that DuPont's claim of unexpected results is unsubstantiated.

In addition, Monsanto and BASF contend that the Anton patent is invalid in view of Example 9 of the Burlone patent. They contend, *inter alia*, that under DuPont's construction of the Anton claims as requiring the sulfonated nylon copolymer to have been "previously formed" before the addition of the pigment, the Anton claims are obvious because the only difference between Anton and Burlone would be whether the Thommtype polymer is pigmented simultaneously or sequentially with the formation of the polymer. (D.I. 276 at 66). Also, according to Monsanto and BASF, the fibers that result from the process disclosed in Burlone example 9 are pigmented, catdye nylon fibers having between 0.3 and 1.2 weight percent aromatic sulfonate. (D.I. 300, Wagener, Tr. at 2533–34).

In response, DuPont contends that the color of the resultant fibers is not the only difference between Crampsey and Anton. Principally, DuPont contends that Crampsey describes a sulfonated nylon fiber that is colored by a dye bath process, as opposed to the producer-colored process of Anton. According to DuPont, the whole purpose of using the sulfonates in the Crampsey process is that, in a dye bath, the sulfonate groups improve the affinity of the fiber to basic dyes and at the same time provide some resistance to acid dyes which may also be present in the dye bath. (D.I. 279 at 60). Thus, according to DuPont, the sulfonate groups of Crampsey are directed to the critical dye bath step of the process, and serve an entirely different purpose than the sulfonate groups in the Anton patent. DuPont alleges that "[t]o ignore Crampsey's dye bath coloring step, as Monsanto and BASF try to do, is to ignore the purpose for Crampsey's use of sulfonated nylon." (D.I. 279 at 64). According to DuPont, one cannot eliminate Crampsey's dye bath step without rewriting the entire Crampsey patent. Moreover, DuPont contends that the TiO2 of Crampsey operates as a delustrant, not as a colored pigment. Indeed, Mr. Caplan testified that "solution dyed fibers are different from white fibers delustered with titanium dioxide." (D.I. 200, Caplan, Tr. at 2140).

DuPont also contends that Monsanto's and BASF's argument regarding Crampsey is completely contradicted by Monsanto's own representations to the PTO when Monsanto was prosecuting its own patent application. Then, Monsanto attempted to distinguish Crampsey from its patent claims based on fiber color; that is, Monsanto amended its claims specifically to recite that the pigment dispersed in the fiber was a *nonwhite* pigment, so as to avoid Crampsey. Monsanto also argued before the PTO that Crampsey used TiO2 as a delustrant, not as a colored pigment. Thus, DuPont asserts that Monsanto's arguments in this litigation with regard to Crampsey are "hollow".

DuPont contends further that the Ucci '762 patent does not render the Anton claims obvious. According to DuPont, the '762 patent taught the ability of a *dye bath* colored sulfonated nylon fiber to resist acid-staining. However, DuPont contends, neither the Ucci '762 patent, nor any other prior art reference contained any suggestion or teaching to use sulfonated nylon in a *producer-colored* process to achieve a stain-resistant fiber, as in the Anton patent.

Finally, DuPont contends that the Anton claims are not obvious in view of Burlone. DuPont contends that Burlone's purpose "is to use a highly sulfonated, water-dispersible nylon to wet the surface of, and serve as a carrier for, pigments in the preparation of a color concentrate." (D.I. 279 at 66). After the claimed color concentrate is made, Burlone teaches the addition of the concentrate to conventional nylon as the fiber-forming polymer. In contrast, Anton teaches the selection of sulfonated nylon as the fundamental fiber-forming polymer. According to DuPont, the differences in the sequence of process steps between the Anton process and Burlone Example 9 compels a finding of non-obviousness. In addition, DuPont argues that "there is not the slightest hint" in the Burlone patent that the fibers produced according to the teachings of the examples would possess the specific stain-resistant properties required by the Anton claims.

After careful consideration of the evidence, the Court finds that the difference between the Anton invention and the prior art Crampsey patent is the use of nonwhite pigments. As DuPont's Mr. Caplan and Dr. Liotta, and Monsanto's Dr. Wagener agree, the process steps of Crampsey and Anton are essentially the same, except that Crampsey's fibers are dyed after they are spun. The sulfonate range of the fibers formed by each process overlaps. (*See* D.I. 299, Tr. at 2130–31). Both processes result in acid stain-resistant fibers.[101] (*E.g.*, D.I. 299, Tr. at 2214; D.I. 300, Tr. at 2408). The difference between the two processes is thus the color of the fibers; Crampsey's process before the dye bath yields white fibers, whereas DuPont's process yields fibers with CIELAB L* values less than 88, *i.e.*, nonwhite fibers. DuPont's arguments that the TiO2 of Crampsey serves merely as a delustrant and not as a pigment is not persuasive, particularly in light of the Examiners' statements to Monsanto in rejecting Monsanto's application. That is, while prosecuting its patent claims, Monsanto attempted to distinguish its claims from Crampsey based on the color of its fibers, but the PTO expressly rejected this distinction. Examiners Morris and Lesmes, in contrast to Examiners Lorin and Tentoni during the Anton prosecution and reexamination, specifically rejected as unpersuasive Monsanto's argument that its claims overcame Crampsey because Crampsey adds TiO2 to his fibers as a delustrant, not as a pigment and further, that white is not a color. Thus, the fact that Monsanto makes that argument here is not, as DuPont asserts, "hollow"; instead, Monsanto seems to be advocating as a basis for invalidity only that upon which the PTO repeatedly based its rejection of Monsanto's own claims. Moreover, although TiO2 is indeed a delustrant, it is also a pigment, as DuPont's Mr. Sandukas and Mr. Caplan concede. (D.I. 295, Sandukas, Tr. at 703; D.I. 299, Tr. at 2220, 2147). During the prosecution of the Anton claims, DuPont successfully distinguished Crampsey, not by pointing to any distinction besides color, but

by arguing "unexpected results". Accordingly, the Court is persuaded by the evidence of record, including the testimony of Mr. Caplan and Dr. Wagener, that TiO2 is indeed a pigment, and that the difference between the Crampsey and the Anton processes is the color of the fibers so produced. Again, that the fibers of Crampsey are subsequently dyed in a dye bath does not change the Court's conclusion.

With regard to the stain-resistance of the Ucci '762 patent, the Court is persuaded by the language of the patent itself and the testimony of Monsanto's Dr. Wagener that it would have been obvious from that patent that the sulfonate group has two roles in life: it can be used either to convey cationic dyeability, or to convey acid stain-resistance and, specifically, household stain-resistance. (D.I. 300, Wagener, Tr. at 2419). The Court finds Dr. Wagener's testimony that the Ucci '762 patent taught the art that acid-*dye* resistance was equivalent to acid-*stain* resistance to be credible and persuasive.[102] The Court also finds credible Dr. Wagener's testimony that it is clear from the Ucci '762 patent that increasing the sulfonate content would improve the stain-resistance of the nylon. (D.I. 300, Tr. at 2535, 2416).

With regard to the difference between the Anton patent and Burlone Example 9, the Court finds a principal difference to be the fiber-forming polymer. Burlone claims a color concentrate that is composed of: 1) a small amount of highly sulfonated nylon polymer as a carrier, and 2) one or more colored pigments. The Burlone examples teach the addition of the claimed color concentrate to a larger amount of unsulfonated nylon polymer, which is the fiber-forming polymer. The blend is then spun, and the resultant fibers are nonwhite, producer-colored fibers with a sulfonate range of about .5–1.8%. (*See* D.I. 300, Harris, Tr. at 2328–29; Wagener, Tr. at 2533–34). In contrast, the fiber-forming polymer of Anton is the .25%–4.0% sulfonated nylon polymer that is formed in step (a). Colored pigments or concentrates

---

**101.** The Ucci '762 patent taught that the acid dye resistance of Crampsey is equivalent to household acid stain-resistance.

**102.** On this point, the Court rejects the contrary testimony of DuPont's Dr. Liotta. (*See* D.I. 302, Liotta, Tr. at 2776–77).

are then added to this sulfonated polymer, but the resulting blend after being spun results in sulfonated, producer-colored fiber. Although the Anton process is composed of three distinct, sequential steps, the process of Burlone example 9 is simultaneous. Nevertheless, the end products of both the Anton process and the process described in Burlone example 9 are sulfonated, solution dyed nylon fiber.

To summarize the Court's findings with regard to the differences between the Anton patent and the prior art, the Court has found that the difference between the Anton and Crampsey processes is the color of the fibers so produced. In this regard, the Court reaches the same conclusion as that reached by the examiners during the prosecution of Monsanto's application, *i.e.*, that TiO2 is a pigment and white is a color. The Ucci '762 patent, in which the sulfonates are copolymerized with the nylon, taught that the acid-dye resistance imparted by the sulfonates is equivalent to acid-stain resistance. Furthermore, after the Ucci '762 patent, it was disclosed in the art that Crampsey would resist Kool–Aid stains. (D.I. 300, Wagener, Tr. at 2435–36). In addition, both Burlone example 9 and the Anton patent disclose processes for producing sulfonated, solution dyed nylon fibers. Based upon the foregoing, it would appear to have been obvious to a person of ordinary skill in the art in 1988 to add non-white pigments to the Crampsey process, and that, based upon the teachings of Ucci '762, the resultant fibers would have exhibited resistance to red Kool–Aid staining within the meaning of the Anton patent. Alternatively, it would appear to have been obvious after Crampsey and Burlone example 9 to spin producer-colored, sulfonated fibers which, after the disclosure in the Ucci '762 patent, would have exhibited acid stain resistance. The Court's conclusions with regard to these differences, and particularly with regard to the differences between Anton and Crampsey, weigh heavily in favor of a finding that the Anton process for producing acid stain-resistant SDN fibers would have been obvious to one of ordinary skill in the art.

### 4) *Secondary Considerations*

Evidence of secondary considerations such as unexpected results, commercial success, failure of others, and long-felt need, if present, must be considered in determining obviousness. *Minnesota Mining & Manufacturing v. Johnson & Johnson*, 976 F.2d 1559, 1573 (Fed.Cir.1992); *Stratoflex*, 713 F.2d at 1538.

#### a) *Unexpected Results*

DuPont responded to the PTO's first rejection of the Anton claims over Crampsey in view of Elbert by "[a]ccepting for the sake of this discussion that it would be obvious for one skilled in the art to combine these references", and asserting that the Anton process yields unexpected results. A showing of unexpected results, *i.e.*, a showing that the claimed invention exhibits some superior advantage that a person of ordinary skill in the relevant art would have found surprising or unexpected, is one indication of nonobviousness. *See In re Soni*, 54 F.3d 746, 750 (Fed.Cir.1995). "[W]hen unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared with the closest prior art." *In re Baxter Travenol Labs*, 952 F.2d 388, 392 (Fed.Cir.1991). Moreover, unexpected results must be demonstrated by factual evidence; mere argument or conclusory statements in the patent specification is insufficient. *In re Soni*, 54 F.3d at 750 (quoting *In re De Blauwe*, 736 F.2d 699, 705 (Fed.Cir. 1984)).

DuPont's alleged unexpected results included improved spinnability and operability. Thus, DuPont must demonstrate that these alleged results were unexpected when compared with the closest prior art. The evidence with regard to this issue essentially falls into two categories. The first category of evidence relates to whether the process claimed in the Anton patent did in fact yield unexpected results. The second category relates to statements about the prior art that DuPont made to the PTO during the prosecution and two reexaminations of the Anton patent to substantiate its claim of unexpected results. Although the two categories are closely related and often intertwining, the Court will, to the extent that it is possible,

discuss them separately for purposes of clarity.

### 1. *Did the Anton Process Yield Unexpected Results?*

In the mid–1980s, the SDN market was growing rapidly, and DuPont wanted to get into that market. (D.I. 296, Sandukas, Tr. at 674–75). DuPont began making SDN in 1986 with an experience level that may have approached zero. (D.I. 296, Corey, Tr. at 919; D.I. 295, Tr. at 890). DuPont's SDN at that time was made from unsulfonated nylon 6,6. A DuPont document dated September 23, 1986, indicates that spinning performance at that time was adequate on 6 or 7 colors and that "much work" was required on 3 colors. (JTX 169; D.I. 296, Tr. at 922). As of October 3, 1986, DuPont's objective was to develop and commercialize eleven colored BCF yarns. (D.I. 296, Tr. at 924; MTX 92). During the late 1986 time period, DuPont was unable to produce eleven colors because it was experiencing difficulty with five of its color concentrates; different color concentrates appeared to perform differently on the machines. (D.I. 296, Tr. at 925). According to Mr. Corey, each of the individual colors has its own specific performance characteristics and, from the beginning, some colors were more difficult to spin than others. "Difficult to spin" connotes that some color concentrates caused break problems in the spinning process. (D.I. 296, Tr. at 954–55). A break is any event that interrupts the continuous spinning process. (D.I. 295, Tr. at 856). The break problems that DuPont experienced with its production of unsulfonated SDN fibers in the 1986–88 time frame affected the quality of the fibers that were produced. (D.I. 295, Tr. at 866–68). As of March 7, 1988, DuPont's objective was to commercialize 22 colors. (D.I. 296, Tr. at 936; JTX 208). However, during the 1986–89 time frame, DuPont was aware that Ca-Mac and BASF were already in the market with more colors in their SDN lines than DuPont.[103]

At some point in 1989, DuPont first commercialized the process claimed in the Anton patent for making its solution dyed LUMENA fibers. (D.I. 295, Tr. at 855; D.I. 294,

Sandukas, Tr. at 609). The difference between the pre-Anton process and the Anton process was the host polymer, *i.e.*, unsulfonated nylon was replaced with sulfonated nylon. (D.I. 295, Tr. at 884–85). Mr. Corey testified that when the Anton process was implemented at DuPont in 1989, the break problem that DuPont had been experiencing from 1986–88 in its SDN production was solved. (D.I. 295, Tr. at 876–77). He testified that prior to the Anton process, DuPont had had a very limited color line because of the break problem, but after Anton, DuPont was able to produce a wider variety of colors. (D.I. 295, Tr. at 879–81).

However, a DuPont document generated on April 5, 1989 indicates that, with respect to spinning improvement, the first, second, and third considerations were "pigment selection, pigment selection, and pigment selection." (MTX 180; D.I. 296, Tr. at 938). Another DuPont report, dated December 4, 1989, indicates that the "overall average break level was unchanged at 200 Q breaks/100M pounds before and after reformulation." (JTX 213; D.I. 300, Tr. at 2448). As of January of 1990, DuPont was still only able to spin eleven colors, and DuPont recognized that pigments make every color spin differently. (D.I. 296 at 940–43). Yet another DuPont document, dated January 5, 1990, reflects that, at least a year after the Anton application was filed, DuPont needed to modify the Anton process "color by color, to produce spinning operability which at least meets [its] operability goal ..." and that DuPont believed that "rapid development and scale-up of large quantities of new colors" would not be possible. (BTX 349; D.I. 300, Tr. at 2229). That same document also indicates that "some pigments just will not spin in 6,6–nylon." (BTX 349; D.I. 300, Tr. at 2232). A DuPont report entitled "ASDN Polymer Developments" dated April 20, 1990, indicates that "Some pigments (*e.g.*, dark plum) were very difficult to spin." (JTX 181; D.I. 296, Tr. at 946). These documents tend to contradict Mr. Corey's assertion that the Anton process solved DuPont's spinning problems; instead, the documents suggest that pigment selection remained a determina-

---

**103.** BASF's and CaMac's SDN fibers were made from unsulfonated nylon 6.

tive factor in DuPont's ability to spin its SDN fibers, even after the implementation of the sulfonated nylon copolymer of Anton. Indeed, Mr. Hale testified that, based upon his experience at CaMac, the spinning performances of sulfonated and unsulfonated nylon are comparable in terms of both waste efficiency and fiber breaks. (D.I. 298, Tr. at 1945). Even Mr. Corey conceded that, to this day, different pigments have different spinning performances. Yet, Mr. Corey also conceded that the Anton patent contains no information about the spinnability of specific pigments. (D.I. 296, Tr. at 945, 947; *see also* D.I. 299, Harris, Tr. at 2261).

What the Anton patent does contain in column 8, Table B, however, are data describing the number of fiber breaks per 8–hour shift when the sulfonated nylon copolymer is used, compared to the number of breaks when an unsulfonated control polymer is used. These data purport to demonstrate that the sulfonated nylon of the Anton process resulted in fewer fiber breaks than the unsulfonated nylon of prior processes. The data reflect the results of the runs of two pigment concentrates, the compositions of which are not disclosed; examples 1 and 2 of the patent refer to a "medium blue" pigment, and examples 3 and 4 relate to a "brown inorganic" pigment concentrate. (D.I. 299, Tr. at 2154–59). To date, DuPont has relied upon these data in the Anton specification to support its claim of improved spinnability. DuPont offered no other data at trial to substantiate its claims of improved spinnability/operability, such as evidence of a breaks-per-shift comparison between the Anton process and the processes claimed in either the Crampsey or Burlone patents, both of which, like Anton, use sulfonated nylons. Similarly, DuPont offered no evidence of a breaks-per-shift comparison between nylon 6,6 (which DuPont uses) and nylon 6 (which CaMac and BASF use) as the fiber-forming polymer. Indeed, Dr. Harris testified that "it is well known" that nylon 6 is much easier to spin into fiber than nylon 6,6. (D.I. 300, Harris, Tr. at 2301). Nor has DuPont offered any evidence of a breaks-per-shift comparison between pigmented, sulfonated nylon and pigmented, unsulfonated nylon in any pigment other than the "medium blue" and "brown inorganic" pigments.

### 2. DuPont's Statements to the PTO About the Prior Art to Substantiate Its Claim of Unexpected Results

DuPont's Anton patent claims were initially rejected by the PTO on June 25, 1990 for obviousness over Crampsey in view of Elbert. (JTX 5 at 43). To overcome this initial rejection, DuPont stated that:

[T]he use of an aromatic sulfonate to form a nylon copolymer significantly reduces the number of breaks incurred in spinning the pigmented fiber when compared with ... [Control 1 and Control 2]. **The use of these sulfonated aromatic copolyamides in combination with colored pigments thus results in improved operability and thereby overcomes the spinning problems associated with spinning pigmented nylon fibers.**

. . . . .

It is respectfully submitted that these results are neither disclosed nor suggested by either Crampsey or Elbert, and furthermore that they are sufficient to overcome the obviousness position presented in the Office Action.

(JTX 5 at 71–72) (emphasis added). This statement to the PTO suggests that by switching its fiber-forming polymer to a sulfonated nylon, DuPont "overcame" the spinning problems associated with spinning SDN. However, an internal DuPont document dated January 5, 1990, which was after the implementation of the Anton process, indicates that "some pigments just will not spin in 6,6–nylon." (BTX 349; D.I. 299, Tr. at 2232). This same document indicates that DuPont had "pretty thoroughly screened pigments to arrive at [its] current pigment palette," and that DuPont knew that "the pigments used are the primary determinant of spinning and end use performance." At trial, Mr. Caplan conceded that there is no information in the Anton patent that describes which pigments work and which pigments do not work. (D.I. 299, Tr. at 2233).

During the first reexamination of the Anton patent, DuPont indicated in a written

statement to the PTO dated March 29, 1993, that:

**[P]rior art processes made it difficult, if not impossible, to spin colored nylon fibers from nylon colored with a wide variety of colored pigments** (colored meaning non-white).... [C]olored pigments significantly affected filament spinning and drawing operations, caused filament breaks to readily occur during such operations, and produced weakened fibers.

[JTX 6 at 77–78 (emphasis added); D.I. 299, Tr. at 2176–77]. Notwithstanding this statement to the PTO in March of 1993 about the prior art processes, Mr. Caplan conceded that, based upon a competitive intelligence report about CaMac that had been generated almost a year earlier, DuPont knew as of May 23, 1992 that CaMac was the largest SDN producer in the United States. (D.I. 299, Caplan, Tr. at 2181; JTX 30). The report indicates that, as of that date, CaMac had a color line of 200 colors and that CaMac's process resulted in a low amount of waste. (D.I. 299, Tr. at 2181–83, 2184–85; JTX 30). At trial, Mr. Caplan conceded that this intelligence report suggested that it was not in fact "impossible" to be in the SDN market with a wide variety of colors, spinning regular yarn. (D.I. 299, Tr. at 2185). Moreover, at the time DuPont filed the response reflected in JTX 6, DuPont had no contrary information about CaMac. (D.I. 299, Tr. at 2188–89).

In the same March 29, 1993 Amendment to its Anton application, DuPont told the PTO that "[u]nexpected results are set forth in the Anton et al specification where the claimed process significantly reduces the number of breaks incurred in spinning pigmented nylon fibers from a pigmented, sulfonated nylon copolymer, when compared to making fibers from [an unsulfonated copolymer] ..." (JTX 6 at 71). At trial, Mr. Caplan was asked:

Q: But you did have this information [contained in JTX 30 about CaMac's ability to spin 200 colors] and it is clear this information is inconsistent with what you said [to the PTO]; that is, the information in Joint Exhibit 30?

A: The document speaks for itself.

(D.I. 299, Tr. at 2195). Conceding that DuPont did not present any evidence to the PTO of "prior art processes" of third parties that made it "difficult if not impossible" to spin a wide variety of colors without significant break problems, Mr. Caplan testified at trial that DuPont's statements to the PTO regarding these prior art processes referred to DuPont's own prior spinning processes with unsulfonated nylon. (D.I. 299, Tr. at 2193–94). That is, according to Mr. Caplan, when DuPont referred to prior art processes that made it difficult if not impossible to spin fiber in a wide variety of colors, DuPont was referring to its own prior problems with spinning solution dyed, unsulfonated nylon 6,6 fiber that the Anton process had allegedly solved.

Also in the first reexamination, DuPont told the PTO with regard to the Burlone and Thomm patents:

Although Burlone and Thomm et al teach spinning fibers from fiber-forming polymers, neither reference discusses any of the problems that may be inherent in or associated with such spinning operations.... **Burlone and Thomm et al are silent both with respect to the quality of the fiber production and with respect to reducing spinning breaks.**

[JTX 6 at 71 (emphasis added); D.I. 300, Tr. at 2331–32]. DuPont made this assertion to the PTO, notwithstanding the following statement that appears in the first column of the Burlone patent: "It is imperative that the degree of dispersion of pigmentary particles in the concentrate be very high so that the spinning process will not be interrupted." (JTX 1, col. 1, 11. 24–26). Significantly, with regard to this statement in the Burlone specification, DuPont's Dr. Witt, who is one of the named inventors on the Anton patent, testified at his deposition as follows:

Q: When you read the Burlone and Thomm patents, were you left with the impression that Burlone was unconcerned with spinning continuity?

A: No.

....

Q: So it would be an unfair interpretation of what Burlone is stating in his patent to say that the reference is completely silent

with respect to quality break questions, isn't it?

A: I think so.

(D.I. 294, Tr. at 461–62).

During the second reexamination of the Anton patent, DuPont stated again that the "claimed process improved spinning operability of many pigments, enabled the use of some pigments that previously had not been successfully used, and made it possible to manufacture on a commercially attractive basis a wider, more complete range of styling colors without encountering serious product deficiencies or operating difficulties." (JTX 7 at 72). In advancing this argument to the PTO, DuPont did not compare its own Anton process to the prior art processes; again, the asserted reason was that Dupont was referring to its own prior spinning processes.

The Court finds that the evidence of record fails to demonstrate that the Anton process resulted in the claimed "unexpected results" of improved spinnability or operability. First, the evidence demonstrates that the ability to spin SDN fibers was largely dependent upon two factors: experience and pigment selection. With regard to experience, both BASF and CaMac had been in the SDN market for ten years before DuPont and thus had considerably more experience in spinning SDN than DuPont; both (or at least CaMac) were able to commercially produce solution dyed nylon 6 fiber in a wider range of colors than DuPont throughout the relevant time period. As to the importance of pigment selection, DuPont's own witnesses and documentary evidence support a conclusion that pigment selection was a determinative factor in DuPont's ability to spin SDN fibers, both before and after Anton. However, the Anton patent contains no disclosure about the spinnability/operability of specific pigments. Instead, the patent covers all fibers with CIELAB L* values less than 88, and reports spinning improvements with an unspecified "medium blue pigment" and "brown inorganic pigment". Contrary to Mr. Corey's testimony, the documentary evidence does not establish that DuPont's switch from unsulfonated nylon to sulfonated nylon solved DuPont's break problems.

Second, even assuming that DuPont had demonstrated that its ability to spin SDN improved after Anton, the Court would be unable to conclude that DuPont had demonstrated unexpected results compared to the closest prior art. That DuPont was able to overcome its own prior spinning problems does not establish unexpected results; to show unexpected results, DuPont must demonstrate that these alleged results were unexpected when compared with the closest prior art. The evidence demonstrates that Dupont's claimed "unexpected results" of improved spinnability and/or operability were not "unexpected" at CaMac and BASF. Both of these companies had been able to commercially produce SDN in a wide variety of colors over a long span of years. In this regard, the Court rejects DuPont's argument that the commercial spinning processes of CaMac and BASF are not relevant to DuPont's statements to the PTO as there is no evidence that these processes were publicly known as of the 1988 filing date of the Anton patent application. The Court observes that the competitive intelligence report about CaMac that DuPont had as of May 23, 1992 contains more than just general information about CaMac's spinning process and equipment. In any event, DuPont has not demonstrated that its unexpected results were unexpected when compared to the closest art Crampsey and/or Burlone patents. To show unexpected results as compared to Crampsey, DuPont would have to show that it achieved improved spinnability/operability with its nonwhite pigments as compared to the white pigments of Crampsey. DuPont has presented no such data.[104] Instead, the

---

**104.** The only evidence with regard to the claimed "improved spinnability" of the Anton process as compared to Crampsey is the trial testimony of Mr. Corey wherein he stated that:

I have had a lot of experience in the past with spinning an aromatic sulfonated copolymer into a nonpigmented or white fiber. And, typically, with those kinds of spinning processes, we had higher break levels, had more problems producing the white undyed yarns with the aromatic sulfonated copolymer, than we did with a homopolymer or a copolymer of caprolactam and type 66 nylon.

(D.I. 295, Corey, Tr. at 885). The Court finds that this vague and conclusory statement is insuf-

data in the Anton specification merely compare breaks per shift with sulfonated nylon, to breaks per shift with unsulfonated nylon in two colors. As such, these data do not demonstrate unexpected results as compared to the Crampsey process. Moreover, as DuPont's Dr. Witt concedes, Dr. Burlone had addressed the issues of spinning continuity and quality breaks in his patent five years earlier. Accordingly, the Court finds that DuPont has failed to demonstrate unexpected results when compared with prior art SDN processes or with the closest prior art patents.

b) *Commercial Success*

■■■■ DuPont cites commercial success in support of its nonobviousness contention. When a patentee asserts commercial success to support its contention of nonobviousness, there must be a nexus between the proven success and the patented invention. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1392 (Fed.Cir.), *cert. denied,* 488 U.S. 956, 109 S.Ct. 395, 102 L.Ed.2d 383 (1988). The burden of proof as to this nexus resides with the patentee. *Id.* To satisfy this burden, the patentee must show both that there is commercial success, and that the product or method that is commercially successful is the invention disclosed and claimed in the patent. *Id.* If the patentee satisfies this burden, then the challenger must demonstrate that the commercial success was due to extraneous factors other than the patented invention, *e.g.,* advertising. *Id.* at 1393.

DuPont's evidence with regard to the commercial success of its LUMENA fibers consists primarily of the testimony of Mr. Sandukas and Mr. Scott. At trial, Mr. Sandukas testified that the carpet market in North America typically grows at about one to two percent a year in terms of volume; in contrast, DuPont had a fifty percent growth rate with its LUMENA fibers. (D.I. 295, Tr. at 637). He testified further that in 1991, LUMENA won the R & D Magazine award for the 100 most significant technical achievements for 1990. (D.I. 295, Tr. at 637–68; DTX 237).

DuPont's Mr. Scott offered testimony regarding sales of LUMENA. He testified that in 1989, DuPont sold **[REDACTED]** pounds of LUMENA. (D.I. 296, Tr. at 1076; MTX–242–B). In 1990, it sold **[REDACTED]** pounds of LUMENA. (JTX 296). In 1991, DuPont sold **[REDACTED]** pounds of LUMENA worldwide. (D.I. 296, Tr. at 1075; JTX 292). In 1992, DuPont sold **[REDACTED]** pounds of LUMENA domestically and received **[REDACTED]** dollars in revenue. (D.I. 296, Tr. at 1070; JTX 287 at 420021). LUMENA was DuPont's most expensive nylon carpet fiber in 1992 and 1993. Worldwide, in 1992, DuPont sold **[REDACTED]** pounds of LUMENA. (D.I. 296, Tr. at 1071; JTX 288). In 1993, DuPont sold **[REDACTED]** pounds of LUMENA domestically, and the revenue was **[REDACTED]**. (D.I. 296, Tr. at 1074; DTX 710). According to Mr. Scott, the most important feature/benefit of LUMENA is its stain-resistance. (D.I. 296, Tr. at 1137, 1169).

Monsanto and BASF contend that the commercial success of LUMENA is attributable to extraneous factors other than the claimed stain-resistance of the fibers. In support of this contention, they point to the testimony of BASF's Mr. Rennie, who estimated that since 1986, the solution dyed nylon market in general has grown five-fold. (D.I. 301, Tr. at 2600). They also point to the evidence of sales of DuPont's DSDN, which is DuPont's value brand of solution dyed nylon. According to Mr. Scott, DSDN was positioned differently in the marketplace than performance brands such as LUMENA; DSDN was targeted for those who could not afford to pay the premium prices of the performance brands. (D.I. 296, Tr. at 1059). DSDN is made by essentially the same process as LUMENA, but the nylon polymer of DSDN **[REDACTED]** as opposed to the LUMENA polymer, **[REDACTED]**. (*E.g.,* D.I. 295, Tr. at 891, 894–95). Nevertheless, the sulfonate range of the DSDN copolymer falls within the 0.25 to 4.0 weight percent range of Anton Claim 1. Unlike LUMENA, however, some DSDN fibers stain. (D.I. 295, Tr. at 691–92, 894). DSDN was introduced into the market in 1990. (D.I. 296, Tr. at

ficient to demonstrate unexpected results as compared to Crampsey.

1113). After its introduction, the volume of sales of DSDN grew very rapidly. (D.I. 296, Tr. at 1116). In fact, DSDN and LUMENA were competing against each other in the commercial market segment. (D.I. 296, Tr. at 1121). Mr. Scott opined that DSDN even took some sales away from LUMENA. Based upon the foregoing, Monsanto and BASF argue that LUMENA's success cannot be attributed to its claimed stain-resistance in light of the fact that DuPont's sales of DSDN, which stains, also grew very rapidly during the same time period.

Furthermore, Monsanto and BASF contend that in marketing LUMENA, DuPont promotes several features completely unrelated to the Anton patent. They contend that LUMENA is marketed for its color fastness, bleach fastness, acid stain resistance, cleanability, anti-microbial properties, and soil hiding. Yet, they argue, neither antimicrobial properties nor soil-hiding are part of the Anton process, and color fastness and bleach-resistance are inherent in all SDN. Moreover, although DuPont offers ten-year warranties on its LUMENA fibers for abrasive wear, color fastness from light, and anti-static protection, and a five-year warranty for color fastness against atmospheric contaminants, DuPont does not offer a warranty against staining.[105] (D.I. 296, Tr. at 1178–79, 1188). Accordingly, Monsanto and BASF contend that the commercial success of LUMENA can be attributed, not to its stain-resistance, but instead to features such as color fastness and bleach resistance, neither of which is claimed in the Anton patent and both of which are inherent in all SDN. See *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed.Cir.1988) ("[c]ommercial success is relevant only if it flows from the merits of the *claimed* invention.") (emphasis in original).

Monsanto and BASF also argue that DuPont's advertising and name recognition are major factors in any commercial success analysis. At trial, when asked whether he knew whether DuPont outspent its competitors in the commercial market segment [REDACTED] in terms of advertising and promotion, Mr. Scott answered: "It wouldn't surprise me." (D.I. 296, Tr. at 1162; *see also* MTX 229, MTX 229A). Monsanto and BASF point to the fact that DuPont's LUMENA is marketed not just as LUMENA, but as "Antron LUMENA". According to BASF's Mr. Rennie, the Antron trademark is DuPont's trademark for its hollow filament cross-section in the commercial market, and is the "number one recognized trademark in the commercial market field." (D.I. 301, Rennie, Tr. at 2600). DuPont's Mr. Scott confirmed that Antron was a very strong brand name. (D.I. 296, Tr. at 1131–32). Accordingly, Monsanto and BASF contend that the product's success is attributable at least in part to the Antron trademark. Mr. Rennie also testified that DuPont itself has powerful name recognition.

In addition, Monsanto and BASF contend that the market experience of other SDN producers demonstrates that LUMENA sales are unrelated to the claimed process. They point to the testimony of Monsanto's Mr. Wilson, who testified that sales of ULTRON SD fibers, which are Monsanto's sulfonated, solution dyed fibers, have been pitifully weak. (D.I. 309, Tr. at 1443, 1448–49; *see also* D.I. 296, Tr. at 1166–67).

After careful consideration of the evidence, and notwithstanding the fact that the evidence with regard to the market share of LUMENA is not entirely clear, the Court finds that DuPont has established a prima facie case of commercial success of its LUMENA fibers. The Court is not convinced, however, that DuPont has established that the success of LUMENA is attributable solely to the merits of the claimed invention, *i.e.*, the patented stain-resistance of the fibers, which, according to Mr. Scott, is the most important feature of LUMENA. Indeed, the Court is unable to conclude that the success of LUMENA is attributable to any one of its various features.[106] In this

---

105. In contrast, BASF offers a ten-year stain removal guarantee on its ZEFTRON 2000 and ZEFTRON 2000ZX fibers, both of which are stain-resistant by virtue of the topical application of stain-resist agents. (D.I. 296, Tr. at 1178; D.I. 302, Tr. at 2602–03, 2612–13, 2606).

106. For example, the evidence establishes that DuPont promotes various features of LUMENA,

regard, the Court observes that DuPont's DSDN line, which is made essentially in accordance with the Anton process but which, like ULTRON SD, LEXES and CAMALON, is not completely acid-stain resistant, is also commercially successful. In addition, it appears that Monsanto's ULTRON SD fibers, most of which are also made by the process claimed in the Anton patent, have not enjoyed commercial success. Further, although DuPont offers several warranties in connection with its LUMENA fibers, it does not warrant against acid staining.[107] Thus, it appears that the success of LUMENA may be attributed to a number of factors, some of which are not within the Anton patent. Nevertheless, the Court does not believe that DuPont has the burden of demonstrating that the success of LUMENA is due solely to the claimed stain-resistance of the fibers. *See Continental Can Co., Inc. v. Monsanto Co.,* 948 F.2d 1264, 1273 (Fed.Cir.1991) (it is not necessary that the patented invention be solely responsible for the commercial success of the product for this factor to be given appropriate weight). Instead, it is enough that DuPont has established that its LUMENA fibers are manufactured according to the Anton process and that these fibers have enjoyed commercial success. *See Demaco,* 851 F.2d at 1394 ("A patentee is not required to prove as part of its prima facie case that the commercial success of the patented invention is *not* due to factors other than the patented invention.") (emphasis in original). The burden now shifts to Monsanto and BASF to demonstrate that LUMENA's success was in fact due to extraneous factors, such as advertising, etc. That is, although Monsanto and BASF assert that "the record is devoid of any evidence of motivation as to why purchasers chose to buy Antron LUMENA over any other fibers in the market", it is their burden to demonstrate that LUMENA's success was in fact due to extraneous factors.

The Court finds that the Monsanto and BASF have not conclusively demonstrated that the success of LUMENA is due to extraneous factors. To be sure, the evidence of record tends to show that LUMENA's success was not attributable solely to its patented stain-resistance. Indeed, it appears to the Court that DuPont's extensive advertising, the various warranties offered in connection with LUMENA, the various features of LUMENA that are inherent in all SDN, and name-recognition all likely play a substantial role in LUMENA's success. Although the Court believes that the success of LUMENA is not entirely attributable to the claimed process, Monsanto and BASF have not conclusively demonstrated that LUMENA's commercial success was in fact due to extraneous factors. Thus, the Court finds that this factor weighs in favor of a finding of nonobviousness, but not heavily so.

c) *Independent Simultaneous Invention*

Near simultaneous invention by two or more inventors working independently of each other may or may not be an indication of obviousness when considered in light of all of the circumstances. *Lindemann Maschinenfabrik v. American Hoist & Derrick Co.,* 730 F.2d 1452, 1460 (Fed.Cir.1984). In this case, the Court believes that the evidence with regard to the 1987 work of Mr. Osborn and Dr. Hoyt is probative as to the obviousness inquiry. Monsanto's Dr. Osborn testified that in July of 1987, Monsanto blended green Astroturf color concentrate with 35JT polymer, which is the designation for Monsanto's cationic dyeable polymer, and spun the resultant blend into fiber. (D.I. 298, Osborn, Tr. at 1750–55; MTX 18A). These fibers were tested for their stain-resistance on an 8–point, 8–hour scale with red Kool–Aid. (D.I. 298, Tr. at 1811–13; MTX 18H). According to Mr. Osborn, the fibers exhibited excellent stain-resist properties. (D.I. 298, Tr. at 1816; MTX 18H at 3). He ultimately filed a patent application on this process.

---

including color-fastness and bleach resistance, both of which are inherent properties of all SDN. (D.I. 296, Tr. at 1125).

**107.** As to whether the LUMENA fibers are, in fact, stain-resistant, the only evidence in the rec-

ord is the testimony of DuPont's Dr. Wilkes who did not himself perform Kool–Aid stain tests on the LUMENA fibers; instead, Dr. Wilkes merely "confirmed" the results of tests performed by a DuPont employee, Mr. Shellenbarger.

Also around that same time, Dr. Hoyt was preparing sulfonated SDN fibers and testing them with Kool–Aid. Dr. Hoyt's fibers had the added feature of amine end group blocking.

Although the evidence with regard to either Mr. Osborn's or Dr. Hoyt's work alone was insufficient to establish anticipation under § 102(g), the Court believes that this evidence is nevertheless probative as to the obviousness inquiry. That is, the evidence demonstrates that in 1987, Mr. Osborn was combining a sulfonated nylon with pigment to produce Kool–Aid stain resistant fibers; Dr. Hoyt was making producer-colored SDN fibers and testing them with Kool–Aid. Although neither Monsanto nor BASF has demonstrated that its fibers would satisfy the 24–hour stain tests of the Anton patent, the Court finds that the evidence with regard to the work of these individuals, particularly Mr. Osborn, is an indication that it would have been obvious to one of ordinary skill in the art in 1988 to form a sulfonated nylon copolymer, add pigment, and spin the resultant blend into Kool–Aid stain-resistant fibers.

### d) *Other Secondary Considerations*

The Court has considered DuPont's arguments and the supporting evidence with regard to long-felt need, copying, praise for the invention, and failed efforts to find acceptable non-infringing substitutes. After careful consideration of the evidence, the Court finds that DuPont has not established that its LUMENA fibers satisfied a long-felt need. For example, DuPont relies upon the statement of BASF's Mr. Lemons that "permanent stain blocking is like the Holy Grail of carpet fiber manufacturing that everybody is trying to get at and has been forever"; however, the Court does not believe that this statement establishes long felt need for LUMENA because the acid stain-resistance of the LUMENA fibers is not necessarily equivalent to the Holy Grail of "permanent stain blocking".[108] The Court also finds that DuPont has failed to demonstrate that Mon-

santo and BASF copied its Anton invention. The Court is similarly unpersuaded by DuPont's evidence regarding failed efforts to find acceptable, non-infringing substitutes. With regard to the fact that the Anton patent survived two reexaminations in the PTO, the Court relies on its discussion in section III. D.2.(c)3 and 4(a) above with regard to this factor.

On the other hand, DuPont's receipt of the 1991 R & D award for most significant technological development in 1990 is indeed indicative of praise for its invention; this factor weighs in favor of nonobviousness.

### 5) *Conclusion—Obviousness*

After careful and thoughtful consideration of all of the evidence with regard to the *Graham* factors, the Court concludes that Monsanto and BASF have demonstrated by clear and convincing evidence that it would have been obvious to a person of ordinary skill in the art, reviewing the foregoing prior art references, to add colored pigments or pigment concentrates to a sulfonated nylon copolymer to produce SDN fibers that are resistant to staining by cherry Kool–Aid as defined in the Anton patent. The difference between the Anton process and the Crampsey process is that Crampsey's fibers are white by virtue of the presence of TiO2.[109] Even the PTO recognized, however, when it rejected Monsanto's application, that the TiO2 of Crampsey operated as a white pigment to produce colored fibers. In this regard, the Court reaches the same conclusion as the examiners in the Monsanto prosecution, *i.e.*, that TiO2 is a pigment and white is a color. The Court believes that by merely changing the color of the fibers produced by the Crampsey process, the Anton claims are invalid for obviousness. Although DuPont was able to overcome the PTO's § 103 rejection of its claims over Crampsey by claiming unexpected results, DuPont has failed to demonstrate such unexpected results. First, it has not demonstrated that the process claimed in the Anton patent did, in fact,

---

108. For example, with some stainants, such as red wine, unsulfonated nylon is more stain-resistant that sulfonated nylon. (*E.g.*, D.I. 297, Tr. at 1678).

109. *See* D.I. 301, Liotta, Tr. at 2787 (right after the spinnerette, the processes of Anton and Crampsey are "indistinguishable").

result in the claimed improved spinnability/operability. Second, even assuming that DuPont did achieve these alleged unexpected results, DuPont has not demonstrated that these results were unexpected when compared with either prior art processes for manufacturing SDN or with the closest prior art patents. In fact, DuPont has conceded that the "prior art processes" that made it "difficult if not impossible" to produce SDN fibers in a wide variety of colors to which it referred in prosecuting its Anton patent referred only to DuPont's own prior spinning experiences.

With regard to the commercial success of its LUMENA fibers, DuPont has indeed made out a prima facie case of commercial success; however, in light of the evidence tending to show that the success of LUMENA is attributable to factors other than the claimed process, this factor weighs only slightly in favor of a finding of nonobviousness. Similarly, DuPont's receipt of the R & D award, which indicates praise for its invention, weighs in favor of nonobviousness. However, DuPont's evidence with regard to long-felt need, copying, and failure to find acceptable, non-infringing substitutes is unpersuasive. Moreover, the evidence with regard to the work of Monsanto's Mr. Osborn in 1987 and BASF''s Dr. Hoyt with producer-colored, sulfonated, Kool–Aid stain resistant fibers is indicative of obviousness.

The Court is persuaded by the clear and convincing evidence in the record that it would have been obvious to a person of ordinary skill in the art to add nonwhite pigments to the Crampsey process, and that, based upon the teachings of Ucci '762, the resultant fibers would have exhibited resistance to cherry Kool–Aid staining within the meaning of the Anton patent. The Court also finds that dependent claims 2, 3, and 5 of the Anton patent are disclosed in the Crampsey reference.[110] (*See* D.I. 300, Wagener, Tr. at 2436–37).

Alternatively, the Court observes that SDN fibers had been in the market since the 1970s. Sulfonated nylon had been in the market even longer. The Court finds that it would have been obvious to one of ordinary skill in the art from Crampsey, Ucci, Burlone and Thomm to incorporate colored pigments into a sulfonated nylon copolymer to produce SDN fibers that are resistant to acid staining. In this regard, the Court finds the testimony of Dr. Wagener to be credible, and the Court rejects the testimony of Dr. Liotta.

In sum, the Court finds that the record contains more than clear and convincing evidence that the process claimed in Claims 1, 2, 3 and 5 of the Anton patent would have been obvious in 1988 to one of ordinary skill in the art.

### d. *Conclusion—Invalidity*

The Court finds that Monsanto and BASF have failed to demonstrate by clear and convincing evidence that the Anton patent is invalid based upon either prior invention or anticipation by Burlone example 9. The Court does find, however, the Monsanto and BASF have overcome the presumption of validity that is afforded to the Anton patent, and have demonstrated by clear and convincing evidence that the Anton patent is invalid for obviousness.

### E. *Attorneys' Fees*

DuPont contends that this case is exceptional under 35 U.S.C. § 285. Accordingly, DuPont argues that it is entitled to an award of attorney's fees. Section 285 provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." A case is exceptional if "it would be grossly unfair for the prevailing party to bear the cost of litigation, or where the conduct of the losing party is marked by bad-faith or unfairness." *Interspiro U.S.A., Inc. v. Figgie International, Inc.*, 815 F.Supp. 1488, 1521 (D.Del.1993), *aff'd*, 18 F.3d 927 (Fed.Cir.1994). Factors to consider in determining whether a case is exceptional

---

**110.** It is true that challengers to a patent's validity have an added burden when they rely upon no prior art other than that which was considered by the PTO. *See American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1359 (Fed.Cir.),

*cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). However, in this case, the evidence demonstrates that the Crampsey reference was not properly understood during the Anton prosecution.

include the closeness of the case, and the conduct of the parties, including evidence of bad faith. *Id.*

■ The Court finds that this is not an exceptional case under § 285. Although the Court has found infringement of the Anton patent, the Court has also found that Monsanto's and BASF's infringement was not willful. More significantly, the Court has found that the Anton patent is invalid. Thus, the record does not support a finding of unfairness or bad faith on the part of either Monsanto or BASF. The Court therefore concludes that it would not be "grossly unfair" for DuPont to bear its own costs of litigation.